IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X          Index No.

JASON GOODMAN,

                        Plaintiff,          **COMPLAINT AND**
        -against-          **JURY DEMAND**

THE CITY OF NEW YORK and NEW YORK CITY
POLICE DEPARTMENT, NEW YORK CITY POLICE
DEPARTMENT LIEUTENANT GEORGE EBRAHIM,
NEW YORK CITY POLICE DEPARTMENT OFFICER
CHANDLER CASTRO, NEW YORK CITY POLICE
DEPARTMENT OFFICER JENNIFER CARUSO, NEW
YORK CITY POLICE DEPARTMENT OFFICER
KELVIN GARCIA, JOHN DOE 1, JOHN DOE 2, JOHN
DOE 3, JOHN DOE 4, JANE DOE, (fictitious names
intended to be officers, representatives, agents, servants of
the New York City Police Department, individually and in
their official capacities, ELON MUSK, X CORP, ADAM
SHARP.

                      Defendants.
-------------------------------------------------------------------X

        Plaintiff, Jason Goodman, ("Goodman") by and for himself pro se, for and with his

complaint against defendants, states the following under penalty of perjury with regard to

himself and his own actions, and upon information and belief with regard to all others:

**INTRODUCTION**

        1.     This is an action seeking compensation and damages pursuant to 42 U.S.C. §§

1981, 1981(a), 1983, 1986 ,1988, New York Executive Law Art. 15 (NY Human Rights Law)

New York State Human Rights Law Sections 290-297, the Administrative Code of the City of

New York, Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991,

the United States Constitution, and the Constitution and the laws of the State of New York as

well as for claims of conduct and deliberate indifference of the above named Defendants, their

agents, servants, employees, licensees, contractors, subcontractors, police officers, officers,

employees, assignees, and/or other affiliates agencies and departments in that they intentionally, maliciously, recklessly and with deliberate indifference to human life, each acting in concert with the other and each acting under the color of the law, violated Plaintiffs rights herein by wrongful and unlawful conduct including, but not limited to: unlawful use of excessive force, negligence, negligent hiring, negligent retention, negligent training, assault, battery, official misconduct, harassment, defamation, slander, libel, false/malicious prosecution, abuse of authority, abuse of power, abuse of trust, abuse of position, deviation and/or gross deviation from proper procedures, malice, recklessness, carelessness, negligence, negligent retention, negligent supervision, failure to intercede/stop/prevent, negligent/failure to discipline, intentional and/or negligent infliction of emotional distress, violation of civil rights, intentional and/or negligent infliction of cruel and unusual punishment, gross negligence, official misconduct, failure to/negligent monitoring of employees/police officers, failure to/negligent monitoring of employees/police officers with dangerous and/or violent propensities, causing, fostering, creating and/or allowing for dangerous/violent employees/police officers to harm citizens, including Plaintiff herein, and/or deprive citizens including Plaintiff herein of their safety, liberty, civil rights and their right to be free from false prosecution, use of excessive force, assault, battery, abuse of position, title, rank and shield, vicarious liability, respondent superior and/or punitive damages committed against and sustained/suffered by Plaintiff Goodman as a direct and proximate result of the Defendants' acts, conduct, omissions, negligence, intentional acts/omissions, recklessness, gross negligence, deliberate indifference in violation of Plaintiff's Federal and State rights herein.

### JURISDICTION

2.      This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

3.      The federal civil rights claims in this action are brought pursuant to 42 U.S.C. §
1983 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the
United States.

4.      The Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Fed. R.
Civ. P. 57 and 65authorize this Court to grant Plaintiffs the declaratory and injunctive relief they
pray for herein.

**VENUE**

5.      Venue is proper in the United States District Court for the Southern District of
New York pursuant to 28U.S.C. § 1391(b)(1) and (b)(2) as at least one of the Defendants resides
in this district and the events substantially took place within this district.

**NOTICE OF CLAIM**

6.      Acting in good faith and with the sincere hope of resolving this dispute, Goodman
cooperated with a NEW YORK CITY POLICE DEPARTMENT INTERNAL AFFAIRS
BUREAU, ("IAB") investigation conducted by NEW YORK CITY POLICE DEPARTMENT
SARGENT ROBERT O'NEILL, ("Sgt. O'Neill"). **(EXHIBT A)**

7.      Due to the surprisingly large amount of time required to complete the IAB
investigation, and Goodman's disappointment with the outcome, the filing of the notice of claim
arrived at the Comptroller's office one day past the ninety-day deadline. **(EXHIBIT B)**

8.      On October 23, 2023, Plaintiff initiated a Special Proceeding in New York
Supreme Court petitioning the court for leave to file a late notice of claim pursuant to NY
General Municipal Law Section 50-e(5). **(EXHIBIT C)**

9.      The claim was unopposed by W. Taylor Pulliam Assistant Corporation Counsel
Special State Law Enforcement Defense Division NYC Law Department. **(EXHIBIT D)**

10.     This action has been commenced within one year and ninety days after the happening of the unlawful events upon which these claims arise.

## PARTIES

11.     Plaintiff JASON GOODMAN ("Goodman") is a lawful resident of the United States and the State of New York.  Goodman is a documentarian, journalist and talk show host.

12.     At all times herein mentioned, Defendant THE CITY OF NEW YORK ("NYC") was and is a municipal corporation existing by and under the laws of the State of New York.

13.     At all times herein mentioned, Defendant NYC was and is a governmental subdivision of the State of New York.

14.     At all times herein mentioned, Defendant NYC is the public employer of Defendants NEW YORK CITY POLICE DEPARTMENT LIEUTENANT GEORGE EBRAHIM SHEILD NO. N/A ("Ebrahim"), NEW YORK CITY POLICE DEPARTMENT OFFICER CHANDLER CASTRO, SHIELD NO. 19008 ("Castro"), NEW YORK CITY POLICE DEPARTMENT OFFICER JENNIFER CARUSO, SHIELD NO. 168 ("Caruso"), NEW YORK CITY POLICE DEPARTMENT OFFICER KELVIN GARCIA, SHEILD NO. 2785 and "JOHN DOES" or "JANE DOES", fictitious names intended to be New York City Police Department Officers, NEW YORK CITY POLICE DEPARTMENT Auxiliary Officers, NEW YORK CITY POLICE DEPARTMENT Employees or NEW YORK CITY POLICE DEPARTMENT Contractors, or assignees individually and in their official capacities as NEW YORK CITY POLICE DEPARTMENT Officers, agents or assignees.

15.     At all times herein mentioned, Defendant NEW YORK CITY POLICE DEPARTMENT ("NYPD") is an agency of Defendant NYC, existing and operating by virtue of the laws of the State of New York and NYC for and with which Defendants Ebrahim, Castro,

Caruso, and "JOHN DOES" or "JANE DOES, fictitious names intended to be NYPD Officers, NYPD Auxiliary Officers, NYPD Employees, NYPD Contractors, or assignees individually and in their official capacities as NYPD Officers are agents, employees, licensees, servants, police officers, officers of the Defendants NYC and the NYPD are employed and act under color of law.

16.     At all times herein mentioned, Defendants Ebrahim, Castro, Caruso, and "JOHN DOES" or "JANE DOES", fictitious names intended to be NYPD Officers, individually and in their official capacities as NYPD Officers, NYPD Auxiliaries, contractors, deputies, or assignees, are agents, employees, licensees, servants, police officers, officers of the Defendants, NYC and NYPD and, at all times herein mentioned, were acting within the scope of their employment and under the color of law.

17.     Defendants Ebrahim, Castro, Caruso, and "JOHN DOES" or "JANE DOES, fictitious names intended to be NYPD Officers, individually and in their official capacities as NYPD Officers, NYPD Auxiliaries, contractors, deputies, or assignees, each individually and in his/her respective official capacity, and as employees/agents of the Defendants NYC and NYPD and as Defendants' duly sworn police officers, agents, servants, employees of NYC and/or NYPD at all times herein mentioned, are agents, servants and/or employees of NYC and NYPD and were acting in their respective individual capacity and/or in their respective official capacities as agents, servants and/or employees in their respective official capacity with all the actual and/or perceived/apparent authority granted, allotted, entrusted to them by NYC and/or NYPD in accordance with their official duties, positions, ranks and titles as NYPD Officers.

18.     In addition to the facts alleged in the foregoing paragraphs and following paragraphs, the individually named Defendants herein in the following subparagraphs are sued in his or her individual and official capacity; acted under color of law and within the scope of his or

her employment, to wit: under color of the statutes, ordinances, regulations, policies, customs, and usages of the State of New York and/or the City of New York:

    a.   Defendants Ebrahim, Castro, Caruso, Garcia, and "JOHN DOES" or "JANE DOES", fictitious names intended to be NYPD Officers, NYPD Auxiliaries, contractors, deputies, or assignees, of, with or to Defendant NYPD.

    b.   Defendant Elon Musk ("Musk"), in his personal capacity, as the owner of X Corp, additionally as the employer of John Doe 1, and as a contractee to NYPD.

    c.   Defendant John Doe 1 fictitious name intended to be NYPD Officer, NYPD Auxiliary, Special Patrolman pursuant to Title 14 §106 of the Administrative Code of New York, contractor, deputy, or assignee, of, with or to Defendant NYPD.

    d.   X Corporation, ("X Corp"), the corporate entity known as Twitter, Inc. at the time of the occurrence of the events described herein.

    e.   Defendant Adam Sharp, ("Sharp") in his personal capacity as an individual collaborator associated with various former X Corp executives and employees.

19.    At all times herein mentioned, Defendant NYC, owned, managed, controlled, maintained, trained, hired, retained, employed and/or supervised the Defendants the NYPD and Ebrahim, Castro, Caruso, and "JOHN DOES" or "JANE DOES", fictitious names intended to be NYPD Officers, individually and in their official capacities as NYPD Officers.

20.    Defendants NYPD Officers Ebrahim, Castro, Caruso, and "JOHN DOES" or "JANE DOES ", fictitious names intended to be NYPD Officers, individually and in their official capacities as NYPD Officers, are agents, servants, licensees, police officers, officers and/or employees of Defendants who, at all times herein mentioned, acted in their individual capacities and/or acted within the scope of their employment and under the color of law.

21.     Defendants and "JOHN DOES" and "JANE DOES", fictitious names intended to be officers, representatives, agents, servants, contractors, deputies, assignees of Defendants NYC, the NYPD and/or Musk and X Corp individually and in their official capacity and/or as agents, servants, employees in their respective official capacity with all the actual and perceived or apparent authority granted, allotted, entrusted to them by NYC and NYPD in according with their official duties and titles.

## FACTUAL BACKGROUND

22.     This is an action against defendants to redress wrongful and unlawful conduct including, but not limited to: assault, battery, false imprisonment, unlawful discrimination based upon race, ethnicity and/or national origin, and related claims in violation of: Title VII of the Civil Rights Act of l964, as amended by the Civil Rights Act of l991, 42 U.S.C. §§ 1983, 1981, 1981(a), New York Executive Law Art. 15 (NY Human Rights Law) New York State Human Rights Law Sections 290-297, the Administrative Code of the City of New York, the Constitution of the State of New York and the laws and the Constitution of the United States of America, denial of Plaintiffs State and Federal Constitutional Right to Equal Protection of the Law in violation of the 14th Amendment to the Constitution of the United States of America, denial of Plaintiff's right to be free from excessive force and/or free from cruel and unusual punishment in violation of the First, Fourth and Fifteenth Amendments of the U.S. Constitution and the loss of related income and benefits therefrom.

23.     On or about October 27, 2022, defendant Musk purchased Twitter, Inc., today known by its new corporate identity, X Corp.

24.     On October 31, 2022, it was widely reported that Musk would terminate fifty percent or more of the staff at X Corp as part of a radical restricting under his new management.

25.     Defendant Adam Sharp, ("Sharp") was an early and influential executive at X Corp while it was still Twitter from 2010 through 2016.  Sharp served as the company's first ever U.S. Government Liaison, the Manager of Government and Political Partnerships, and later Head of News, Government and Elections.  Prior to his employment there, Sharp was perhaps Washington D.C.'s earliest Twitter adopter and most vocal advocate.  According to his own Linkedin.com resume, Sharp integrated Twitter's API into the C-SPAN broadcast workflow while he was an executive producer there in 2009, (https://www.linkedin.com/in/adamsharp).

26.      Sharp is widely regarded as the creator of Twitter's historic White House Presidential Townhall in 2011 after introducing then CEO Jack Dorsey to his personal friend and former Senate associate, forty-fourth U.S. President Barack Obama ("Obama"). (https://archive.nytimes.com/mediadecoder.blogs.nytimes.com/2011/06/30/obama-to-tweet-during-twitter-town-hall/).  Sharp is an unequivocal expert in the field of social media and politics, and he has expressed a career-long, laser-like focus on Twitter.

27.     Goodman has been involved in prior legal action with Sharp beginning in 2020, (*See National Academy of Television Arts and Sciences v. Multimedia System Design Inc. D/B/A/ Crowdsource the Truth*).  Various odd circumstances surrounding the lawsuit prompted Goodman to investigate further.  Goodman's investigation led to him publishing a five-part report titled *The Twitter Coup*, (https://crowdsourcethetruth.substack.com/p/the-twitter-coup). **(EXHIBIT E)**

28.     The report was a culmination of more than two years of research.  In it, Goodman cited unimpeachable evidence that supports allegations that Sharp worked with former FBI General Counsel, current U.S. District Court Judge Valerie Caproni, to violate the Fourth Amendment and multiple other state and federal laws, by granting the FBI and U.S. Government virtually unfettered, clandestine access to Twitter.  Judge Caproni was FBI General Counsel from

2003 through 2011, until former House Judiciary Committee chairman, the late John Conyers, demanded she be removed for Fourth Amendment and other serious criminal violations, (https://web.archive.org/web/20100419051249/http:/judiciary.house.gov/news/100414.html).

29.     If the content of Goodman's report were untrue and the allegations incorrect, Sharp would be motivated to refute them in court with true facts and litigation against Goodman would be an appropriate venue in which to do that.  There has been no shortage of litigation between Goodman and Sharp, however not one of the accused have refuted any element of evidence cited in *The Twitter Coup*.  Despite being implicated, even Judge Caproni has not challenged the facts or so much as attempted to strike the filing as scurrilous or false.  Were Goodman's allegations false, it would be directly within the scope of Judge Caproni's judicial authority to make that determination, but she has not.  Her inaction further supports the veracity of Goodman's claims.  Because Sharp and others cannot refute Goodman's truthful claims, they rely on underhanded dirty tricks, schemes, and abusive, vexatious litigation tactics to thwart Goodman.  Goodman alleges the NYPD assault was only another of these coordinated tactics, intended to prevent Goodman from providing facts about the criminal past of Musk's X Corp and former executives including Sharp, who we now know were scrambling to hide evidence of wrongdoing in their final days of employment at the now defunct social media brand.

30.     Through discovery in this instant action, Goodman expects to obtain information that will prove that Sharp has communicated with third parties, either directly or indirectly, who in turn communicated with individuals who were encouraged, coerced, employed or otherwise directed to engaged in a wide array of tactics including assault, abuse of authority, wrongful imprisonment, denial of rights under color of law, and other criminal acts, calculated to prevent

Goodman from delivering information to Musk at the outset of his reorganization of X Corp and preventing Goodman from publicizing true but unfavorable facts of these matters to the public.

31. On October 31, 2022, upon reading news that Musk would fire most X Corp employees, Goodman decided to do a livestream video broadcast standing outside X Corp's New York City headquarters at 249 West 17th Street New York, NY, herein after, ("Twitter NYC"). (https://odysee.com/@Crowdsourcethetruth:d/ghosttowntwitterheadsroll)

32. While live broadcasting outside Twitter NYC on October 31, 2023, (https://odysee.com/@Crowdsourcethetruth:d/ghosttowntwitterheadsroll:8?r=C2tm6zsMvSkK2rATN8ne1yXNTFGxjvh4), Goodman observed a Tesla Model S automobile ("Tesla S") with New Jersey Dealership license plates.  Goodman found this odd because he is aware that Tesla cars are not sold through traditional dealerships.

33. Goodman further observed a group of tall, burly individuals wearing what appeared to be expensive tailored business shirts standing around the car in a way that made them appear to be guarding it.  Goodman observed a black SUV parked directly behind the Tesla S with additional individuals who also appeared to be security or law enforcement.  Goodman observed protrusions at the small of the back of more than one of these individuals that caused him to believe they were carrying concealed firearms.  Because it is so unusual to observe anyone other than an NYPD officer with a firearm in NYC, and because Goodman is aware New York State law and NYPD policy make it virtually impossible for any individual to carry a concealed firearm, these observations caused Goodman to believe the individuals were specially licensed professional security or perhaps undercover law enforcement officers.

34. Upon observing the totally of this evidence, Goodman began to speculate that it appeared likely Musk was inside Twitter NYC and might be there to do the firing of certain

employees personally.  Goodman began to interact with his audience, responding to live viewers'
suggestions offered through the live chat provided by YouTube.  Hundreds of viewers watched
and encouraged Goodman to remain outside the building to wait and see if Musk would emerge.

35.     Approximately 20 minutes into Goodman's broadcast, John Doe 3 attracted
Goodman's attention by shouting, "They got fired, it's over, go home!"  He then started a verbal
altercation with Goodman.  John Doe 3 further instructed Goodman, "You need to leave sir."
This discussion was taking place in public on 17th Street.  Goodman was present lawfully and
John Doe 3 had no inherent legal authority to instruct Goodman to vacate the public premises.
Goodman replied, "I don't need to leave, who the hell are you telling me to leave?"  John Doe 3
continued to berate Goodman stating, "I think you need to get the f**k up outta here, this is my
plantation," and concluding with, "Black Lives Matter motherf**ker!"  John Doe 3 can be seen
video recording the interaction on his phone just as Goodman was.   John Doe 2, John Doe 4 and
Jane Doe were among the other individuals situated outside Twitter NYC apparently waiting for
Musk.  The group expressed their dissatisfaction with Goodman's presence and stated that they
did not consent to being recorded and would call the police if Goodman did not leave.  Goodman
told them they had no right to privacy in public, so they called 911.  NYPD Sargent Stephen
O'Leary Shield number 3306 ("O'Leary"), and one other unknown NYPD officer responded.

36.     Goodman explained the dispute to O'Leary who then separately interviewed John
and Jane Does.  After returning to Goodman having completed the interview, O'Leary agreed
Goodman had acted lawfully and advised him to avoid further contact with the Doe individuals if
he chose to continue recording video in public.

37.     Approximately fifty-one minutes and fifty-four seconds into Goodman's
broadcast he approached the individuals surrounding the Tesla S, stating, "excuse me, guys, I'm

COMPLAINT AND JURY DEMAND                                                              11

approaching you, and I believe you have a gun, so I want to make sure you know that I'm here. I'm not trying to be a pain in the *ss. I want to convey some information to Mr. Musk, can you help me do that?  Information about stuff that he's talking about this morning, criminal stuff that the Twitter board and previous people at Twitter were doing.  You guys seem to be security. Anybody I could contact about that?"  One individual responded stating, "offhand, I don't know."  Goodman thanked him and returned to the opposite side of the street where he continued recording for approximately one more hour without incident and then went home.

38.     The following morning, on November 1, 2022, it was widely reported that Musk had been in NYC the night before and had attended a high-profile celebrity Halloween party dressed as "the Devil's Champion". ([https://www.newsweek.com/elon-musk-leads-celebrities-attending-heidi-klum-halloween-party-costume-1755931](https://www.newsweek.com/elon-musk-leads-celebrities-attending-heidi-klum-halloween-party-costume-1755931)).  Later that same day, Musk himself updated his location on www.twitter.com to indicate he was at Twitter NYC.

39.     Goodman, realizing the opportunity to directly inform Musk of *The Twitter Coup*, returned to Twitter NYC in the afternoon of November 1, 2022, and approached one of the individuals guarding the same Tesla S car.  Goodman asked the individual if he could assist in sharing a message with Musk.  The individual curtly responded, "no."  Goodman realized a professional security guard likely would not allow himself to become preoccupied with taking messages or even engage in any conversation beyond assessing Goodman as a threat.  Goodman returned home and typed a short letter on one sheet of paper.  Goodman inserted the pater into a U.S. Postal Service Priority Mail envelope and returned later that evening to Twitter NYC.

40.     Goodman observed a different individual guarding the Tesla S, herein after, ("John Doe 1").  As Goodman approached John Doe 1, he extended his hand making a 'stop' gesture and said, "I cannot deliver any messages for you."  Goodman stood stationary and

replied, "I am not going to ask you that, may I approach?"  Doe 1 agreed, and Goodman asked, "may I wait here outside this building and when Mr. Musk comes out, may I ask him if I can hand him this envelope?'  John Doe 1 responded affirmatively and thanked Goodman for asking. John Doe 1 did not deny that Musk was expected to exit the building.  Goodman sat down on a standpipe extending out of the front facade of 227–239 West 17th Street, approximate three doors east of Twitter NYC, on the sidewalk adjacent to the Tesla S parked with John Doe 1 standing beside it.  Maintaining awareness of John Doe 1's concealed firearm, Goodman made a point of situating himself within view of the parked car while keeping his mobile phone in one hand and a conspicuous U.S. Postal envelope in the other, to be clear he had no suspicious intentions.

41.     As Goodman waited, he observed John Doe 1 maintaining general situational awareness, looking at his surroundings, checking his mobile phone, the car, the buildings, and everything around, in the manner one might expect an alert professional security guard would.

42.     Goodman decided it would be a good idea to capture any potential interaction with Musk on video and began to record on his mobile phone.  Within the first sixty seconds of Goodman's recording, John Doe 2 approached John Doe 1 at the Tesla S and stated, "y'all don't have to worry, we're gonna block all these cars for you."  John Doe 1 exhibited a casual, unconcerned response and resumed looking at his phone.  This interaction between John Doe 1 and John Doe 2 was not noticed by Goodman on November 1, 2022 at the time that it occurred. Only after the altercation and review of the video did Goodman realize that John Does 1 and 2 had interacted like this.  The interaction causes Goodman to believe John Doe 1 and Joe Doe 2 know each other and that either one or both of them are undercover law enforcement or part of a clandestine security team working for Musk, X Corp, Twitter NYC, NYPD, or all of those.

43.     Approximately two minutes after interacting with John Doe 1, John Doe 2, John Doe 3, and Jane Doe approached and surrounded Goodman.  John Doe 2 engaged Goodman in conversation, asking, "How are you today?"  Goodman responded saying, "I'm well, what can I do for you?"  After pausing and noticing he was surrounded, Goodman continued stating, "I'm feeling intimidated by the two of you coming over here and standing near me."  In that moment, Goodman had not yet noticed John Doe 3 standing slighting farther away had begun recording again on his mobile phone, just as he had the previous day.  Goodman did not initially recognize any of the three from the previous day.  As Goodman noticed John Doe 3 recording, he presumed the individuals intended to start a fight and then video record a gang beating to upload to the internet for fun.  This realization, in combination with the antagonizing rhetoric each of them engaged in, put Goodman in acute fear of imminent and potentially extreme bodily injury.

44.     Jane Doe began ruthlessly harassing Goodman with insults and profanity of such an offensive nature it was shocking to observe.  The thrust of her argument was that, according to her, Goodman was a homosexual coward who should leave and go home.  Goodman responded saying that he was minding his own business and that she had no authority to tell him what to do.

45.     Goodman continued to record as the altercation intensified, attempting to ignore Doe, while focusing his camera on the entrance of Twitter NYC and anticipating Musk's exit.

46.     Jane Doe repositioned herself blocking Goodman's camera view, exclaiming, "yeah mutherf****r, [that's] a shield mutherf****r," thrusting what appeared to be an NYPD badge directly at Goodman's camera, striking it and Goodman in the first incident of assault. The video of the badge is not clear enough to make out a number or any other details, but the intent of this action is violative of New York Administrative Code Title 14 § 107, Unlawful Use of Police Uniform or Emblem, unless Jane Doe was granted such authority by NYPD.

COMPLAINT AND JURY DEMAND                                                          14

47.     Even if Jane Doe is authorized by NYPD to carry an NYPD badge pursuant to New York Administrative Code Title 14 § 107 and other applicable laws, no law or statute grants anyone authority to assault a peaceful law-abiding citizen with any NYPD equipment.

48.     Goodman immediately demanded, "Let me see the shield, let me see the badge." Goodman asked directly if Jane Doe was NYPD, but she refused to identify herself.  John Doe 2 restrained Jane Doe and moved her away from Goodman, but the two remained in close proximity and continued making threats such as Jane Doe announcing, "I will f**k him up!"

49.     John Doe 1 can be seen throughout the video in the background.  The large touchscreen inside the Tesla S can be seen in Goodman's video and it appears to be on and recording the surroundings via a feature Tesla calls "Sentry Mode".  It is implausible to presume that a person standing in such close proximity would not be aware of the protracted argument unfolding in front of them.  It is less plausible to presume a security professional would not be aware that a loud altercation was happening right near the property of his designated protectee.

50.     Jane Doe persisted in her harsh antagonization of Goodman, now provoking him with a pen in her hand, accusing Goodman of being racist.  Jane Doe repeatedly taunted Goodman, challenging him to fight her with statements including, "I will f**k you up", "you got to back up them f*****g words", and "what makes you intimidated, that we're minorities?"

51.     Goodman observed, Jane Doe had nothing to write on and was holding a pen like a knife while wielding it like a stabbing weapon, thrusting it toward Goodman repeatedly.

52.     Goodman noticed a large number of baseballs in the pockets of the sweatshirt worn by Jane Doe.  Goodman presumed she was carrying these common items because unlike guns, knives, or other weapons, these were street fighting tools meant to appear unassuming, but

able to turn deadly in an instant.  Goodman announced loudly, "What have you got? Baseballs

here?  I think you are a threat to whoever is in that building..."

53.     Security professional John Doe 1 was standing only feet away when Goodman

shouted this loudly, but he did not even look to assess what Goodman was describing.

54.     The lack of interest in multiple potentially serious security issues was a "dog that

didn't bark" moment and Goodman to believe John Doe 1 knew Jane Doe and knew she was not

a threat to Musk, despite having five or more baseballs in her pockets and wielding a pen like a

stabbing weapon while relentlessly spewing foul language and violent threats within earshot.

55.     Because of the proximity of her pen to Goodman's face, and the enthusiasm with

which Jane Doe was thrusting it at him, Goodman became immediately concerned that her

intention was to stab him in the eye or neck or that any possible "accident" could cause either.

56.     Goodman moved his hand quickly to block the pen and deflected it to the ground.

Jane Doe continued arguing unabated, apparently not noticing that she had dropped the pen.  The

action prompted John Doe 2 to drop items he was holding, grab Goodman and begin shouting,

"Yo bro, backup, backup, backup."  He proceeded to put his hand at the base of Goodman's neck

pinning him against the façade of 227–239 West 17th Street.  John Doe 2 tightened his grip on

Goodman's neck repeating, "back up, back up," while immobilizing Goodman against the wall.

57.     Goodman looked at John Doe 1 and observed John Doe 1 looking directly back at

him.  Goodman shouted, "You see this?  Call the cops please this f*****g [kid is choking me!]".

Before Goodman could finish his plea, the phone dropped to the ground and stopped recording.

58.     Despite being an armed security professional, and the largest, most physically fit

person present by far, John Doe 1 displayed a fearful countenance as his looked back with eyes

wide open.  John Doe 1 stood frozen and did not respond to Goodman's request, nor dial 911.

COMPLAINT AND JURY DEMAND                                                                16

59.     As the struggle continued, Goodman had a moment of clarity, finding it strange that he could breathe and talk while John Doe 2 was restraining him and gripping his throat.  The careful, calculated way in which John Doe 2 pushed Goodman into the wall by the base of the neck and then tightened his grip around the muscles of the neck, restraining Goodman but stopping short of violently choking, asphyxiating, or striking him, seemed like strange behavior for a random street attack.  John Doe 2 or any other random street fighter could easily and would likely resort to random shoving, punching, or other sloppy tactics likely to cause serious injury.

60.     Repeated chants of "back up, back up, back up" also seemed strange at the time. Goodman was pinned to the wall and could not back up or move at all.  The persistent, chanting reminded Goodman of police tactics he observed while reporting on protests in the past in NYC.

61.     All of these factors cause Goodman to believe that John Doe 2 could be an undercover NYPD officer, an NYPD trainee, NYPD Auxiliary, a Special Patrolman pursuant to Title 14 §106 of the Administrative Code of New York, or has at least had some police, or other security or self-defense training and was practiced and skilled in physically restraining people.

62.     With John Doe 2's hand still around Goodman's neck restraining Goodman against the wall, a fourth individual who Goodman had previously presumed to be a news photographer, ("John Doe 4") began to approach causing Goodman to immediately fear extreme imminent bodily injury or possible death should the altercation continue to escalate.

63.     With an open hand, Goodman pushed John Doe 4 back which prompted John Doe 2 to release Goodman and caused the crowd to disperse.  They returned to their former position in front of Twitter NYC while Jane Doe remained back in closer proximity to Goodman.

64.     Goodman called 9-1-1 on his now damaged phone.  During the call, Goodman observed Jane Doe listening to him speak with operator.  Once the called ended, Goodman

resumed video recording on his phone, announcing to Jane Doe, "Your young friend is going to be arrested for assault."  Jane Doe responded shouting "No he's not you're disrespectful!" She went on to advise him to, "Make sure you keep that same energy and speak to the police."

65.    To Goodman's astonishment, none of the assailants made any effort to flee the scene, not even attempting walk away despite the fact that nothing impeded them.  A reasonable observer would be likely to conclude there is no logical reason for them to have remained. They had no fear of arrest for the multiple assaults, each just committed.  If Goodman is correct and they are affiliated with NYPD, that might explain their indifference to arrest or prosecution.

66.    NYPD responded with approximately four to six cars and seven or more uniformed officers including Ebrahim, Caruso, and Castro.  Despite informing the officers that he had been assaulted and choked, none of the officers examined Goodman's neck.  During the course of Caruso's interview with Goodman, Castro smiled, laughed, and openly mocked Goodman.  When Goodman admonished Castro for doing this, Ebrahim instructed Castro to move away from the interview towards the vehicles and other officers.  Caruso asked John Doe 1 if he had witnessed anything to which he responded, "no" before quickly departing with video evidence of the altercation stored within the Tesla S or Tesla's offsite Dojo Artificial Intelligence.

67.    Despite the fact that the only witness to the event who was not one of the assailants claimed to witness nothing, Caruso cited Goodman with a disorderly conduct summons, which read, "At TPO the undersigned is informed by someone known to the dept. that the defendant caused public alarm." **(EXHIBIT F)**

68.    By identifying Goodman as a "defendant" rather than a suspect, Laruso betrays the predetermined outcome of this interaction.  Furthermore, Laruso knew, or reasonably should have known that she deliberately made a false statement that was known to her to be false at the

COMPLAINT AND JURY DEMAND                                                                18

time she made.  If John Doe 1 was the only witness in public not directly involved in the altercation and he witnessed nothing, there could not reasonably have been any member of the public to report it to Caruso.  The form of the summons itself warns filers, in case of inadequate training as with Caruso, that "[f]alse statements made herein are punishable as a Class A misdemeanor pursuant to section 210.45 of the Penal Law.  Affirmed under penalty of law."

69.     Upon returning home, disgusted with NYPD's unprofessional and abusive response, Goodman observed red finger marks on his neck in the location where John Doe 2 had grabbed and applied continuous pressure.  Goodman photographed the bruises. **(EXHIBIT G)**

70.     Four days after the incident on November 5, 2022, Goodman went to the 10th Precinct with the intention of amending the official report of the November 1 incident to include the photographic evidence of John Doe 2 grabbing, detaining, and injuring Goodman.

71.     Upon arriving at the 10th Precinct, Goodman observed officer Castro visible through the open front door and greeted him saying, "Hey, Castro. How are you doing, man? I need the report from this. Can I speak to you for a second?"  Castro responded with an unenthusiastic, "great…" before walking away and refusing initial requests to come to the door. Goodman repeated, "Officer Castro can I speak to you please?"  Castro replied snidely, "no, thanks."  Because of the dishonest, unprofessional, and hostile treatment Goodman had experienced only days prior with 10th Precinct Officers, and this renewed hostility from Castro, Goodman did not feel safe interacting with the police without his own concurrent video record of the interaction.  Goodman was aware video recording is not allowed inside the precinct and so, was attempting to speak with an officer outside, or through the open door.  Goodman continued to speak, "I'm trying to obtain the report from this. You guys did not view the evidence. You did not examine my neck. I have photographs of red fingerprint marks on my neck from where I was

choked."  This caused Castro to come to the door where he refused Goodman's request to amend the report insisting that there was no report and there was no assault and reminding Goodman that he had received a summons as a result of the incident.  Goodman was shocked and insulted, not only had the police cited him after he was attacked, but Castro was also now denying the reality of what occurred.  Goodman insisted that he be allowed to file a report to which Castro responded, "There is no report to make because you were given a summons."  Castro went on to say that there was no one available to take a report and, "there's no evidence to provide." Castro's crude approach to gaslighting reveals the simple-minded tactics he and his fellow misguided NYPD officers utilize in what seemed to be a well-practiced procedure of violating citizens' rights.  Castro stated his belief that citing Goodman negated the existence of any actual assault and precluded the possibility of filing any report.  Flabbergasted by this ridiculous assertion, Goodman took out his phone to show Castro the photograph of his neck where John Doe 2 had caused injury.  Castro continued to obstruct, refused to view the phone, and repeatedly insisted there was no evidence, there was no assault and there would be no report.  Realizing Castro would not relent, Goodman raised his voice to shout past Castro, through the doorway in an attempt to draw the attention of another officer visible inside the precinct.

72.    NYPD Officer Kelvin A. Garcia, Shield No. 2785, ("Garcia") came to the door, and immediately stated, "I just heard the story of what happened, there is no report to be filed." After continuing their disrespectful and unprofessional treatment of Goodman for several minutes, the officers refused to take a report and dismissed Goodman with Castro saying, "see you later," as the officers went back inside the 10th Precinct closing the door behind them.

73.    Incensed, Goodman shouted, "I demand to file a report, Castro!  I'm going to sue every officer involved under the Bivens Act.  Come out here and take a report!"  This prompted

Garcia to remerge from the Precinct and warn Goodman, "because you are acting the way you are, we called an ambulance for you and it's going to take you to the hospital."

74.     Goodman immediately perceived this as a threat of involuntary incarceration into a potentially dangerous hostile medical facility.  Goodman discontinued the conversation and immediately left as Garcia sunk back into the 10th Precinct doorway.  This veiled threat was an abuse of power by Garcia that appeared calculated to dissuade Goodman from filing a report including evidence of the assault, and compelled Goodman to leave as the officers desired.

75.     The following day, on Sunday November 6, 2022, in what can only be described as a remarkable coincidence, while broadcasting another live stream near Central Park during the Marathon, Goodman encountered Ebrahim on duty.  Goodman approached Ebrahim informing him, "I've got evidence on my phone that you refused to look at. You said there was no evidence that I got strangled. I took these photographs right when I got home.  You see the red marks on my neck?"  Ebrahim immediately acknowledged the obvious injury caused by pressure applied to Goodman's neck by John Doe 2 while John Doe 2 restrained Goodman's freedom of movement against Goodman's will, wrongfully imprisoning him, and in abuse of authority under the color of law and in violation of Goodman's rights.  Ebrahim went on to say, "we're gonna take a report for you," instructing Goodman to go to the 10th Precinct the following day.

76.     On Monday November 7, 2022, Goodman returned once again to the 10th Precinct and approached NYPD Officer Matthew Powlett Shield No. 31995 ("Powlett"), who was standing just outside the entrance.  Goodman told Powlett he had been instructed by Ebrahim to come in to file a report.  Powlett began recording on his bodycam and asked Goodman to explain the nature of the incident.  Just as Goodman began, Powlett received a phone call on an iPhone Pro Max, possibly from Community Affairs Officer Jarett Dilorenzo Shield No. 13318

("Dilorenzo").  Powlett interrupted the interview with Goodman and began to speak on the call, saying, "Hey, Jarrett, [I] just had um, some guys that are doing security for Google, and they're armed, so I just needed them to link up with you to do… all right… I'm actually talking with a complainant right now about assaults so just give me a number and they can leave a message. You know how like the Hudson Yards security guys have like certain things that let us know that they're armed and everything, they just have like some… two gentlemen came from Google, they're going to be doing armed security there and they just need to touch base with you to show like what identifiers they have and everything else.  So like blast it out in the email…. I have my camera on right now because I'm talking with someone who's like an assault victim, so I won't get into it too much.  But if you get a call, it'll be like the two guys from Google that are going to be armed security just like... All right?  I thought you were at the precinct, so I was going to have them talk with you now.  No, no.  No, I think I had Joe reaching out to you.  So, like, I'm, I guess we'll get him, like, a card or something so we can follow up.  All right. So sorry to bother you." Ending the call and turning back to Goodman, Powlett further stated, "I'm sorry about that. Sir, I was waiting on a call from my community affairs person."  Dilorenzo is a Community Affairs officer at the 10th Precent.  Powlett left Goodman on the sidewalk as he went inside to locate Ebrahim.  When he came out and informed Goodman that Ebrahim was not on duty that day, he suggested he could continue to take the report.  Powlett was aware Goodman had been recording the entire conversation so far, but he attempted to coerce Goodman to stop recording and come inside to file the report.  Just as he did, Powlett punched his own leg and slammed his foot on the sidewalk in a bizarre and inexplicable manner that made Goodman extremely uneasy.  The conversation deteriorated rapidly, and Goodman left without filing a report.

77. Powell's telephone conversation caused Goodman to believe that 10th Precinct officers are in a regular practice of negotiating off duty or other unofficial private security work. To learn more about this, Goodman contacted the Detective Squad at the 10th Precinct and spoke with Detective Gene Ruda Shield No. 2173, ("Ruda").  Goodman asked Ruda if he were planning an event that included a celebrity guest speaker that required an out of state concealed carry personal security guard, what procedure he would need to go through with NYPD.  Ruda provided a phone number for the legal records office and suggested they might be able to provide more information.  This prompted Goodman to inquire further, "but just to be clear, it's something that can be done?  There's a legal process to do this with the NYPD?  To bring a licensed gun, you know, professional bodyguard, concealed carry guy from Texas and have him legally concealed carry a gun in New York City once we complete whatever process they'll tell me about, correct?"  This direct line of questioning prompted Ruda to respond, "Well, as far as I know, the law is very gray on that. That's why I don't want to give you any wrong information."  Goodman has tried the legal records office phone number several times with no response.

78. On January 24, 2023, Goodman was contacted by Sargent Robert O'Neill Shield No. 5041, ("O'Neill") the 10th Precinct's Assistant Integrity Control Officer who had been assigned to investigate Goodman's complain with the Internal Affairs Bureau.  O'Neill took what Goodman believe to be an inordinately large amount of time to investigate the information and ultimately came to a conclusion that was not satisfactory to Goodman and did not provide the identities or any opportunity to press charges against Goodman's assailants.  The incompetent prosecution and undesirable outcome of O'Neill's investigation was the final motivation toward bringing this instant action.

79.     Goodman observed an array of evidence that caused him to believe that officers in the 10th precent might be engaging in the trade of temporary, illicit, or otherwise illegal concealed carry permits, waives or some other "identifiers" as referenced by Powlett in his phone conversation with Dilorenzo on November 7, 2022.  The evasive way in which Powlett conducted the conversation about armed security in front of Goodman, caused Goodman to believe the two were not discussing official police procedures.  This phone call caused Goodman to suspect that some similar arrangement could have been made with Musk, X Corp, Twitter NYC, John Doe 1 or another third party which allowed Musk's private security to carry concealed firearms within New York City despite what Detective Ruda described as, "extremely gray" laws on this specific topic.  The totality of evidence causes Goodman to believe that Ebrahim, Caruso, Castro, NYC, NYPD, and the other defendants abused their authority and retaliated against Goodman using excessive force and attempted to intimidate him and wrongfully imprison him to protect an illicit private security operation that may include illegally granting individuals the authority to carry concealed firearms within NYC.

## ARGUMENT

### Violation of Plaintiff's Constitutional Rights Pursuant to 42 US Code § 1983

80.     The 14th Amendment of the U.S. Constitution guarantees all citizens "equal protection of the laws".  There is no stipulation requiring an individual to pay an entry fee or purchase a subscription.  The NYPD is not a rights vendor offering service only to those who pay.  The United States Constitution is free and intended to benefit all Americans equally and with guaranteed equal protection of the laws.  The NYPD when secretly employed by Musk however, appears to provide unequal protection to billionaires and their hired security professionals, while abusing anyone who gets in their way or is wrongly perceived as doing so.

COMPLAINT AND JURY DEMAND                                                    24

81.      It is widely known that despite the existence of the 2nd Amendment, it is near impossible to obtain a concealed carry permit in NYC.  NYPD maintains an arguably illegal and unconstitutional grip of control over permitting individuals to carry concealed firearms.  This strict department policy appears to have created a black market that opportunistic NYPD officers appear to exploit actively and regularly.

82.      After a conversation on or around November 7, 2023, outside the 10th Precinct with NYPD Officer Powlett, Goodman became aware that NYPD officers including Powlett and allegedly Community Affairs officer Dilorenzo, are engaged is a side business providing security, approving armed guards, or somehow obtaining "identifiers" an unclear term used by Powlett.

83.      Goodman has observed a large amount of evidence primarily obtained through calling various offices of NYPD, that cause him to believe there are no clearly defined laws or even departmental policies governing this particular and highly sensitive topic.

84.      On information and belief, Goodman alleges multiple NYPD officers are engaged in the illicit business activity of contracting with corporations or VIP individuals providing security services of various types, many of which appear outside the context of the law.  These transactions appear to be conducted in code on personal phones, with a degree of stealth.  These factors also suggest the activity is not departmentally approved and may be illegal.  This would explain the illegal behavior exhibited by ever officer from the 10th Precinct that Goodman has interacted with in regard to this instant action.

85.      Goodman's constitutional rights to engage in the First Amendment protected activity of journalism were denied by a coalition of individuals brought together to accommodate Musk through a mysterious business arrangement between NYPD, Musk, X Corp, Twitter NYC and perhaps others.  Goodman alleges it was this business relationship, and the mishap that

COMPLAINT AND JURY DEMAND                                                                    25

occurred outside Twitter NYC that risked exposing it, which motivated NYPD officers to maliciously prosecute Goodman for disorderly conduct, rather than allow him to press charges against his Doe attackers.  NYPD denied Goodman's First, Fifth and Fourteenth Amendment Constitutional rights while assaulting and illegally detaining him in violation of the law.

86.    Goodman alleges individuals within X Corp, which was still largely under previous management's control at the time of this incident, and their agents, associates, employees, assignees, and affiliates are aware of Goodman's reporting and were aware he was reporting from outside their office on October 31, 2022.  Certain individuals associated with X Corp including Sharp, are aware Goodman has exposed evidence of their alleged criminal activity.  More than one year ago, Goodman's Twitter Coup report accused Sharp of treasonous acts and Sharp has not refuted any of these allegations.  Sharp would be highly motivated to prevent Musk from learning the allegations contained in Goodman's report.  Musk could take action that would certainly lead to civil if not criminal prosecution.  Preventing Goodman from broadcasting his investigative reports has been a central focus for Sharp since Goodman first became aware of him on August 20, 2020.  Sharp speaks frequently about the need to control "disinformation" but he cannot disprove any of the information Goodman has presented which exposes Sharp's treasonous acts.

87.    John and Jane Does became particularly interested in Goodman after he stated on air during the October 31, 2022 live broadcast that he would convey information to Musk that would reveal evidence of criminal acts taking place at the time in his newly acquired company.

88.    Goodman alleges some third party was communicating with John and Jane Does and instructed them to specifically deter Goodman from Communicating with Musk.  There is no doubt the team was focused on removing Goodman from the scene and they did succeed in

preventing Goodman from delivering his message to Musk. Preventing Goodman from learning the identities of his assailants was a required step, that could only be carried out by NYPD. Caruso as led by Ebrahim made the requisite false statement need to issue Goodman a summons which caused Castro to believe negated the possibility of Goodman filing a report about the incident. To wit, this development gave Castro the excuse that he used to further abuse Goodman's rights when he and fellow officer Garcia, directly threatened Goodman in the course of denying his right to file a police report at the 10th Precinct. In order to protect the alleged illegal gun licensing operation, it was necessary for NYPD officers to prevent Goodman from exposing any illicit relationship between Goodman's attackers, NYPD, Musk, X Corp and Twitter NYC. Evidence suggests Defendants entered into an agreement with one another to provide various security services including illegally issued temporary concealed carry permits to support Musk's work at Twitter NYC on October 31, 2022, and November 1, 2022.

## FIRST CLAIM FOR RELIEF

### Unlawful Detention

89.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs with the same force and effect as if as if fully set forth herein.

90.     Defendants NYC and NYPD are employers within the meaning of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. Section 1981, 1981(a), and 1983 and are vicariously liable and liable pursuant to respondeat superior for the actions, conduct, omissions and negligence of their employees including, but not limited to, the individually named Defendants herein, to wit: Defendants Ebrahim, Castro, Caruso, Garcia, John Doe 1, John Doe 2, John Doe 3, John Doe 4 and Jane Doe.

91.     Defendants Ebrahim, Castro, Caruso, Garcia, John Doe 1, John Doe 2, John Doe 3, John Doe 4 and Jane Doe's unlawful, discriminatory, retaliatory, abusive and/or hostile conduct and unlawful disparate treatment against Plaintiff because of his race, color, gender, sexual identity, and/or national origin, and in retaliation for his exercising his right to engage in the first amendment protected activity of journalism and separately filing legitimate reports with law enforcement including but not limited to Plaintiff's complaints about the NYPD Officer defendants' physical and criminal assault, excessive use of force, abuse of authority and other actions against Plaintiff, as set forth in detail herein.  Defendants compelled and forced Plaintiff to refrain from filing a police report and denied the excessive force used against Goodman in the process of wrongfully and illegally detaining him in violation of Title VII of the Civil Rights Act, 42 U.S.C. Sections 1981, 1981(a), 1983, for which Defendants NYC and NYPD are liable.

92.     Defendants had no judicial warrant authorizing them to seize Plaintiff, but illegally detained Goodman against his will and in violation of Penal Law § 135.10.  Goodman did not behave in any manner that allowed for lawful restriction of his movements immediately after Jane Doe identified herself with a badge Goodman presumed indicated she was an undercover NYPD officer.

93.     On November 1, 2022, in the County of New York defendant John Doe 2 restricted Goodman's movements in such manner as to interfere substantially with Goodman's liberty by confining him in the place where the restriction commenced and holding him against his will and without authorization while acting under the color of law.

94.     Plaintiff was conscious of the confinement by defendants and was placed in acute fear of severe imminent bodily injury or death as a proximate result of defendant's willful, deliberate, malicious actions intended to harm Goodman and deprive him of constitutional rights.

95.     Goodman did not consent to being detained by defendants.

96.     It was unreasonable and beyond the scope of all authority for Defendants to believe that they had lawful cause to seize, detain, or assault Goodman.

97.     Defendants did not have probable cause to seize, detain, or arrest Plaintiff and no legal authority to instruct Plaintiff to vacate a public street.

## SECOND CLAIM FOR RELIEF

### Excessive Use of Force

98.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs with the same force and effect as if as if fully set forth herein.

99.     Defendants NYC and NYPD, designed and implemented policies which Defendants who participated in detaining and assaulting Goodman subjected Goodman to; unlawful seizure, false prosecution, abuse of authority and abuse of constitutional rights.

100.    While acting under color of law, Defendants failed to give constitutionally adequate dispersal orders prior to unlawfully assaulting and detaining Goodman.

101.    The summons issued by Caruso as supervised by Ebrahim indicates the Doe defendants were acting in a manner consistent with official NYPD policy.

102.    Castro's assertion on November 5, 2022 at the 10th Precinct, that the issuance of summons to Goodman precluded Goodman from filing a police report or criminal complaint further proves that Defendants acted in a manner consistent with official NYPD policy.

103.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs with the same force and effect as if as if fully set forth herein.

## THIRD CLAIM FOR RELIEF

### Infringement of First Amendment Rights / First Amendment Retaliation

104.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs with the same force and effect as if as if fully set forth herein.

105.    Defendants retaliated against Goodman or were motivated by another party to do so, while Goodman was engaging in speech and conduct protected by the First Amendment, specifically journalism.  Defendants imposed restrictions on such protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, falsely detaining Goodman, subjecting him to excessive force, in selectively enforcing laws and regulations against Goodman, in making known false claims to fabricate evidence and falsify official documents for the purpose of maliciously prosecuting Goodman.

106.    Defendants engaged in these and other acts and omissions complained of herein in retaliation for Goodman's protected speech and/or conduct related to journalism concerning X Corp, Twitter NYC, Sharp, Musk and other parties.

107.    Defendants engaged in these and other acts in order to prevent Goodman from continuing to engage in first amendment protected speech and conduct.

108.    Defendants engaged in the actions complained of herein in order to prevent and/or discourage Goodman from engaging in similar First Amendment protected conduct in the future.

109.    Upon information and belief, Goodman alleges defendants engaged in the acts complained of herein with respect to First Amendment-based claims, including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline - with malice.

110.    Upon information and belief, Goodman alleges Defendants engaged in the acts complained of herein with respect to Plaintiffs' First Amendment retaliation claims – including the related municipal liability claims involving the adoption of policies, practices, and/or

COMPLAINT AND JURY DEMAND                                                                30

customs and/or related failures to train, supervise, and/or discipline – in response to the

perceived viewpoint and/or message expressed by Goodman.

## FOURTH CLAIM FOR RELIEF

### Violations of Due Process and Racial Discrimination

111.    Plaintiff incorporates by reference the allegations set forth in all preceding and

following paragraphs with the same force and effect as if as if fully set forth herein.

112.    Defendants made numerous insulting and offensive comments directed at

Goodman concerning his racial and sexual identity.  Each of Goodman's assailants clarified that

they identify as non-white.  John Doe 3 shouted at Goodman, "Black Lives Matter

mother****er" and "this is my plantation" as he attempted to expel Goodman from a public

street.  Jane Doe asked Goodman if he was intimidated by his assailants because they were

minorities in her words and she repeatedly insisted that Goodman was a "racist" and a "faggot".

113.    Defendants Ebrahim, Castro, Caruso, Garcia, John Doe 1, John Doe 2, John Doe

3, John Doe 4 and Jane Doe, each acted in an unlawful, discriminatory, retaliatory, abusive

and/or hostile manner and engaged in unlawful disparate treatment of Goodman because of race,

color and/or national origin, and in retaliation for exercising his right to engage in the first

amendment protected activity of journalism, and further retaliation for reporting a violent assault

against him to 9-1-1 police dispatch.  This includes but is not limited to Plaintiff's complaints

about being assaulted by a mob suspected of being NYPD Auxiliary officers.  Defendants

deprived Plaintiff of his fourth, fifth and fifteenth amendment constitutional rights by utilizing

excessive force to unlawfully detain Goodman and using racial profiling to put Goodman in

immediate and acute fear of extreme injury or death and then initiating malicious false

prosecution to protect and defend the wrongful acts of their colleagues.  These actions denied

COMPLAINT AND JURY DEMAND                                                          31

Goodman his Fourteenth Amendment right to equal protection under the law and violate 42

U.S.C. Sections 1981, 1981(a), 1983, for which Defendants NYC and NYPD are liable.

114.    Defendants Ebrahim, Castro, Caruso, Garcia, Doe 1, Doe 2, John Doe 3, John

Doe 4 and Jane Doe, their officers, agents, servants, and/or employees are/were, at all times

herein mentioned, acting within the scope of their employment, acting under the color of law,

and in concert with one another.  Defendants NYC and NYPD are liable for said individually

named Defendants' intentional, unlawful, discriminatory, hostile, disparate and/or retaliatory acts,

conduct, treatment, practices and/or policies created, fostered, enforced, maintained and/or

perpetuated against Plaintiff herein.

115.    Defendants NYC and NYPD are vicariously liable for Defendants' Ebrahim,

Castro, Caruso, Garcia, John Doe, 1, Doe 2, John Doe 3, John Doe 4 and Jane Doe, their officers,

agents, servants, and/or employees' intentional, unlawful, discriminatory and/or disparate acts,

conduct, treatment, practices and/or policies that were intentionally and with hostility, unlawfully

retaliatorily and discriminatorily applied to Plaintiff including, but not limited to the unlawful

retaliatory acts/conduct set forth above including; but not limited to:

116.    In her capacity as an undercover NYPD officer, and NYPD employee, an NYPD

trainee, NYPD Auxiliary, a Special Patrolman pursuant to Title 14 §106 of the Administrative

Code of New York, or as private security officer or contractor to or for X Corp and or Musk,

Jane Doe racially profiled Goodman, calling him a racist and presuming he feared her, Doe 2 and

Doe 3 because they were "minorities" in her words.  Black male John Doe 2 engaged in physical

assaulted with the intent to cause serious injury to white male Goodman immediately after Jane

Doe's racially motivated antagonization.  One day prior, John Doe 1 taunted Goodman, telling

him, "This is my plantation," while ordering Goodman to "get the f**k up outta here" and instructing him that, "Black Lives Matter motherf**ker!"

117.    Caruso deliberately and maliciously violated Goodman's fourteenth amendment rights to equal protection of the law when she recorded a false statement on a summons issued to Goodman that she knew or reasonably should have known to be false at the time she filed it.

118.    Castro wrongfully retaliated against Goodman when he deliberately and maliciously violated Goodman's fourteenth amendment rights to equal protection of the law by insisting against facts that there was no evidence, and no police report could be filed.

119.    Garcia wrongfully retaliated against Goodman and deliberately and maliciously violated Goodman's fourteenth amendment rights to equal protection of the law and abused his authority when he threatened Goodman with involuntary incarceration in a medical hospital because Goodman wanted to file an official police report with the 10th Precinct that would implicate NYPD officers in criminal acts including, inter alia, assault and illegal detention.

120.    At all times herein mentioned, the Defendants NYC, NYPD, Ebrahim, Castro, Caruso, Garcia, John and Jane Does, Musk, X Corp, and Sharp, their officers, agents, servants, and/or employees' conduct, actions and/or omissions were intentional and willful violations of Title VII of the Civil Rights Act, 42 USC Sections 1981, 1983, for which Defendants the City of New York and NYPD are liable herein and that as a direct and proximate result of the foregoing, Plaintiff claims damages.

**DEMAND FOR RELIEF**

121.    Award Goodman compensatory and punitive damages in amounts that are fair, just and reasonable, to be determined at trial;

122.    Grant any such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

Dated: New York, New York October 31, 2023

Respectfully submitted,

Jason Goodman
Pro Se Plaintiff
truth@crowdsourcethetruth.org
252 7th Avenue Apt 6s
New York, NY 10001
347-380-6998

**EXHIBIT A**

From: **ONEILL, ROBERT** ▮▮▮▮▮▮▮nypd.org
Subject: nc dent on 11/1/2022
Date: January 24, 2023 at 3:42 AM
To: JASON@21STCENTURY3D.COM



Good morning,

My name is Sergeant O'Neill and I am the Assistant Integrity Control Officer of the Tenth Precinct. I have been assigned to investigate your complaint against the officers of the 10th precinct regarding a request for a complaint relating to an assault occurring on 11/1/2022. If you would be able to provide me a timeline of when you visited the 10th precinct, as well as the names of any officers you may have interacted with at the scene of the assault, and at the time of your visit to the 10th precinct, it would be helpful for my investigation.

I will be in my office from on Wednesday, January 25, 2023 from approximately 9 am till 1 pm. I will be available to speak at the numbers listed below, or we could continue correspondence through e-mail.

Sincerely,

*Sergeant Robert O'Neill*
*10th Precinct Assistant Integrity Control Officer*
▮▮▮▮▮▮▮ *Department Cell*
▮▮▮▮▮▮▮ *Office*

**CONFIDENTIALITY NOTICE:** *This email and any attachments may contain confidential and privileged information for the use of the designated recipient(s) named above. If you are not the intended recipient, you are hereby notified that you have received this communication in error and that any review, use or disclosure of it or its contents is prohibited and may violate laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication.*

*Please treat this and all other communications from the New York City Police Department as **LAW ENFORCEMENT SENSITIVE / FOR OFFICIAL USE ONLY**.*

**EXHIBIT B**



www.comptroller.nyc.gov

**THE CITY OF NEW YORK**
**OFFICE OF THE COMPTROLLER**
**CLAIMS AND ADJUDICATIONS**
**1 CENTRE STREET  ROOM 1200**
**NEW YORK, N.Y.  10007-2341**

_____

**Brad Lander**
**COMPTROLLER**

015 - 151

Date:        1/31/2023
Claim Number:  2023PI003214
RE:        Acknowledgment of Claim
Your Claim/Policy#:

JASON GOODMAN
252 7 AV APT 6S
NEW YORK NY 10001
JASONGOODMAN3D@GMAIL.COM

Dear Claimant:

   We acknowledge receipt of your claim, which has been assigned the claim number shown above. Please refer to this claim number in any correspondence or inquiry you may have with our office.

   We will do our best to investigate and, if possible, settle your claim. However, if we are unable to resolve your claim, **any lawsuit against the City must be started within one year and ninety days from the date of the occurrence.**

   If you have any questions regarding your claim, you may contact us at 212-669-4729 for claims involving personal injury.

   If you need to communicate in a language other than English, please let us know, and we will make translation services available to you.

Sincerely,

Bureau of Law & Adjustment

**EXHIBIT C**

[PROPOSED] NOTICE OF CLAIM

In the Matter of the Claim of Jason Goodman
-against-

THE CITY OF NEW YORK and
NEW YORK CITY POLICE DEPARTMENT

TO:     The Comptroller of the City of New York and Commissioner of the New York City Police
Department:

SIR(S):  PLEASE TAKE NOTICE that the claimant herein hereby makes claim and demand against
the CITY OF NEW YORK and NEW YORK CITY POLICE DEPARTMENT as follows:

I.      The name and post-office address of the claimant is:


Jason Goodman
252 7th Avenue Apt 6s
New York, NY 10001

2.      The nature of the claim:


To recover damages for mental anguish, pain and suffering, loss of personal freedom, harm to
reputation, embarrassment, and ridicule and abuse of civil rights sustained by claimant Jason
Goodman, all as a result of the negligence, carelessness and recklessness of the respondent,
THE CITY OF NEW YORK and/ THE NEW YORK CITY POLICE DEPARTMENT, and/or their agents,
servants, and/or employees, in the negligence, assault, and deprivation of civil rights under the
Constitution of the State of New York and the Constitution of the United States, as well as other
State ordinances, statutes, codes and rules including 42 USC 1981, 1983, 1985 and 28 USC 1345
and for negligent hiring, training and retention of the officers and suspected NYPD Auxiliary
personnel involved in the incident on November 1, 2022 outside 249 West 17th St. NY, NY.

3.      The time when, the place where, and the manner in which the claim arose:

On November 1, 2022, at approximately 8:30 p.m., the claimant Jason Goodman ("Goodman"),
was minding his own business and lawfully present on the public sidewalk of 17th Street
between 7th and 8th avenue, outside the New York City Headquarters of X Corp (formerly
Twitter, INC.).  Goodman was approached assaulted by individuals who displayed a badge and
were "known to the department" according to the report filed by NYPD.  The unknown
assailants are suspected of being NYPD Auxiliary agents.  Responding NYPD officers including Lt.
George Ebrahim and officer Castro failed to investigate Goodman's claims that he had been

choked by John Doe #1 and instead, wrongfully and vindictively cited Goodman for disorderly conduct. The citation was immediately dismissed in Court due to facial deficiency. Multiple attempts to file criminal charges against John Doe #1 resulted in Goodman being physically threatened by NYPD Officer Castro outside the entrance of the 10th Precinct on or around November 2, 2022, all due to the negligence of the City of New York, the New York City Police Department, their servants, employees, and agents, causing damage to Goodman and deprivation of his civil rights.

4.     The items of damage are:

Damages, include loss of freedom, severe mental anguish, humiliation, reputational harm, psychological trauma, and financial expense all to his detriment in the sum on $1,500,000.00

The undersigned therefore presents this claim for adjustment and payment and notifies you that unless the same is adjusted and paid within the time provided by law from the date of its presentation to you, it is the intention of the undersigned to commence an action thereon.

Dated: New York, New York October 20, 2023
Respectfully submitted,

Jason Goodman
Pro Se Petitioner
truth@crowdsourcethetruth.org
252 7th Avenue Apt 6s
New York, NY 10001
347-380-6998

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

In the Matter of the Claim of JASON GOODMAN,

                                     Petitioner,

                -against-

THE CITY OF NEW YORK and NEW YORK CITY
POLICE DEPARTMENT,

                                    Respondents.

-------------------------------------------------------------------X

Index No. 160214/2023

NOTICE OF PETITION

PLEASE TAKE NOTICE that upon the verified petition of JASON GOODMAN sworn to on the 23rd day of October, 2023, and the exhibits attached thereto, and upon all the proceedings in the case to date, the petitioner JASON GOODMAN will at 9:30am on Tuesday October 31, 2023, at the courthouse located at 60 Centre Street New York, in the Motion Submission Part Courtroom, Room 130, request that the Court issue a judgment, pursuant to the Civil Practice law and Rules (CPLR), granting the Petitioner's late notice of claim and any such other and further relief as to this Court may seem just and proper.

Dated: New York, New York October 23, 2023
Respectfully submitted,

Jason Goodman
Pro Se Petitioner
truth@crowdsourcethetruth.org
252 7th Avenue Apt 6s
New York, NY 10001
347-380-6998

10/23/23

JOANN FAZIO ARONOFF
NOTARY PUBLIC-STATE OF NEW YORK
No. 01FA6331965
Qualified in Richmond County
My Commission Expires 10-19-2027

Respondent
Corporation Counsel
100 Church Street
New York, New York 10007

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X          Index No.
In the Matter of the Claim of JASON GOODMAN,

                                                      Petitioner,                         PRO SE PETITION TO
                              -against-                                                   FILE A LATE NOTICE
                                                                                          OF CLAIM
THE CITY OF NEW YORK and NEW YORK CITY
POLICE DEPARTMENT,

                                                      Respondents.
-------------------------------------------------------------------X

Petitioner Jason Goodman by and for himself pro se, affirms the following under the penalties of

perjury:

1.      I am over eighteen (18) years of age. I have never been convicted of a felony or any

        crime involving moral turpitude.  I am competent to testify to the matters stated herein.

2.      I respectfully seek an Order pursuant to General Municipal Law Section 50-e(5),

        permitting him to serve and file a late Notice of Claim (annexed as **EXHIBIT A**)

        regarding the assault that occurred on November 1, 2022 outside X Corp (formerly

        Twitter) New York headquarters, on THE CITY OF NEW YORK and NEW YORK CITY

        POLICE DEPARTMENT; and for such other, further, as determined by the Court.

3.      At approximately 8:30 PM on Nov 1, 2023, I went to 249 West 17th Street New York, NY

        to cover a national news story taking place there.  This is the New York City headquarters

        of X Corp, formerly Twitter, hereinafter, ("X Corp").  The company had just been

        purchased by Elon Musk ("Musk") and it was widely reported that he had come to New

        York to fire seventy-five percent of the staff.

Case 1:23-cv-09648-JGLC-GWG   Document 1   Filed 10/31/23   Page 44 of 75

4.   When I approached 249 West 17th Street, I observed multiple individuals with visible but concealed firearms guarding a Tesla Model S automobile parked approximately 100 yards from the entrance to X Corp.

5.   I engaged an individual I presumed to be a Musk personal security guard ("John Doe 1") and asked if it would be allowed to wait on the sidewalk for Musk to emerge from the building.  The security guard did not deny that Musk would emerge from the building and said it would be ok to wait in that location.

6.   Within minutes and without cause, I was approached by three unknown individuals.

7.   The first individual was a black male, eighteen to twenty-four years old, approximately six feet tall and 175lbs, ("John Doe 2").

8.   The second individual was a white female approximately sixty to sixty-five years old, five feet tall, 200lbs, ("Jane Doe").

9.   The third individual was a black male, eighteen to twenty-four years old, six feet tall and 175lbs, ("John Doe 3").

10.   The three individuals surrounded me and began antagonizing and harassing me.

11.   Jane Doe was the primary antagonist and appeared to become agitated when I ignored her.  She then assaulted me by hitting the mobile phone I was using to video record the incident with an unidentifiable badge while she announced, "That's a badge, mother f****r".  The details of the badge were undiscernible to me, and she quickly put it away.

12.   I asked if she was NYPD and demanded that she identify herself, but she refused.

13.   The dispute escalated and John Doe 3 began to choke me and press me against the building I was standing in front of while repeatedly shouting, "Back up, back up."

14.     I looked directly at John Doe 1 and pleaded, "call the police, this kid is choking me!" I observed a look of shock on John Doe 1's face, but he did not call 911.

15.     At this point in the altercation, my phone dropped to the ground and stopped recording. John Doe 3 released his grip and the individuals retreated to their original positions outside the entrance of 249 West 17th Street about 100 yards away.

16.     I resumed video recording, and shouted to the nearby assailants instructing them that I was calling the police and anticipating they would be going to jail.

17.     They observed me as I called and spoke with the police who arrived promptly with multiple cars and an unusually large number of officers.

18.     I primarily interacted with Lt. George Ibrahim ("Ebrahim"), Officer Castro ("Castro") and a female officer whose name is illegible on the summons, ("NYPD 1").

19.     NYPD 1 interviewed the assailants and me, eventually writing a disorderly conduct summons for me, which alleged, "a party known to the department told the undersigned that the suspect caused a public disturbance."

20.     This claim was false, and NYPD 1 knew it to be false at the time she made it because her investigation into the matter included questioning John Doe 1, who claimed to have not witnessed anything. It contradicts logic to presume that a public disturbance could exist, but a security professional standing less than ten feet away from it heard and saw nothing.

21.     John Doe 1 was positioned less than ten feet from the altercation for its entire duration. I personally observed him looking right at me when I asked him to call the police. His testimony that he did not witness anything contradicts NYPD 1's conclusion that resulted in the summons because a public disturbance would have been witnessed by someone in public less than ten feet from the source looking directly at it.

22.  These facts indicate malicious intent on NYPD 1's part and cause me to believe she issued the summons deliberately to protect the assailants and retaliate against me.

23.  The way in which John Doe 3 carefully applied modulated pressure to my neck, in combination with his robotic repetition of the command to "back up" despite it being obvious I could not do that, cause me to believe he had military or police training.

24.  I told NYPD 1 and Ebrahim that John Doe 3 had choked me, but neither attempted to examine my neck or tried to photograph the injured area.  Less than one hour later I did.

25.  The apparent age of John Doe 3 causes me to believe he is too young to have been in and out of the military, but more likely could participate in the NYPD Auxiliary program. This belief was furthered by Jane Doe's presentation of a badge and the NYPD officers' overt negligence and abuse of power in wrongfully and vindictively issuing me a summons in violation of my civil rights.

26.  I previously filed a notice of claim that was received and acknowledged by the Office of the Comptroller on January 31, 2023. **("EXHIBIT B")**

27.  I later received a phone call informing me it arrived at the City Comptroller's Office one day after the ninety-day deadline to file.

28.  Prior to filing the initial notice of claim, I had participated in an investigation with the NYPD's Internal Affairs Bureau, ("IAB"). **("EXHIBIT C")**

29.  I had numerous phone conversations and email communications with 10th Precinct Assistant Integrity Control Officer Sergeant Robert O'Neill, ("Sgt. O'Neill").

30.  The NYPD investigation is proof that the defendants were aware of these claims and would not be prejudiced by this delay.

31. Sgt. O'Neill's investigation was time consuming and did not ultimately provide an outcome that I found satisfactory, but my willingness to cooperate with the NYPD, and my faith that Sgt. O'Neill could get a fair outcome, delayed the filing of my initial claim.

32. Goodman now moves the Court for leave to serve a late Notice of Claim, seeking to preserve his claims against the City of New York and New York City Police Department.

33. Municipal Law Section 50-e(5), in relevant part, states, "Upon application, the court, in its discretion may extend the time to serve a notice of claim. The extension shall not exceed the time limited for the commencement of an action by the claimant against the public corporation. In determining whether to grant the extension, the court shall consider, in particular, whether the public corporation or its attorney or its insurance carrier acquired actual knowledge of the essential facts constituting the claim and whether the delay in serving the notice of claim substantially prejudiced the public corporation in maintaining its defense on the merits. Municipal Law Section 50-e(5).

34. Case law precedent, as cited below, is overwhelmingly in favor of the petitioner in this instant matter. The City of New York through its agency The New York City Police Department ("NYPD") had actual notice of the essential facts constituting Goodman's claims because Sgt. O'Neill was conducting an investigation into the claims.

35. In the matter of *Ragland v. NYCHA*, 201 A.D.2d 7,613 N.Y.S.2d 7,613 N.Y.S.2d 937 (2d Dep't 1994), it was found as a matter of law, municipal defendants has actual knowledge of an incident "when it is the acts of the police which give rise to the very claim set forth in the proposed notice" and the police create reports of the incident for their records. *See also, Tatum v. City of New York,* 161 A.D.2d 580, 555 N.Y.S.2d 158 (2d Dep't 1990)(false imprisonment, malicious prosecution); *McKenna v. City of New York*, 254 A.D.2d 655,

Case 1:23-cv-09648-JGLC-GWG   Document 1   Filed 10/31/23   Page 48 of 75

154 A.D.2d 655 (2d Dep't 1989)(false arrest and imprisonment); *Montalto v. Town of Harrison*, 151 A.D.2d 652, 543 N.Y.S.2d 97 (2d Dep't 1989)(false arrest and imprisonment, malicious prosecution); *Matter of Reisse v. County of Nassau*, 141 A.D.2d 649, 529 N.Y.S.2:d 37 (2d Dep't 1988)(false arrest and imprisonment, malicious prosecution, violation of civil rights); *Schiffman v. City of New York*, 19 A.D.3d 206, 797 N.Y.S.2d 450 (1st Dep't 2005)(City acquired essential notice of the essential facts based upon the facts that police were directly involved in all aspects of the claims emanating from the death of petitioner's decedent); *Boskin v. New York City Transit Authority*, 843 N.Y.S.2d 454 (2d Dep't 2007); *Nunez v. City of New York*, 307 A.D.2d 218 716 N.Y.S.2d 384 (1st Dep't 2003).

36.     In this case there is also actual knowledge because the acts of NYPD officers and suspected NYPD Auxiliaries gave rise to Goodman's claims and those claims were investigated by NYPD Sgt. O'Neill.

37.     Goodman's cooperation with Sgt. O'Neill proves that police officers, themselves City employees, had immediate knowledge of the events giving rise to the claims.  *See generally Diallo v. City of New York*, 224 A.D.2d 339, 340, 638 N.Y.S.2d 58 (1st Dep't 1996).  The City should also be foreclosed from claiming prejudice where the police have all of the investigative records pertaining to this matter in their files.

38.     In *Grullon v. City of New York*, 222 A.D.2d 257 (1st Dep't 1995), the City conceded that the claim for malicious prosecution was timely, since such a cause of action accrues on the date the charges are dismissed. *Id.* The Court stated, "As to the causes of action for false arrest and false imprisonment, under the circumstances of this case, where the police department conducted an extensive investigation in which the District Attorney's

Case 1:23-cv-09648-JGLC-GWG   Document 1   Filed 10/31/23   Page 49 of 75

Office joined, knowledge of the essential facts constituting the claims within the statutory period can be imputed to the City. *Id.* Therefore, the City cannot claim that it was prejudiced by the delay. In this case, Goodman communicated with Sgt. O'Neill throughout the course of his investigation.  The City cannot claim prejudice or lack of knowledge of the essential facts constituting Goodman's claims.

39.     For the foregoing reasons, the Court should grant petitioner's request for leave to serve and file a late Notice of Claim for damages resulting from the November 1, 2022 assault and subsequent NYPD response at 249 West 17th Street New York, NY including violations of Goodman's civil rights.

40.     No prior application for the relief requested herein has been made to this Court.

WHEREFORE, Jason Goodman petitioner pro se, respectfully requests his application be granted in its entirety and that an Order be issued pursuant to General Municipal Law Section 50-e(5), permitting the petitioner JASON GOODMAN to serve and file a late Notice of Claim (annexed as Exhibit "A") regarding the assault and subsequent violations of civil rights by NYPD, against THE CITY OF NEW YORK and NEW YORK CITY POLICE DEPARTMENT, and for further and different relief as may be just and proper.

Dated: New York, New York October 20, 2023

Respectfully submitted,

Jason Goodman
Pro Se Petitioner
truth@crowdsourcethetruth.org
252 7th Avenue Apt 6s
New York, NY 10001
347-380-6998

UCS-840
(rev. 02/01/2022)

# REQUEST FOR JUDICIAL INTERVENTION

### Supreme COURT, COUNTY OF New York

Index No: _____160214/2023_____    Date Index Issued: _____10/20/2023_____

| For Court Use Only: |
| --- |
| **IAS Entry Date** |
| **Judge Assigned** |
| **RJI Filed Date** |

**CAPTION**    Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

Jason Goodman

Plaintiff(s)/Petitioner(s)

-against-

THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT

Defendant(s)/Respondent(s)

## NATURE OF ACTION OR PROCEEDING:    Check only one box and specify where indicated.

**COMMERCIAL**
- ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ☐ Contract
- ☐ Insurance (where insurance company is a party, except arbitration)
- ☐ UCC (includes sales and negotiable instruments)
- ☐ Other Commercial (specify): _____

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C).*

**TORTS**
- ☐ Adult Survivors Act
- ☐ Asbestos
- ☐ Environmental (specify): _____
- ☐ Medical, Dental or Podiatric Malpractice
- ☐ Motor Vehicle
- ☐ Products Liability (specify): _____
- ☐ Other Negligence (specify): _____
- ☐ Other Professional Malpractice (specify): _____
- ☐ Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ☐ Child-Parent Security Act (specify): ☐ Assisted Reproduction ☐ Surrogacy Agreement
- ☐ CPLR Article 75 - Arbitration    [see NOTE in COMMERCIAL section]
- ☐ CPLR Article 78 - Proceeding against a Body or Officer
- ☐ Election Law
- ☐ Extreme Risk Protection Order
- ☐ MHL Article 9.60 - Kendra's Law
- ☐ MHL Article 10 - Sex Offender Confinement (specify): ☐ Initial ☐ Review
- ☐ MHL Article 81 (Guardianship)
- ☐ Other Mental Hygiene (specify): _____
- ☒ Other Special Proceeding (specify): late notice of claim

**MATRIMONIAL**
- ☐ Contested
  *NOTE: If there are children under the age of 18, complete and attach the MATRIMONIAL RJI Addendum (UCS-840M).*
  *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI (UD-13).*

**REAL PROPERTY** Specify how many properties the application includes: _____
- ☐ Condemnation
- ☐ Mortgage Foreclosure (specify): ☐ Residential ☐ Commercial
  Property Address: _____
  *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the FORECLOSURE RJI ADDENDUM (UCS-840F).*
- ☐ Partition
  *NOTE: Complete and attach the PARTITION RJI ADDENDUM (UCS-840P).*
- ☐ Tax Certiorari (specify): Section: _____ Block: _____ Lot: _____
- ☐ Tax Foreclosure
- ☐ Other Real Property (specify): _____

**OTHER MATTERS**
- ☐ Certificate of Incorporation/Dissolution    [see NOTE in COMMERCIAL section]
- ☐ Emergency Medical Treatment
- ☐ Habeas Corpus
- ☐ Local Court Appeal
- ☐ Mechanic's Lien
- ☐ Name Change/Sex Designation Change
- ☐ Pistol Permit Revocation Hearing
- ☐ Sale or Finance of Religious/Not-for-Profit Property
- ☐ Other (specify): _____

## STATUS OF ACTION OR PROCEEDING    Answer YES or NO for every question and enter additional information where indicated.

|  | YES | NO |  |  |
| --- | --- | --- | --- | --- |
| Has a summons and complaint or summons with notice been filed? | ☐ | ☒ | If yes, date filed: _____ |
| Has a summons and complaint or summons with notice been served? | ☐ | ☒ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: _____ |

## NATURE OF JUDICIAL INTERVENTION    Check one box only and enter additional information where indicated.

- ☐ Infant's Compromise
- ☐ Extreme Risk Protection Order Application
- ☐ Note of Issue/Certificate of Readiness
- ☐ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
- ☐ Notice of Motion    Relief Requested: _____    Return Date: _____
- ☐ Notice of Petition    Relief Requested: _____    Return Date: _____
- ☐ Order to Show Cause    Relief Requested: _____    Return Date: _____
- ☐ Other Ex Parte Application    Relief Requested: _____
- ☐ Partition Settlement Conference
- ☐ Poor Person Application
- ☐ Request for Preliminary Conference
- ☐ Residential Mortgage Foreclosure Settlement Conference
- ☐ Writ of Habeas Corpus
- ☒ Other (specify): Petition to file late notice of claim

Case 1:23-cv-09648-JGLC-GWG   Document 1   Filed 10/31/23   Page 51 of 75

| RELATED CASES | List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | | |
|---|---|---|---|---|
| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| PARTIES | | For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**. | | |
|---|---|---|---|---|
| Un-Rep | Parties<br>List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants<br>For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined<br>For each defendant, indicate if issue has been joined. | Insurance Carriers<br>For each defendant, indicate insurance carrier, if applicable. |
| ☐ | Name: Goodman, Jason<br><br>Role(s): Plaintiff/Petitioner | Jason Goodman, 252 7Th Ave, Apt 6S, Apt 6S Apt 6S, New York, NY  10001, jason@21stcentury3d.com | ☐ YES  ☒ NO | |
| ☐ | Name: THE CITY OF NEW YORK<br><br>Role(s): Defendant/Respondent | Corporation Counsel, 100 Church St, NEW YORK, NY 10007 | ☐ YES  ☒ NO | |
| ☐ | Name: NEW YORK CITY POLICE DEPARTMENT<br>Role(s): Defendant/Respondent | Corporation Counsel, 100 Church St, New York, NY  10007 | ☐ YES  ☒ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |
| ☐ | Name:<br><br>Role(s): | | ☐ YES  ☐ NO | |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER  RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated:  10/20/2023

_____          Jason Goodman
                                          Signature

_____          Jason Goodman
Attorney Registration Number              Print Name

*This form was generated by NYSCEF*

**EXHIBIT D**

**From:** Pulliam, William (Taylor) ███████████

**Subject:** Jason Goodman vs. C ty of New York and NYPD / Index #: 160214/2023

**Date:** October 30, 2023 at 12:00 PM

**To:** truth@crowdsourcethetruth.org



Hi Mr. Goodman,

I am reaching out regarding your Petition to File a Late Notice of Claim in the subject matter. The City does not oppose your motion. Would you like to stipulate allowing your Late Notice of Claim prior to tomorrow's court date?

Respectfully,

**W. Taylor Pulliam**
Assistant Corporation Counsel (not yet admitted)
Special State Law Enforcement Defense Division
New York City Law Department, Tort Division
233 Broadway, Room 12-153
New York, New York 10279
███████████████████████████
████████████████

**(EXHIBIT E)**



Jason Goodman
Dec 22, 2022 · 3 min read · ▶ Listen

🔖 Save   🐦   f   in   🔗

# THE TWITTER COUP Part 1



Twitter's former Government Liaison Adam Sharp has stars in his eyes as he stares longingly at President Barack Obama during the Twitter Townhall @thewhitehouse July 6, 2011

**Preliminary Statement**

Over the past four years, U.S. District Court Judge Valerie Caproni has presided over three cases in which the author was a litigant.

In two of the cases, the author was opposed by Adam Sharp. Facts surrounding an alleged relationship between Caproni and Sharp were unknown prior to researching and writing this article in December 2022. A motion to disqualify Caproni was denied on January 10, 2022 (Case 1:21-cv-10627-VEC Document 17).

Recusal is warranted in cases where, "a reasonable person, knowing all the facts would have doubts about the judge's ability to be impartial in the case." Judges may also recuse themselves to avoid the appearance of conflicts of interest.

**The Fundamental Transformation of America**

Elon Musk's "Twitter Files" reveal a deeply troubling, previously hidden relationship between federal law enforcement and private sector social media companies, but an important question remains unanswered. Who could have executed such a vast government infiltration of private industry and how could they overcome the technical and legal hurdles? As implausible as it seems, this all occurred in plain sight right under our noses over the past two decades.

Evidence in the public domain is likely to prove that former President Barack Obama, former FBI General Counsel Valerie Caproni, and Twitter's former Government Liaison Adam Sharp, were the three most important conspirators at the outset. It appears they worked together and with others to launch one of the most sinister and sophisticated crimes in our nation's history.

**From Weatherman to U.S. President — The Rise of Barack Obama**

Just after his historic Presidential win, the New York Times ran a story about "How Obama Tapped Into Social Networks' Power". Journalist David Carr wrote, "In February 2007, a friend called Marc Andreessen, a founder of Netscape and a board member of Facebook and asked if he wanted to meet with a man with an idea that sounded preposterous on its face." Carr never reveals the identity of Andreessen's friend but goes on to depict Obama as the genius behind a grass roots campaign facilitated by emerging technology.

In 2015, long after Ayers and Dohrn helped the obscure Illinois State Senator rise to international prominence, President Obama held a technology summit at Stanford University. After delivering remarks on the future of technology and industry, Obama signed Executive Order 13691 Promoting Private Sector Cybersecurity Information Sharing. In it, the President commanded that, "private companies, nonprofit organizations, executive departments and agencies (agencies), and other entities must be able to share information related to cybersecurity risks and incidents and collaborate to respond in as close to real time as possible." Stanford students in attendance were probably unaware, but this order codified long standing FBI demands to supersede the fourth amendment and investigate anyone they wanted. This paved the way for the Neo-fascism now being exposed in the ongoing releases of the "Twitter Files".

Making good on his campaign promise, Obama ensured that America would be fundamentally transformed from a Constitutional Republic into a Neo-fascist Technocratic Autocracy. This new authority would be enforced by a digitally enabled Super-Stasi made up of FBI InfraGard members, (https://www.infragard.org/) and other contractors including hundreds, perhaps even thousands of ordinary citizens patrolling on-line as America's Secret Police.

Such an Orwellian overthrow would be calculated to happen without anyone noticing until it was too late. The merger of government and corporate technological power enabled a class of politically aligned bureaucratic elites to maintain control by monitoring and stifling opposition rather than allowing open debate in a free marketplace of ideas. These traitors have trampled the Constitution and destroyed the most fundamental aspect of American greatness.

Part two of this series will explore Congressional allegations of criminal malfeasance within the FBI.


Twitter        FBI        Obama        Corruption        Elon Musk

Open in app ↗

Get unlimited access

Search Medium

29

Jason Goodman
Dec 22, 2022  ·  2 min read  ·  ▶ Listen

🔖 Save

# THE TWITTER COUP Part 2



**Accusations of Criminal Malfeasance in the FBI General Counsel's Office**

FBI broke the law on telephone records privacy and the General Counsel's Office, headed by Valerie Caproni, sanctioned it and must face consequences."

Conyers went on to say he was "outraged" that the FBI Office of the General Counsel had invented exigent letters apparently out of whole cloth, "It's not in the Patriot Act. It never has been. And its use, perhaps coincidentally, began in the same month that Ms. Valerie Caproni began her work as general counsel."

Given the most recent revelations of Elon Musk's "Twitter Files" concerning the FBI, Conyers' closing statement in a letter to then FBI director Mueller is eerily prescient, "I'm extremely disappointed that every time Congress has tried to plug potential civil rights and civil liberties violations in our counterterrorism activities, the FBI seems to have figured out a way to get around it."

Chairman Conyers implored Mueller to take action and fire the responsible parties in Caproni's Office. No records of any action in response could be located and the press release has been removed from the House Judiciary web page.

Rather than face any consequences for her actions, Caproni would leave the FBI to join Northrup Grumman as Deputy General Counsel in 2011. She was nominated for a District Court Judge position in the Southern District of New York by Barack Obama in 2012.

During the course of her contentious Senate confirmation, Ranking Member of the Judiciary Committee Chuck Grassley sent a letter to the Dept. of Justice Office of the Inspector General. The letter detailed Senator Grassley's concerns about undue resistance to the committee's requests for documents and transcripts related to Caproni's ongoing constitutional abuses including repeated inappropriate use of National Security Letters and the even more urgent "exigent letters" throughout her tenure. The Grassley letter describes a culture of autocracy at the FBI that obstructed oversight, ignored the law and operated with impunity.

Valerie Caproni was confirmed by the Senate in 2013 and still serves as a U.S. District Court Judge for the Southern District of New York where she continues her abuse of citizens' constitutional rights to this day.

Part three will discuss how technical and legal barriers were overcome in the effort to destroy Americans' constitutional protections.

FBI        Twitter        Valerie Caproni        Corruption        Congress

Open in app ↗

Get unlimited access

 Search Medium



Jason Goodman

Dec 22, 2022 · 4 min read ·  Listen

Save

# THE TWITTER COUP Part 3



President George W. Bush and a gaggle of neocon cronies delight in laying the groundwork for the destruction of the U.S. Constitution

**Overcoming Legal Hurdles Takes a Village**

The groundwork was laid by the George W. Bush Administration. In the wake of the national trauma of 9/11, the Patriot Act was passed under the guise of increased security. This unconstitutional statute called for the creation of the National Cyber Investigative Joint Task Force, an interagency intelligence sharing organization led by the FBI. It also granted federal law enforcement new tools in their self-declared "war on terror". For the first time since the signing of the Bill of Rights, federal agents were granted unilateral authority to surveil any person they deemed a national security threat without first establishing probable cause or providing any evidence to a judge. Due process was bypassed, the need for warrants ignored, and newly created National Security Letters decimated the Fourth Amendment.

No longer were We the People "secure in our persons, houses, papers, and effects, against unreasonable searches and seizures". The FBI and other Federal agencies could simply send a National Security Letter to your phone company or internet provider seeking any information associated with any account for any reason. Although National Security Letters do not have the same legal force and effect as Court Orders or properly issued search warrants, the practical impact is virtually identical with an historical record nearing 100% compliance by providers.

During her tenure as general counsel at the FBI, Valerie Caproni coined the phrase "Going Dark". The term purported to describe an increasing proliferation of digital communications technologies and a widening gap in law enforcement's ability to penetrate those technologies in the due course of criminal investigations. Things like end-to-end encryption and automatically decimated chat logs had investigators in the dark according to Caproni.

The FBI's proposed solution was to create new legislation granting agencies unfettered access to all digital communications in real time. Setting aside the unrealistic network bandwidth and storage requirements of such a concept, the idea was controversial to say the least. Caproni and the FBI aimed to compel all technology companies to modify their products with "back doors" that would bypass primary security measures and allow federal investigators instant and full access to any account upon receipt of a National Security Letter.

Caproni would come under fire throughout her career for gross abuses of the process including the arbitrary creation of so called "exigent letters" which have no statutory

basis in the Patriot Act and the reliance on false statements to open alleged counterintelligence investigations.

https://www.c-span.org/video/?197219-1/fbi-national-security-letters

https://www.grassley.senate.gov/imo/media/doc/judiciary/upload/Caproni-03-19-13-letter-to-OIG-requesting-information.pdf

https://www.techdirt.com/2013/09/09/former-fbi-lawyer-who-oversaw-years-fourth-amendment-violations-agency-nominated-federal-judge-seat/

https://www.washingtonpost.com/world/national-security/former-fbi-official-questioned-on-abuse-of-intelligence-gathering-tools/2013/02/04/b228c4dc-6eef-11e2-aa58-243de81040ba_story.html

Caproni and her successors Andrew Weissman and James Baker went as far as suggesting modifications that amounted to hobbling the most sophisticated products available. These products' creators admonished FBI luddites and articulated how the changes would dramatically weaken security and expose all users to data theft and hacking. Despite a fundamental lack of subject matter knowledge, for years the FBI continued to make demands that industry experts argued would pose too great a risk for everyone should they be compelled to comply.

**A Decade of "Going Dark"**

Nearly eight years after Valerie Caproni delivered an address at Lewis & Clark Law School on "Crimes, War Crimes, and the War on Terror", the New York Times reported, "Obama Won't Seek Access to Encrypted User Data". Perhaps this was true of encrypted data, but perhaps this was just a lawyerly way of talking around a new cooperative plan to intercept data at the source, before it was encrypted or after it had been decrypted. Going back as far as 2005, Caproni had made the FBI's position on "Going Dark" extremely clear, it was a top priority. The persistence with which the FBI pursued this agenda cannot be overstated, nor can the public resistance to it.

Would secretly planting FBI operatives directly inside Twitter allow agents to address management's "Going Dark" concerns without the need to crack encryption keys or reveal their efforts to the public? Could such a cozy relationship indicate that Twitter

had agreed to implement the long-sought FBI back door without informing unsuspecting users? Twitter's new CEO has revealed emails indicating reimbursements to Twitter from the FBI for the fulfilment of requests related to investigations. While Twitter's CEO may have <u>incorrectly characterized</u> the nature and purpose of the payments, it is not denied that the payments were made.

Was Twitter motivated to comply with FBI investigation requests by law or by financial incentives? Did the FBI need warrants to investigate, penetrate or terminate the private Twitter accounts of U.S. citizens? These and other questions remain open. Many may ask, would the FBI do something illegal? Would they take action even if it had no basis in law? House and Senate oversight of the FBI General Counsel's Office and the Inspector General's report on the matter indicate they were in a regular practice of doing exactly that.

<u>Part four will reveal how the U.S. Government essentially became one with private industry when it infiltrated Twitter.</u>

Twitter        Elon Musk        FBI        Patriot Act        Valerie Caproni



Open in app ↗

Get unlimited access

Search Medium

29

Jason Goodman

Dec 22, 2022 · 4 min read · ▶ Listen

🔖 Save    [Twitter] [Facebook] [LinkedIn] [Link]

# THE TWITTER COUP Part 4



President Barack Obama and Twitter CEO Jack Dorsey at the Whitehouse Twitter Town Hall July 6, 2011

**The Marriage of the U.S. Government and Social Media**

Although Barack Obama does not consider himself a luddite, during a 2022 address at the Stanford Internet Observatory he admitted he has to ask his "daughters how to work basic functions" on his phone. Even fifteen years after joining Twitter, Barack Obama's background, experience and technological profile is inconsistent with that of

someone who could have foreseen the impact social media would have on politics all the way back in 2007.

It is impossible to understand the U.S. Government's infiltration into Twitter without exploring the role of the man who is most likely to have presided over this unholy union. Today, he is the President and CEO of the National Academy of Television Arts and Sciences ("NATAS"), an obscure individual named Adam Sharp. Before handing out EMMY awards, Sharp joined Twitter in its pre-IPO days, early in November of 2010. Hot topics in DC at that time included regulation of social media firms. It was quietly coming out that many had hired lobbyists to get in front of the issue. Just prior to Sharp joining Twitter, in October of 2010, the LA Times ran an op-ed reporting "Facebook lobbies California on online privacy act (but shhh — don't tell anyone).

Evidence indicates Sharp's interest in Twitter began long before he was hired there. While serving as an Executive Producer for C-SPAN in 2009, Sharp launched a public affairs database that included "Twitter and Facebook API integration". API stands for application programming interface and describes a set of software tools provided to developers to enable customization and integration with other products. Sharp's utilization of Twitter's development API is an indication that he was very familiar with the inner workings and unrealized potential of Twitter at least by 2009, likely prior.

Sharp's online resume fails to discuss Valerie Caproni's appearance on C-SPAN3 in June of 2009 during the time he was the Executive Producer and managed primetime programming. It is difficult to imagine that the Executive Producer would not interact at all with such an important FBI guest. At very least, as programming manager, Sharp would be aware of the content of the broadcast in which Caproni articulated the FBI's goals to penetrate online communications. It remains unknown if any interaction occurred between Sharp and Caproni. Even in the event that there was none, Sharp was very likely aware of the FBI's concerns about "Going Dark" as long ago as 2009.

While at Twitter, Sharp made incredible inroads both for the company and the U.S. Government. https://www.cnn.com/2015/02/03/politics/twitter-washington-office

Throughout his time at Twitter, Sharp separately owned and operated Sharp Political Consulting, LLC. Sharp incorporated this firm in April of 2007. This is notably close in time proximity to the March 5, 2007 creation of the @barackobama Twitter account

cited in the Atlantic Magazine article, "You're Not Really Following @BarackObama on Twitter".

Creation of Obama's now famous Twitter account is especially notable because Twitter was virtually unknown in 2007. Jack Dorsey had published the world's first Tweet less than one year prior on March 21, 2006. Obama was not only one of the first politicians to join Twitter, but he was also among the first of all users. Technology moguls including current Twitter CEO Elon Musk, and former Microsoft CEO Bill Gates would not join until years later in June 2009. No other person fits the profile or was in the position to put Barack Obama and Twitter together in the way Adam Sharp clearly was.

Journalist Phillip Bump told Atlantic Magazine readers that Obama's "Twitter account was created by a staffer on March 5, 2007, two months before he formally announced his Presidential candidacy." The Senate staffer has never been identified, but Sharp was serving as Deputy Chief of Staff for Senator Mary L. Landrieu at the time. An election postmortem from the New York Times citing Obama's genius in leveraging social media declared an anonymous "friend" brought Marc Andreessen to the Obama campaign. Could both of these anonymous King Makers be Sharp? The answer remains a mystery, but it is likely 'yes'.

Even after Sharp became Twitter's official Government Liaison, Sharp Political Consulting, LLC remained active and engaged in matters that do not seem to have clear connections to Twitter.

Sharp Political Consulting made over $50,000 in political contributions to Democrat candidates in 2014.

In January 2016, pollsters calculated a 71% likelihood of a Hillary Clinton presidential win. For reasons that are unclear, Sharp voluntarily dissolved Sharp Political Consulting, LLC on January 29, 2016. In December 2016, less than one year later and precisely one month after Donald Trump's largely unexpected victory over Clinton, Sharp abruptly left his beloved Twitter and promptly formed SharpThings, LLC, just one week after the press release announcing his departure. Sharp would spend a lot of time lecturing about Disinformation in various public speaking engagements from 2016 through 2018 and then during his tenure as CEO of NATAS beginning in 2018. Was

Sharp's departure motivated by an urgent need to step up *la Résistance* to Donald Trump?

Part five will bring the story up to today and connect the suspected conspirators to the events being exposed in The TWITTER FILES.

Obama       Jack Dorsey       Twitter       FBI       Elon Musk

Open in app ↗



🔍 Search Medium



Jason Goodman
Dec 22, 2022 · 3 min read · ▶ Listen

🔖 Save   🐦   f   in   🔗

# THE TWITTER COUP Part 5



President Barack Obama, Twitter Head of News, Politics and Elections Adam Sharp, Twitter General Counsel Alexander Macgillivray and other staff members celebrate their success at the Whitehouse on July 6, 2011

**Operational Deployment of FBI–Twitter**

For more than a decade, FBI leadership was acutely focused on a "Going Dark" public relations campaign. James Comey and Christopher Wray each spoke about it throughout their respective tenures as FBI Director.

But it was Valerie Caproni's disciples in the FBI General Counsel's office that finally made the plans operational. Her direct successor Andrew Weissman led the Mueller Investigation into Russian Collusion with the Donald Trump Presidential Campaign. This investigation was marred by the abuse of the secret FISA Court process and was distinctly categorized by Mueller's team as a Counterintelligence investigation rather than a criminal investigation. This distinction allowed investigators to access the unconstitutional and disputed powers imbued upon the FBI by Caproni. Ultimately, no evidence was found to substantiate the Mueller accusations.

Because the mere suggestion of Russian interference with a U.S. Presidential election represents a national security threat, the accusation alone absent evidence, was legally sufficient to open an investigation under the Patriot Act. This would have allowed Andrew Weissmann to use National Security Letters to merely allege that Trump represented a national security threat and initiate the years long and highly disruptive probe. This is perhaps the clearest example of naked abuse of the Patriot Act since its inception and provides good grounds for its termination.

Weissmann's successor James Baker. Director Comey appointed Baker General Counsel of the FBI on January 15, 2014. Baker was reassigned by Wray in 2017 and then resigned amid accusations that he leaked classified documents related to the Mueller investigation of Trump.

Senior Fellow in Governance Studies at the Brookings Institution, Benjamin Wittes was the likely recipient of the leak. Wittes is the editor of Lawfare, an online publication of the Brookings Institution that James Comey told an audience he reads every day. Wittes has claimed to be among James Comey's closest friends. Baker would transition to Brookings and Lawfare after departing the FBI and prior to becoming Twitter's Deputy General Counsel. The Brookings Institution is a non-profit think tank and a potential incubator for domestic coup d'etats, perhaps along the lines of what was done with Twitter. Baker appeared on MSNBC as recently as 2019 restating unconstitutional FBI demands to access everyone's data at any time.

**FBI All in at Twitter**

On or around May 28, 2020, a new Twitter policy began adding warnings to "fact check" users' Tweets. After warnings were applied to Tweets sent from @realDonaldTrump, the President issued executive order 13925 titled "Preventing Online Censorship". The order sought to curb perceived abuse of 47 USC § 230, the infamous Communications Decency Act that shields online service providers from liability even if they editorialize content that does not violate the law or civil torts. If implemented, the proposed changes threatened to expose Twitter to thousands of civil legal actions. Less than three weeks after Trump's order, former FBI General Counsel Baker joined Twitter as Deputy General Counsel. Was this a coincidence or was Baker still serving the demands of his long-time FBI colleagues? Baker had transitioned through the FBI revolving door of non-profit think tanks, including the Brookings Institution, Lawfare and the R Street Institute, following the plan articulated in Obama's 2015 Stanford inspired order.

It has now been widely reported that during Baker's time as Deputy General Counsel, Twitter suppressed a true and accurate news story published by the New York Post that likely affected the outcome of the 2020 Presidential election. Dr. Michael Shellenberger provides evidence of communications between FBI Special Agent Elvis Chan and employees of Twitter in the Twitter Files 7.

The communications indicate the FBI had foreknowledge of facts that would be asserted by the New York Post and knew them to be true, but falsely informed Twitter it was the product of a Russian "hack and leak" operation.

Now we stand at the brink of world war in Ukraine. Even stating the opinion "Joe Biden and Twitter rigged the 2020 election with the help of the FBI" is considered spreading disinformation. The FBI and CISA have determined disinformation is a national security threat. This logically could lead to the FBI investigating you if they decide something you say is false.

America has been transformed right before our eyes, and all that was needed was a pen and a phone.

Sources and Additional Information

**(EXHIBIT F)**

**Complaint/Information**
## The People of The State of New York vs.

CS-901213-22CN

Name *(Last, First, MI)*
Goodman Jason

Date of Birth *(mm/dd/yy)*

Apt. No.

City
NY

State
NY

Zip

Cell Phone Number *(Write N/A or Refused if not provided)*
(   )

Home Phone Number *(Write N/A or Refused if not provided)*
(   )

Court Appearance Date *(mm/dd/yy):*
**(Ensure correct return date is entered)**    11/22/22    **at: 9:30 a.m.**

### The court appearance location:    ○ Other (specify)

| ○ Bronx Criminal Court | ○ Kings & New York Criminal Court | ● Midtown Community Court | ○ Redhook Community Justice Center | ○ Queens Criminal Court | ○ Richmond Criminal Court |

ID/Summons Number

State
NY

Type/Class
D

Expires *(mm/dd/yy)*

| Race | Sex M | Ht | Wt | Eyes | Hair | Plate/Reg |
| ● White | | | | | | |
| ○ Hisp. White    ○ Black | | | | | | |
| ○ Am. Ind./Alaskan Native    ○ Hisp. Black | | | | | | |
| ○ Asian/Pacific Is. | | | | | | |

| Reg State | Expires *(mm/dd/yy)* | Plate Type | Veh Type | Make | Year | Color |

### The Person Described Above is Charged as Follows:

Title of Offense: DISCON-Creates Hazardous physically

| Time 24 Hour *(hh:mm)* 1455 | Date of Offense *(mm/dd/yy)* 11/01/22 | County NY offender Carolina |

Place of Occurrence 245 West 17th Street    Precinct 010

In Violation of Section 240.20(7)    Subsection    ☐ VTL  ☐ Admin Code  ● Penal Law  ☐ Park Rules  ☐ Other

Factual Allegations *(describe how the offense was committed, OR complete reverse):*
At tpo the undersigned is informed by someone known to the Dept. that the defendant engaged in conduct that caused public Alarm

| NYPD CODE    ☐ 1    ☐ 2    ☐ 3    ● 4 | ICAD # |

Defendant stated in my presence, *(in substance):*
"They approached me"

I personally observed the commission of the offense charged herein. False statements made herein are punishable as a Class A Misdemeanor pursuant to section 210.45 of the Penal Law. Affirmed under penalty of law.

| Complainant's Full Name Printed PO Turim | Rank/Full Signature of Complainant PO | Date Affirmed *(mm/dd/yy)* 11/01/22 |

| Tax Registry # 972998 | Agency NYPD    **ORIGINAL** | Command Code 010 |

444667 8921

**(EXHIBIT G)**

