IN THE UNITED STATES DISTRICT COURT　　　　　　　　23-cv-09648-JGLC-GWG
FOR THE SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
　　　　　　　　　　JASON GOODMAN,　　　　　　　　**RESPONSE IN OPPOSITION TO DEFENDANT X CORP'S MOTION TO DISMISS**

　　　　　　　　　　　　　Plaintiff,
　　　　　　-against-

THE CITY OF NEW YORK and NEW YORK CITY
POLICE DEPARTMENT, NEW YORK CITY MAYOR
ERIC ADAMS, NEW YORK CITY POLICE
DEPARTMENT LIEUTENANT GEORGE EBRAHIM,
NEW YORK CITY POLICE DEPARTMENT OFFICER
CHANDLER CASTRO, NEW YORK CITY POLICE
DEPARTMENT OFFICER JENNIFER CARUSO, NEW
YORK CITY POLICE DEPARTMENT OFFICER
KELVIN GARCIA, JOHN DOE 1, JOHN DOE 2, JOHN
DOE 3, JOHN DOE 4, JANE DOE, (fictitious names
intended to be officers, representatives, agents, servants of
the New York City Police Department, individually and in
their official capacities, ELON MUSK, X CORP, ADAM
SHARP.
　　　　　　　　　　　　Defendants.
----------------------------------------------------------------------X

　　　Plaintiff, Jason Goodman, ("Goodman") by and for himself pro se, respectfully submits the following response in opposition to defendant X Corp's motion to dismiss.

## INTRODUCTION

　　　1.　　Defendant X Corp's motion to dismiss (Dkt. 19) demonstrates a fundamental misunderstanding of the facts and claims in this case or otherwise relies upon radically dishonest explanations of its own employees' actions to arrive at numerous false conclusions.

　　　2.　　Defendant X Corp has falsely concluded that Plaintiff does not allege any misconduct or harm by X Corp. Goodman alleges X Corp is vicariously liable for the misconduct of its employees, contractors or assignees including assault and violation of Goodman's rights while acting under color of law and with dubious authority granted by NYPD

and other government agencies including the FBI. This is demonstrated by the production of a badge by Jane Doe, NYPD's use of illegal tactics calculated to protect X Corp employees from prosecution, and X Corp's employment of former FBI General Counsel James Baker ("Baker").

3. Defendant X Corp has incorrectly concluded that claims in the complaint came about as a result of quarrels with NYPD officers and Doe defendants who they allege are unrelated to X Corp or its owner defendant Elon Musk ("Musk"). Evidence in Goodman's own video recording demonstrates the Does were collocated with and interacted extensively with Musk's security team outside X Corp's New York office on October 31 and November 1, 2022.

4. Defendant X Corp has falsely concluded that Goodman did not visually identify firearms in the possession of X Corp's or Musk's security employees.

5. Defendant X Corp has incorrectly concluded that these claims, if proven true, would be insufficient to plausibly allege a Section 1983 claim against X Corp.

## BACKGROUND

### I. Doe Defendants are X Corp Security Employees

6. Goodman alleges X Corp security coordinated with NYPD and Musk's personal security team to make arrangements for Musk's visit to X Corp's New York Headquarters on October 31, and November 1, 2022. It was Goodman's initial interaction with these X Corp and Musk employed security personnel, not the NYPD, that gave rise to this complaint.

7. The Doe defendants were described in a facially defective summons issued by defendant NYPD Officer Jennifer Caruso ("Caruso") as being "known to the department." Upon further review of the evidence while writing this response, it is now clear these individuals were either full-time or temporary X Corp security and each were acting in a security guard capacity for, and at the instructions of X Corp at the time of the assault.

8. A later conversation Goodman had with NYPD officer Matthew Powlett indicated that at least one 10th precinct officer knew X Corp and knew their offices were at 249 West 17th street. This at least indicated that X Corp's employment of security personnel is "known to the department." The summons written by Caruso confirmed that the Does are "known to the department." This and other evidence indicate that the Does are X Corp security employees.

9. In addition to the Tesla and the SUV that were parked on 17th Street on October 31, 2022, Goodman's assailants were seen seated in and hovering around a Hyundai parked directly in front of the Tesla forming a barrier between the street and X Corps' offices. (*Fig. 1*)


(*Fig. 1*)

10. At that time, X Corp had offices in both 249 West 17th Street and 245 West 17th Street. The line of parked cars being guarded by Musk's personal security team and the Doe defendants effectively formed a barrier between the street and the buildings. Blocking cars was apparently a substantial concern because this was also the subject of a discussion between Does 1 and 2 on November 1, 2022. That discussion was recorded by Goodman prior to the assault.

11. Goodman's assailants including Doe 2 can be observed in and around this third car throughout the video on October 31. (*Fig. 2*)

RESPONSE IN OPPOSITION TO DEFENDANT X CORP'S MOTION TO DISMISS               3



(*Fig. 2*)

12.   Doe defendants were positioned directly outside X Corp with Musk's personal security for two days as observed by Goodman. They were insistent that Goodman leave the vicinity of X Corp's office on October 31 and November 1. They did not fear NYPD when Goodman called them. This behavior does not match that of random individuals on the street.

13.   The Doe defendants' behavior shows they were performing security duties for X Corp and Musk. X Corp is vicariously liable for their unjustified and illegal actions which Goodman alleges were carried out under color of law by and through unfounded authority illegally granted to them by NYPD and or FBI.

**II.   X Corp and Musk Security Employees Visibly Displayed Concealed Firearms**

14.   Concealed carry weapons licenses are intended to allow individuals to carry firearms without revealing them. Goodman has had NRA certified handgun training and precision rifle training and is able to recognize and identify a concealed firearm by sight.

15.   A phenomenon known as "printing" describes the undesired effect of revealing the outline of a concealed weapon underneath the wearer's clothing. The thinner or tighter the

RESPONSE IN OPPOSITION TO DEFENDANT X CORP'S MOTION TO DISMISS            4

clothing, the more pronounced this problem can be.  Goodman observed multiple individuals carrying concealed weapons and could see the weapons printing on their clothing. (*Fig. 3*)



(*Fig. 3*)

16.     The individual in the solid-colored shirt on the left side of the photo is a left-handed shooter.  He has the holstered gun in the six o'clock location with its handle positioned to the left.  The other individual is also printing a holstered firearm at the six o'clock position in the small of his back.  Goodman discussed the firearms with some of these individuals on the scene.

17.     In conversation, Goodman confirmed they work for Musk.  Goodman was granted permission to wait to speak with Musk and was even thanked by Doe 1 for asking politely.

18.     Goodman further alleges security arrangements made by X Corp would have included NYPD granting special permission for employees to carry concealed weapons, ("CCW") under color of law as temporary special patrolmen pursuant to the cited statutes.

III.    **Special Arrangement with NYPD Paid Detail Unit**

19.     NYPD operates a Paid Detail Unit, through which private businesses may hire off duty NYPD officers to carry out certain on-site security duties as contractors to the business.

RESPONSE IN OPPOSITION TO DEFENDANT X CORP'S MOTION TO DISMISS            5

(https://www.nyc.gov/html/nypd/downloads/pdf/public_information/nypd-258_paid_details_2016-06-16.pdf)

20.     The NYPD Paid Detail Unit web site informs readers, "vendors will be given a formal Participation Agreement to sign, which outlines the specifics of the program. This contract, along with a certificate of insurance, will be submitted for the Police Commissioner's approval prior to distribution of assignments. (Approximate preparation time is about 8 weeks.) Once your organization has been approved, you may schedule details on a regular basis, or only as needed for special events."

21.     It is not unusual for businesses to employ off duty NYPD officers to work in various private capacities.  https://nypost.com/2022/05/29/off-duty-nypd-officer-working-security-at-nyc-drug-store-struck-by-thief/

22.     Powlett's stated familiarity with X Corp based on the specific street address indicates a greater than normal familiarity with X Corp and is further evidence of a possible existing relationship between the NYPD 10th Precinct and X Corp with regard to special security concerns and permits.  Powlett's phone call with Jarett Dilorenzo with regard to CCW permitting or unspecified "indictors" of such is evidence of some process outside of the Paid Detail Unit that so far, no NYPD officer or executive has been able to clearly describe over the phone.

23.     On November 8, 2023, Goodman observed an NYPD officer positioned inside an Apple store on 14th Street.  Goodman engaged the officer in conversation and asked how he could hire NYPD at his private business. The officer answered, "we have this Paid Detail Unit" (https://odysee.com/@Crowdsourcethetruth:d/TheNYPDJuniorJrMeetingInsidetheAppleStore14thStreet:1), but provided no further information and did not seem well equipped to answer the question or even familiar with any standard procedures of the Paid Detail Unit.

24. An inquiry to the Paid Detail Unit on Monday January 8, 2023, revealed that four days would be insufficient to provide CCW permits to non-residents. This is more evidence that some other arrangement was made with NYPD outside the normal rules and possibly the law.

25. If no special arrangement to carry concealed firearms was made with NYPD, that would mean employees of Musk and X Corp may have been illegally carrying guns in violation of New York law and city ordinances when they harassed and assaulted Goodman.

26. Doe 1 told NYPD Caruso he did not witness the alteration. This was a lie. Goodman observed Doe 1 throughout the altercation and saw him looking right at it. He was certainly within earshot when Goodman looked in his eyes and shouted, "Call the cops!"

27. Goodman's video reveals the Tesla recorded the altercation with its Sentry Mode feature. Video of the surroundings can be seen throughout on the car's large internal display.

28. After Doe 1 lied to Caruso and left, he took the evidence with him. Even if he had nothing to do with the assault or the Doe defendants, he became complicit in their actions when he assisted NYPD in producing a facially defective summons by providing false testimony.

29. It is notable that less than two months prior to this altercation, New York City Mayor Eric Adams announced new, even more restrictive CCW laws and rules in New York City that do not seem to apply to Musk's security or X Corp, (https://www.nyc.gov/nyc-resources/new-york-city-concealed-carry-law.page).

30. Goodman further alleges security measures arranged by X Corp included a team that surveiled 17th street to enhance Musk's security while there. That team assaulted Goodman, interacted, and coordinated with Musk's security, NYPD, and other X Corp employees over the course of two days. These individuals were employed by X Corp to protect X Corp owner Musk

and operated under color of law pursuant to the cited statutes and alleged arrangements with NYPD and by and through their employment of former FBI General Counsel Baker.

IV. **X Corp Became Complicit in the Assault After the Fact**

31. On November 2, 2022, Goodman returned to X Corp and spoke to an employee who identified himself only as an X Corp security employee. After acknowledging the video surveillance camera outside the front door, this individual refused to provide Goodman with access to surveillance video of the incident he admitted was in X Corp's possession. (*Fig. 4*)



(*Fig. 4*)

32. Goodman intended to use this evidence to file criminal charges. Even if the Court determines X Corp played no role in the assault, failure to cooperate in providing evidence to press criminal charges makes them complicit after the fact. This act alone justifies inclusion in this instant action. Goodman intends to obtain this video footage through discovery.

33. Goodman has alleged X Corp was complicit in and vicariously liable for the assault that took place on November 1, 2022, outside their New York City headquarters. X Corp's failure to cooperate by providing evidence for an NYPD criminal complaint further

implicates them and suggests they may be protecting employees from prosecution or hiding larger crimes connected with this altercation and NYPD or FBI involvement.

34. Employees of X Corp and its owner Musk were directly involved in or otherwise aided and abetted the harassment, assault and police response which violated Goodman's rights while X Corp employees and contractors operated under color of law.

35. Contrary to the false conclusions asserted in the motion to dismiss, this altercation began as a result of Goodman's attempt to communicate a message to the owner of X Corp outside X Corp headquarters that would have been objectionable to embedded FBI interests.

36. The allegations in Goodman's Twitter Coup expose explicitly implicate X Corp's Deputy General Counsel Baker and others including former and current FBI and other government employees. (https://crowdsourcethetruth.substack.com/p/the-twitter-coup)

37. Baker and others in the FBI and X Corp would have been motivated to remove Goodman from X Corp's New York Headquarters on November 1, 2022, and would have had the ability to communicate with the Doe defendants to effectuate that removal.

V.   **Violations of Goodman's Rights Pursuant to 42 U.S. Code § 1983**

38. Defendants incorrectly conclude that Goodman has failed to state a plausible section 1983 claim.  In this response, Goodman has presented numerous points of evidence that prove Defendants arrived at this conclusion using faulty logic and false claims.

39. Even if the Court finds that all of Goodman's claims relative to X Corp and the assault outside their offices on November 1 and interactions with the Does do not satisfy the requirements for a Section 1983 claim, X Corp cannot deny that their Deputy General Counsel at the time of this incident was Baker.  Baker was former FBI General Counsel and was removed by Musk only weeks after this incident precisely because of concerns that the FBI was exerting

undue and even possibly illegal control over X Corp including during the time Goodman was assaulted. (https://www.nytimes.com/2022/12/13/technology/elon-musk-twitter-shakeup.html)

40. From a legal standpoint, the hot button question of government influence over private sector social media companies remains unanswered.

41. Congress has formed a Weaponization of Government committee which, for the past year, has examined allegations similar to Goodman's regarding FBI involvement at X Corp.

42. Both *Missouri v. Biden*, No. 3:22-CV-01213, 2023 U.S. Dist. LEXIS 46918 (W.D. La. Mar. 20, 2023) and *Kennedy v Biden* 3:23-cv-00381-TAD-KDM are presently contemplating these same questions.  *Missouri v Biden* awaits the decision of the Supreme Court.

43. It would be premature at this early stage for the Court to dismiss Goodman's complaint or make a determination that X Corp was not acting under color of law, prior to discovery and certainly prior to a decision on similar facts from the higher court.

## CONCLUSION

44. For the reasons stated herein and any other reasons as determined by the Court, plaintiff's complaint should not be dismissed.  This case should advance to discovery where defendants may present evidence that will prove or disprove Goodman's well-founded claims.

Dated: New York, New York January 8, 2024

Respectfully submitted,

Jason Goodman
Pro Se Plaintiff
truth@crowdsourcethetruth.org
252 7th Avenue Apt 6s
New York, NY 10001
347-380-6998