IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK                    23-cv-09648-JGLC-GWG
------------------------------------------------------------------------X
                              JASON GOODMAN,

                                                         **RESPONSE TO SHOW**
                                    Plaintiff,           **CAUSE ORDER**

                              -against-

THE CITY OF NEW YORK and NEW YORK CITY
POLICE DEPARTMENT, NEW YORK CITY POLICE
DEPARTMENT LIEUTENANT GEORGE EBRAHIM,
NEW YORK CITY POLICE DEPARTMENT OFFICER
CHANDLER CASTRO, NEW YORK CITY POLICE
DEPARTMENT OFFICER JENNIFER CARUSO, NEW
YORK CITY POLICE DEPARTMENT OFFICER
KELVIN GARCIA, JOHN DOE 1, JOHN DOE 2, JOHN
DOE 3, JOHN DOE 4, JANE DOE, ELON MUSK, X
CORP, ADAM SHARP.
                              Defendants.
------------------------------------------------------------------------X

        Plaintiff, Jason Goodman, ("Goodman") by and for himself pro se, respectfully submits

this response to the Court's order to show cause as to why the claims against Musk should not be

dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

        **I.        INTRODUCTION**

        1.      Defendants argue that Goodman failed to allege a violation under 42 U.S. Code §

1983, and that he lacks evidence of an explicit agreement between NYPD, the Doe defendants,

and X Corp.  Defendants attempt to ignore the fact that it is now known the FBI had clandestine

influence over Twitter and paid the corporation over three million dollars during this association.

        2.      Throughout this document the defendant is referred to as X Corp.  The social

media platform, the company as it existed, and location of this incident is referenced as Twitter.

        3.      On November 1, 2022, Twitter itself and all of its employees, agents, contractors,

and assignees were acting under color of law carrying out orders from the FBI.  This includes but

is not limited to attempts to compel Goodman to leave the public sidewalk to November 1, 2022.

RESPONSE TO SHOW CAUSE ORDER                                                                    1

## II.    FBI AND NYPD

4.     While it is not widely known, according to information published by the FBI, in 1980, without congressional mandate or formal announcement, an unknown FBI special agent and an unknown NYPD executive created the Joint Terrorism Task Force, ("JTTF") ostensibly to fight terrorism, (*See* https://www.fbi.gov/news/stories/new-york-jttf-celebrates-35-years).

5.     NYPD is so closely linked with the FBI through the JTTF, at a celebration of its thirty fifth anniversary, then FBI director James Comey described the New York JTTF as the "granddaddy of them all." (https://www.fbi.gov/news/stories/new-york-jttf-celebrates-35-years)

6.     What began as a small, highly specialized investigative unit of less than two dozen total members has now spread like an unchecked, rapidly metastasizing cancer, to nearly every local law enforcement agency in the nation, blurring the lines of states' rights and infringing on citizens individual freedoms.  (https://www.seattletimes.com/nation-world/it-was-like-being-preyed-upon-federal-officers-in-unmarked-vans-detain-portland-protesters/)

## III.    GOODMAN INTENDED TO REPORT CRIMINAL ACTIVITY

7.     Prior to October 27, 2022, when defendant Elon Musk ("Musk") purchased defendant X Corp, Goodman learned through public domain information, that the FBI had established illegal influence over the social media platform Twitter.

8.     Goodman is not engaged in terrorism or any crime and was not engaged in any activity that would be subject to FBI or JTTF action throughout the duration of these events.

9.     When Goodman learned Musk was in New York City and at Twitter headquarters less than ten blocks from his home, he went there to inform Musk of the FBI infiltration.

10.     Subsequent to November 1, 2022, and despite the assault which prevented Goodman from informing him, Musk learned of the FBI infiltration from company records.

11.     Musk made the first post announcing the revelation on Twitter itself, (*See* https://twitter.com/elonmusk/status/1597336812732575744) **(EXHIBIT A)**

12.     Shortly thereafter multiple committees in Congress opened investigations into the claims. https://www.nytimes.com/2023/02/08/us/politics/twitter-congressional-hearing.html

### IV.     DOE DEFENDANTS WERE ALERTED OF GOODMAN'S PRESENCE

13.     Goodman is an independent journalist whose primary medium is livestreamed video on the internet.  He posts daily videos providing news and information in and around New York and viewers including malicious parties can easily determine his location in real time.

14.     The Court is already aware of the malicious, vexatious nonparty David George Sweigert, ("Sweigert") and his several failed attempts to intervene and otherwise interfere in this action, (*See* Dkt. 2, Dkt. 7, Dkt. 8, Dkt. 54, Dkt. 55, Dkt. 58, Dkt. 61).

15.     In his filing at Dkt. 61, Sweigert included elements of his correspondence with Nintendo of America, another large corporation he has proactively solicited and encouraged to take legal action against Goodman for his creation of the Stupid Mario Brothers parody.

16.     On October 31, 2022, Goodman livestreamed a video report outside 249 West 17th Street, which as nearly all of his broadcasts are, would have been observed by Sweigert.

17.     Contacting Twitter, the FBI and or NYPD to make false, malicious claims with regard to Goodman would fit Sweigert's seven year long, well established pattern and practice.

18.     On March 12, 2024, Sweigert sent one of several irrelevant communications to counsel for NYPD defendants Mary Jane Anderson, ("Anderson").  The irrelevant letter detailed yet another of his attempts to provoke law enforcement with false allegations against Goodman.

RESPONSE TO SHOW CAUSE ORDER                                                                                          3

19.     The NYPD officers' confusion is apparent even in the included photo.  They expected to intercede in an assault against a "Stephanie" who Goodman does not know, has never met, and was not ever present or assaulted in Goodman's apartment. **(EXHIBIT B)**

**V.      PLAUSIBILITY OF GOODMAN'S CLAIMS**

20.     "The plausibility standard for a motion to dismiss asks for more than a sheer possibility that a defendant has acted so as to create liability."

*Ehrenberg v. Kelly* (In re Orion Healthcorp, Inc.), Nos. 18-71748 (AST), 20-08048 (AST), 2024 Bankr. LEXIS 295, at *1 (Bankr. E.D.N.Y. Feb. 7, 2024)

21.     Contrary to defendants' motion to dismiss, Goodman's claims are not mere conclusions devoid of factual evidence.  An astounding array of evidence exists, including video recorded by Goodman on his personal phone and surveillance video in the possession of X Corp, Musk and referred to by NYPD Sgt. Robert O'Neill during the course of his investigation into this matter.  The Court should not dismiss this case prior to evaluating all of this evidence.

22.     Several other facts relevant to this matter support the truth of Goodman's allegations. These facts were not publicly known prior to November 2022 but have now become public knowledge due to actions by defendants Musk and X Corp which are not in dispute.

   a.   The FBI had inappropriate clandestine influence or complete control over Twitter.

   b.   Disgraced and fired former FBI General Counsel James Baker, ("Baker") was employed at Twitter at the time of this incident.

   c.   Musk fired Baker for actively thwarting efforts to reveal FBI Twitter infiltration.

   d.   Musk is accompanied by a personal security team everywhere he goes including the restroom at work. (*See Wolfram Arnold v X Corp et at*, Case 1:23-cv-00528-JLH-CJB page 31 paragraph 234).

e.  It was widely reported that Musk was in New York City on October 31, 2022 and November 1, 2022, (https://people.com/human-interest/elon-musk-heidi-klum-halloween-party-twitter-controversy/).

23.    The existence or lack thereof, of any agreement between NYPD, Musk, X Corp and the Doe defendants is peripheral to the fact that Twitter as a corporation and all of its employees were operating under the color of law at the behest of the FBI as proven by the company's inability to follow owner Musk's instructions prior to the removal Baker.

24.    It is not only plausible, but likely to presume that an individual such as Baker who would directly defy Musk's orders and endeavor to hide the FBI's influence, would also take steps to prevent Goodman from revealing that FBI influence while it remained unknown.

25.    It is not only plausible, but highly likely that nonparty Sweigert was aware of Goodman's attempt to reveal illegal FBI influence to Musk and proactively alerted Baker.

26.    It is also plausible to presume, and can be regularly observed that Sweigert actively seeks opportunities to engage law enforcement, attorneys general, corporate counsel and others to thwart Goodman in any way he can and does so persistently over the past seven years.

**VI.    FBI General Counsel Jim Baker as Twitter Deputy General Counsel**

27.    On or around December 6, 2022, Musk fired Twitter Deputy General Counsel Baker who was previously FBI General Counsel from January 2014 through December 2017. (https://www.nytimes.com/2022/12/13/technology/elon-musk-twitter-shakeup.html)

28.    Baker was notably removed from the FBI after becoming embroiled in a matter concerning the criminal prosecution of Hillary Clinton campaign attorney Michael Sussman.

29.     Musk admitted publicly that even after discovering FBI involvement at Twitter, he was unaware of Baker's employment until December 4, 2022. **(EXHIBIT C)** (https://twitter.com/elonmusk/status/1600274469104234497)

30.     In a Walter Isaacson biography titled "Elon Musk" published on September 12, 2023, Musk explained his reasons for firing Baker.  After learning Baker defied his instructions and blocked information related to a New York Post story concerning a laptop attributed to Hunter Biden, Musk stated, "It's like asking Al Capone to, like, look into his own taxes."

31.     On February 8, 2023, former Twitter employees including Baker, gave sworn testimony to The House Judiciary Select Subcommittee on the Weaponization of the Federal Government proving the FBI had pervasive clandestine influence over Twitter and had paid the company millions. (https://oversight.house.gov/hearing/protecting-speech-from-government-interference-and-social-media-bias-part-1-twitters-role-in-suppressing-the-biden-laptop-story/)

## VII.   NYPD COMPLICITY

32.     Whether a clandestine agreement between NYPD, Musk, the Doe defendants, or X Corp existed or not is secondary at this stage of the case but could be learned in discovery.

33.     The NYPD defendants became complicit when they failed to examine Goodman's neck at the scene of the incident, failed to examine more than thirty seconds of a thirty nine minute video, and proceeded to cite Goodman for an offence he did not commit.

34.     To wit, the only evidence relevant to a public disturbance or disorderly conduct investigation was NYPD Officer Jennifer Caruso's brief interrogation of John Doe 1 who claimed he was not paying attention and did not hear or see anything.  This witness account is recorded in Goodman's video and contradicts Caruso's facially defective summons.

35.     At a minimum, when the doe defendants insisted that Goodman leave the public sidewalk on 17ᵗʰ street and physically assaulted him first by striking him with a badge and then by choking him, they wrongfully denied him the freedom to travel and the freedom to speak to Musk or any other party on the public on sidewalk.

36.     When John Doe 2 choked Goodman and physically grabbed him Goodman was unable to leave and was unlawfully, albeit only momentarily detained.

### VIII.   VICARIOIUS LIABILITY

37.     Although the specific interaction between the FBI and privately held X Corp as alleged here is rare, in *Romanski v. Detroit Entertainment, L.L.C,* 428 F.3d 629 (6th Cir. 2005) a jury found the Motor City Casino, a property owned by the LLC, was vicariously liable and subject to claims under 42 U.S.C. § 1983.  That case differs from this, in part due to Michigan law which dictates, "casino's security staff were licensed under state law as "private security police officer[s]." Mich. Comp. Laws (M.C.L.) § 338.1079." *Romanski v. Detroit Entertainment, L.L.C*, 428 F.3d 629, 633 (6th Cir. 2005)

38.     While New York law and the circumstances in this case differ from those Romanski faced, the actions of the Doe defendants including displaying a badge, waiting to speak with police after approaching, aggressively harassing, and ultimately assaulting Goodman belie the presumption that the Does were mere bystanders.  Additionally, NYPD Caruso's written statement that the individual was "known to the department" lend probability well beyond plausibility to Goodman claim that the Does defendants were either Twitter security personnel or private security contractor with a shared relationship between Twitter and NYPD.

### IX.   DEFENDANTS ACTED UNDER COLOR OF LAW IN VIOLATION OF GOODMAN'S RIGHTS

39.    Throughout the duration of these events, X Corp collectively and each of its employees acted under color of law at the behest, and under the control, of the FBI as proven by Baker's refusal to carry out Musk's orders to expose illegal activity implicating the FBI.

40.    "The actions of nominally private entities are attributable to the state when those actions meet one of three tests: 1. The "compulsion test:" "the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state," 2. The "public function test:" "the entity 'has been delegated a public function by the [s]tate,'" or, 3. The "joint action test" or "close nexus test:" "the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies." Sybalski, 546 F.3d at 257(emphasis added) (quoting Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n, 531 U.S. 288, 296, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001) (citations and internal quotation marks omitted)).

*Den Hollander v. Copacabana Nightclub*, 624 F.3d 30, 34 (2d Cir. 2010)

41.    Testimony from former Twitter employees in congress proved that Twitter was paid and otherwise coerced and even compelled by the FBI to engage in activity that did not include investigations into specific criminal acts or suspicion of criminal acts.

42.    In part due to the thoroughly disgusting and unprecedented nature of the allegations against the FBI with regard to its influence over Twitter, very few similar circumstances exist.  However, in *Smith v. Allwright*, the Supreme Court held that the Texas Democratic Party's primary elections constituted state action because the party was performing a traditional government function in holding elections.

*Smith v. Allwright,* 321 U.S. 649, 64 S. Ct. 757 (1944)

43.     Additionally, in Terry v. Adams, the Supreme Court held that the Jaybird

Democratic Association, a private political organization in Texas, was a state actor when it

conducted pre-primary elections that effectively excluded African American voters. The Court

found that the Jaybird Association was performing a traditional government function by holding

elections that had a significant impact on the official Democratic primary.

Terry v. Adams, 345 U.S. 461, 73 S. Ct. 809 (1953)

44.     Even though Twitter did not specifically conduct the 2020 presidential election, or

hold primaries, and did not target a specific racial group, their unprecedently role in mass media

allowed them to influence and overtly affect the outcome of the election, effectively

disenfranchising voters in a matter similar to Terry v Adams.

45.      By hiding facts now known to be true at the behest of the FBI, Twitter denied

voters their rights to an honest election and carried out a public function.

46.     The close nexus and joint function prongs are practically self-satisfying in this

case.  Former FBI attorney Baker was literally embedded at Twitter and ignored orders of

company owner Musk to jealously protect the carefully hidden interests of the FBI.

47.     Former Twitter employees including Baker have testified under oath that the FBI

caused Twitter to police speech that did not directly violate the law and was not part of a criminal

investigation, including the removal of news stories published by the New York Post related to a

laptop attributed the Hunter Biden which were subsequently found to be true, the FBI.

### CONCLUSION

48.     Goodman is not a large, multibillion dollar corporation or the wealthiest

individual on earth.  Goodman is not the largest municipality in the United States or the largest

law enforcement agency in the world.  Goodman is an individual independent journalist who can

barely pay his monthly bills and was merely trying to assist his fellow citizens by alerting Musk

of a criminal infiltration of Twitter by the FBI.

49.    The notion that Musk should be protected by the Court from appearing by counsel

in this case to defend these claims is not only absurd it is offensive to the very concept of justice.

50.    Goodman's pro se status compels the court to construe his pleadings in the most

liberal and favorable light possible.  Evidence supporting the overwhelming majority of claims in

this case is recorded on video that the Court has yet to evaluate.

51.    The Court should find that Musk has been served, should order X Corp to instruct

its owner to appear and should schedule a hearing at which this evidence will be heard.

52.    Only after that can a proper decision be rendered.  Anything less would be

manifest injustice.

Dated: New York, New York April 8, 2024
Respectfully submitted,

Jason Goodman
Pro Se Plaintiff
truth@crowdsourcethetruth.org
252 7th Avenue Apt 6s
New York, NY 10001
347-380-6998

**(EXHIBIT A)**



**(EXHIBIT B)**

D. G. SWEIGERT
PMB 13339, 514 Americas Way,
Box Elder, SD 57719

March 12, 2024

Richard a Sawyer
Special Counsel for Hate Crimes
New York State Office of the Attorney General
28 Liberty Street
20th Floor
New York, New York 10005

REF: YouTuber inciting violence against federal judge Jessica G. L. Clarke

Ladies and Gentlemen,

1.      Kindly construe this letter as a complaint against Jason Goodman, 252 7ᵗʰ Avenue, Unit 6-S, New York, N.Y. 10001 for reporting fake hate crimes.

2.      Today YouTube Jason Goodman published the following tweet concerning a fake hate crime involving a slur "kill that f_cking Jew". See below.



https://twitter.com/JG_CSTT/status/1767676939706274289

3.      Mr. Goodman is the plaintiff in litigation against the N.Y.P.D. presided over by federal judge Jessica G. L. Clarke. Apparently, Mr. Goodman was unhappy with the judge denying a motion. *Goodman v. The City of New York et al*, 1:23-cv-09648-JGLC.

4.      The matter refers to the arrival of two (2) N.Y.P.D. officers at the home of Mr. Goodman at Unit 6-S, 252 7th Avenue. In that video Mr. Goodman advises the officers that someone was on a social media channel broadcasting Mr. Goodman's address and shouting "Kill that f_cking Jew." This is Mr. Goodman's language and comments to the officers. This was a fake hoax staged for YouTube views.



Respectfully,

D. 5~f

D. G. Sweigert

Copies to:

Mary Anderson
New York City Law Department
100 Church Street
New York, NY 10007

Jason Goodman
Unit 6-S
252 7th Avenue
New York, N.Y. 10001

**(EXHIBIT C)**

