**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| JASON GOODMAN, | No. 1:23-cv-09648-JGLC-GWG |
| Plaintiff, | |
| v. | |
| THE CITY OF NEW YORK and NEW YORK CITY POLICE DEPARTMENT, NEW YORK CITY POLICE DEPARTMENT LIEUTENANT GEORGE EBRAHIM, NEW YORK CITY POLICE DEPARTMENT OFFICER CHANDLER CASTRO, NEW YORK CITY POLICE DEPARTMENT OFFICER JENNIFER CARUSO, NEW YORK CITY POLICE DEPARTMENT OFFICER KELVIN GARCIA, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JANE DOE, (fictitious names intended to be officers, representatives, agents, servants of the New York City Police Department, individually and in their official capacities), ELON MUSK, X CORP, ADAM SHARP, | |
| Defendants. | |

---

**DEFENDANT X CORP.'S RESPONSE TO**
**<u>PLAINTIFF'S RESPONSE TO ORDER TO SHOW CAUSE</u>**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION.................................................................................................1

II.     BACKGROUND...................................................................................................1

       A.      Plaintiff's Alleged Altercations With NYPD Officers and the Doe Defendants Outside X Corp.'s New York City Office.............................................................1

       B.      Plaintiff's Alleged Later Interactions With NYPD..................................................4

       C.      Plaintiff's Speculations About a Purported Agreement Between Musk and X Corp., on the One Hand, and Other Defendants, on the Other..............................5

       D.      Plaintiff's Complaint.............................................................................................5

       E.      X Corp.'s Motion to Dismiss and This Court's Order to Show Cause...................7

III.    LEGAL STANDARD ..........................................................................................7

IV.    ARGUMENT ......................................................................................................8

       A.      Plaintiff Fails to State a Plausible Section 1983 Claim Against Musk..................8

             1.      Plaintiff Does Not Plausibly Allege Musk Violated His Federal Rights ....8

             2.      Plaintiff Does Not Plausibly Allege Musk Acted Under Color of State Law ........................................................................................................12

       B.      This Court Should Not Grant Leave to Amend..................................................15

V.     CONCLUSION .................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*4C Foods Corp. v. Package Automation Co.*
　　No. 14-CV-2212, 2014 WL 6602535 (S.D.N.Y. Nov. 18, 2014) ..................................10

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*
　　526 U.S. 40 (1999) ..........................................................................................................12

*Ashcroft v. Iqbal*
　　556 U.S. 662 (2009) ..........................................................................................................7

*Bell Atl. Corp. v. Twombly*
　　550 U.S. 544 (2007) ..........................................................................................................7

*Betts v. Shearman*
　　751 F.3d 78 (2d Cir. 2014) .............................................................................................13

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*
　　531 U.S. 288 (2001) ........................................................................................................12

*Brown v. Nassau Cnty. Police Dep't.*
　　No. 14-CV-247, 2014 WL 1401510 (E.D.N.Y. Apr. 8, 2014) ........................................15

*Brown v. Twitter, Automattic Inc.*
　　No. 19-CV-6328, 2021 WL 3887611 (S.D.N.Y. Aug. 31, 2021) ......................................7

*Bynog v. Cipriani Grp., Inc.*
　　1 N.Y.3d 193 (2003) ..........................................................................................................9

*Chainani v. Bd. of Educ. Of City of N.Y.*
　　87 N.Y.2d 370 (1995) ........................................................................................................9

*Cohen v. Capers*
　　No. 16-CV-6090, 2017 WL 2455132 (S.D.N.Y. June 6, 2017) ......................................14

*Colabella v. Am. Inst. of Certified Pub. Accts.*
　　No. 2011 WL 4532132 (E.D.N.Y. Sept. 28, 2011) ........................................................12

*Davis v. City of New York*
　　No. 06-CV-3323, 2007 WL 2973695 (E.D.N.Y. Sept. 28, 2007) ..................................13

*Dotson v. Griesa*
　　398 F.3d 156 (2d Cir. 2005) .............................................................................................14

*Gomez v. N.Y. City Dep't of Educ.*
　　No. 21-CV-1711, 2022 WL 4298728 (S.D.N.Y. Sept. 19, 2022) ..................................14

*Goodman v. Bouzy*
　　No. 21-CV-10878, 2023 WL 4235851 (S.D.N.Y. June 28, 2023)...................................2

*Goodman v. Sharp*
　　No. 21-CV-10627, 2022 WL 2702609 (S.D.N.Y. July 12, 2022) ...................................2

*Grogan v. Blooming Grove Volunteer Ambulance Corps.*
　　768 F.3d 259 (2d Cir. 2014)............................................................................. 12, 13, 15

*Grullon v. City of New Haven*
　　720 F.3d 133 (2d Cir. 2013).................................................................................. 10, 11

*Hale v. Teledoc Health, Inc.*
　　No. 20-CV-5245, 2021 WL 1163925 (S.D.N.Y. Mar. 25, 2021) ...................................10

*Hogan v. A.O. Fox Mem'l Hosp.*
　　346 Fed. App'x 627 (2d Cir. 2009) ...............................................................................12

*Hollander v. Copacabana Nightclub*
　　624 F.3d 30 (2d Cir. 2010)............................................................................................13

*Hunt v. All. N. Am. Gov't Income Tr., Inc.*
　　159 F.3d 723 (2d Cir. 1998)..........................................................................................15

*Iosilevich v. Walmart Inc.*
　　No. 22-CV-4757, 2024 WL 168283 (S.D.N.Y. Jan. 12, 2024)......................................11

*King v. Mitchell*
　　31 A.D.3d 958 (N.Y. App. Div. 2006) ..........................................................................10

*Lockett v. City of Middletown*
　　No. 19-CV-08255, 2021 WL 1092357 (S.D.N.Y. Mar. 22, 2021) .................................11

*Lynch v. Southampton Animal Shelter Found. Inc.*
　　971 F. Supp. 2d 340 (E.D.N.Y. 2013) .................................................................... 12, 13

*M Entm't, Inc. v. Leydier*
　　71 A.D.3d 517 (N.Y. App. Div. 2010) ..........................................................................10

*McGugan v. Aldana-Bernier*
　　752 F.3d 224 (2d Cir. 2014)......................................................................................8, 12

*Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*
　　551 F. Supp. 3d 408 (S.D.N.Y. 2021) .............................................................................2

*Rendell-Baker v. Kohn*
　　457 U.S. 830 (1982) ......................................................................................................12

*Rice v. NAACP*
   103 A.D.2d 801 (N.Y. App. Div. 1984) ...................................................................9

*Smith v. Allwright*
   321 U.S. 649 (1944) .............................................................................................15

*Sutton v. Stony Brook Univ.*
   No. 18-CV-7434, 2021 WL 3667013 (E.D.N.Y. Aug. 18, 2021)...................................15

*Sybalski v. Indep. Grp. Home Living Program, Inc.*
   546 F.3d 255 (2d Cir. 2008)...............................................................................12, 13

*Tasfay v. Ramos*
   No. 20-CV-5472, 2022 WL 2338323 (S.D.N.Y. June 29, 2022)...................................13

*Wright v. Ernst & Young LLP.*
   152 F.3d 169 (2d Cir. 1998)..................................................................................14

*Yamashita v. Scholastic, Inc.*
   No. 16-CV-9201, 2017 WL 74738 (S.D.N.Y. Jan. 5, 2017) ...........................................9

## Statutes and Rules

42 U.S.C. § 1983.................................................................................................*passim*

Fed. R. Civ. P. 12(b)(6)........................................................................................1, 7

## I.     <u>INTRODUCTION</u>

Plaintiff's Response to the Court's Order to Show Cause (Dkt. 89; "Plaintiff's Response") only confirms that his claims should be dismissed against Elon Musk under Rule 12(b)(6). Plaintiff asserts four claims against Musk for alleged violations of Plaintiff's constitutional rights under 42 U.S.C. § 1983 ("Section 1983"). Plaintiff's claims are all based on various theories arising from Plaintiff's alleged quarrels with New York Police Department ("NYPD") officers and Doe defendants in Fall 2022, when he allegedly tried to record video outside the building where X Corp.'s New York office is located. But Plaintiff does not allege any harm by Musk. Rather, Plaintiff "suspects" Musk contracted for security services with the NYPD—a purely speculative allegation made without any supporting facts, which Plaintiff admits in his Response—and which in any event are insufficient to plausibly allege a Section 1983 claim against Musk.

Amending the Complaint cannot save Plaintiff's futile claims. At bottom, Plaintiff's dispute is with the NYPD and the Doe defendants—not Musk (or, for that matter, X Corp.). This Court should dismiss the claims against Musk without leave to amend.

## II.    <u>BACKGROUND</u>

### A.     **Plaintiff's Alleged Altercations With NYPD Officers and the Doe Defendants Outside X Corp.'s New York City Office**

Plaintiff alleges that on October 31, 2022, he read that Musk, owner of X Corp., wanted to terminate most of X Corp.'s employees, so Plaintiff "decided to do a livestream video broadcast standing outside" the building where X Corp.'s New York City office is located. Dkt. 1 ("Compl.") ¶¶ 23, 31-32. Plaintiff "speculate[d]" that Musk "likely . . . was inside" the building because Plaintiff allegedly saw a Tesla car "with New Jersey Dealership license plates" parked outside, and "a group of tall, burly individuals," who "appeared" to Plaintiff "to be security or law enforcement," "standing around the car," while "additional individuals" were in a "black SUV parked directly behind the Tesla." *Id.* ¶¶ 33-34. Plaintiff alleges he saw "protrusions at the small of the back" of some of these individuals, which "caused him to believe they were

carrying concealed firearms," though he does not allege seeing any firearms. *Id.* ¶ 33. On that day, Plaintiff alleges he had a "verbal altercation" about his video recording with John Does 2-4 and Jane Doe, who were among those individuals. Plaintiff speculates they could be NYPD police officers working as part of a security team for Musk. *Id.* ¶ 35. Plaintiff alleges the altercation ended when police officers arrived. *Id.* ¶ 35.

Plaintiff alleges that the next day, he saw a post on Twitter[1] indicating that Musk again was at X Corp.'s New York City office. *Id.* ¶ 37. He alleges he returned to the street outside the office building because Plaintiff wanted to inform Musk about Plaintiff's report allegedly called "The Twitter Coup." According to the Complaint, that "report" accuses Adam Sharp, allegedly an X Corp. employee from 2010 to 2016, and District Judge Valerie Caproni, a former general counsel of the FBI, of working "to violate the Fourth Amendment and multiple other state and federal laws, by granting the FBI and U.S Government virtually unfettered, clandestine access" to Twitter. *Id.* ¶ 28, Ex. E. The report names Sharp, Judge Caproni, and President Obama as "the three most important conspirators" of "one of the most sinister and sophisticated crimes in our nation's history," which purportedly occurred during the Obama presidency and before Judge Caproni left the FBI in 2011. *Id.* Ex. E. Plaintiff alleges he "first became aware of" Sharp in 2020, and Plaintiff began the "investigation" for his report after he and Sharp became "involved in prior legal action."[2] *Id.* ¶¶ 25, 27, 86. Judge Caproni allegedly presided over two of the lawsuits between Plaintiff and Sharp. *Id.* Ex. E.

Plaintiff alleges he returned home to write a letter to Musk and, later that evening, returned to the street outside the office building where X Corp.'s New York City office is

---

[1] Twitter, the online social media platform, has been re-branded as "X." This memorandum continues to refer to the platform as "Twitter" and refers to the company as "X Corp."

[2] X Corp. has located three lawsuits between Plaintiff and Sharp in this Court; in each of them, Plaintiff's claims or counterclaims were dismissed with prejudice. *Goodman v. Bouzy*, 21-CV-10878, 2023 WL 4235851, at *4 (S.D.N.Y. June 28, 2023); *Goodman v. Sharp*, 21-CV-10627, 2022 WL 2702609, at *9 (S.D.N.Y. July 12, 2022); *Nat'l Acad. of Television Arts & Scis., Inc. v. Multimedia Sys. Design, Inc.*, 551 F. Supp. 3d 408, 433 (S.D.N.Y. 2021).

located. *Id.* ¶ 39. Plaintiff alleges he asked John Doe 1, who was standing near the Tesla, whether Plaintiff could "wait here outside this building and when Mr. Musk comes out, . . . ask [Musk] if [Plaintiff] can hand him" an envelope, which contained the letter. *Id.* ¶ 40. John Doe 1 allegedly "responded affirmatively" and "did not deny that Musk was expected to exit the building." *Id.* Plaintiff believed John Doe 1 had a "concealed firearm," though he does not allege seeing any indication of such a firearm. *Id.*

Plaintiff alleges that while he was waiting for Musk, John Doe 2, an individual Plaintiff had encountered the day before, approached John Doe 1 and said, "y'all don't have to worry, we're gonna block all these cars for you." *Id.* ¶ 42. According to the Complaint, "[t]he interaction cause[d] [Plaintiff] to believe John Doe 1 and Jo[hn] Doe 2 kn[ew] each other and that either one or both of them [we]re undercover law enforcement or part of a clandestine security team working for Musk, X Corp[.], . . . NYPD, or all of those." *Id.*

Plaintiff further alleges that he then was approached by, and had another argument with, John Does 2-4 and Jane Doe. *Id.* ¶¶ 43-45. Jane Doe allegedly "thrust[] what appeared to be an NYPD badge" in front of Plaintiff's camera but did not identify herself as "NYPD." *Id.* ¶¶ 46, 48. She also allegedly "wield[ed] a pen like a stabbing weapon" and carried in her pockets "a large number of baseballs," which Plaintiff believes were "street fighting tools." *Id.* ¶¶ 52, 54. Plaintiff alleges that when he deflected the pen, John Doe 2 "grab[bed]" Plaintiff and shouted, "Yo bro, backup, backup, backup." *Id.* ¶ 56. John Doe 2 then "put his hand at the base of [Plaintiff's] neck[,] pinning [Plaintiff] against the façade" of the building in a "careful, calculated way." *Id.* ¶¶ 56, 59. John Doe 2's actions caused Plaintiff "to believe that John Doe 2 could be an undercover NYPD officer" or other person with "some police, or other security or self-defense training." *Id.* ¶ 61. Plaintiff alleges he caused John Doe 2 to release him, after which Plaintiff called 911. *Id.* ¶¶ 63-64. According to the Complaint, John Does 2-4 and Jane Doe did not "flee the scene," causing Plaintiff to further suspect "they are affiliated with NYPD." *Id.* ¶ 65.

Plaintiff alleges several NYPD officers arrived, including defendants George Ebrahim, Chandler Castro, and Jennifer Caruso. *Id.* ¶ 66. John Doe 1 allegedly told the officers that he

witnessed nothing. *Id.* Plaintiff was cited "with a disorderly conduct summons." *Id.* ¶ 67.

Plaintiff further alleges that "some third party" instructed the Doe defendants to "deter [Plaintiff] from [c]ommunicating with Musk." *Id.* ¶ 88. Plaintiff also alleges "Sharp would be highly motivated to prevent Musk from learning the allegations contained in [Plaintiff's] report" because "Musk could take action that would certainly lead to civil if not criminal prosecution" against Sharp. *Id.* ¶ 86.

### B.    Plaintiff's Alleged Later Interactions With NYPD

On November 5, 2022, Plaintiff allegedly went to the 10th Precinct NYPD station "with the intention of amending the official report of the November 1 incident." *Id.* ¶ 70. Plaintiff alleges he had an argument with police officers, including defendants Castro and Kelvin Garcia, who prevented Plaintiff from amending the report or filing his own report. *See id.* ¶¶ 71-73. Plaintiff alleges he left the station because Garcia threatened to "call[] an ambulance . . . to take [Plaintiff] to the hospital." *Id.* ¶ 73.

Plaintiff allegedly returned to the 10th Precinct station two days later, where police officer Matthew Powlett answered a phone call in front of Plaintiff ("Powlett Call"). *Id.* ¶ 76. Plaintiff alleges he overheard Powlett's side of the conversation, during which Powlett discussed "two guys from Google that are going to be armed security" who "need to touch base" with the caller "to show . . . what identifiers they have," but Powlett did not want to "get into it too much" because he was in the presence of "someone who's like an assault victim," *i.e.*, Plaintiff. *Id.* Plaintiff alleges "Powlett was aware [Plaintiff] had been recording the entire conversation." *Id.*

 Plaintiff does not allege Powlett mentioned Musk (or X Corp.), nor that police officers provided off-duty security services or concealed carry permits. Plaintiff alleges the Powlett Call nonetheless "caused [him] to believe" NYPD officers "are in a regular practice of negotiating off duty or other unofficial private security work." *Id.* ¶ 77. "To learn more," Plaintiff alleges, he contacted a detective to ask whether "[t]here's a legal process . . . with the NYPD" for a "professional bodyguard" to "legally concealed carry a gun in New York City" for "an event that included a celebrity speaker." *Id.* The detective allegedly responded that he believed "the law is

very gray" and that he did not "want to give [Plaintiff] any wrong information." *Id.* Plaintiff alleges the detective gave him the "phone number for the legal records office," which Plaintiff called but got "no response." *Id.*

On January 24, 2023, Plaintiff allegedly was contacted by a police officer who had investigated Plaintiff's complaint. *Id.* ¶ 78. Plaintiff states the officer's conclusion "was not satisfactory" to Plaintiff and "was the final motivation toward bringing this instant action." *Id.*

### C.  Plaintiff's Speculations About a Purported Agreement Between Musk and X Corp., on the One Hand, and Other Defendants, on the Other

Plaintiff alleges the Powlett Call "caused him to believe" NYPD officers "*might* be engaging in the trade of temporary, illicit, or otherwise illegal concealed carry permits, waive[r]s or some other 'identifiers.'" *Id.* ¶ 79 (emphasis added). This belief, in turn, "caused [Plaintiff] to *suspect* that some similar arrangement *could have been made* with Musk, X Corp[.], . . . John Doe 1 or *another third party* which allowed Musk's private security to carry concealed firearms within New York City." *Id.* (emphasis added). From this suspicion, Plaintiff contends unidentified "[e]vidence *suggests* Defendants entered into an agreement with one another to provide various security services including illegally issued temporary concealed carry permits to support Musk's work at [X Corp.'s New York office] on October 31, 2022, and November 1, 2022." *Id.* ¶ 88 (emphasis added). Plaintiff also contends that "[i]n order to protect the illegal gun licensing operation, it was necessary for NYPD officers to prevent [Plaintiff] from exposing any illicit relationship between [his] attackers, NYPD, Musk, [and] X Corp." *Id.*

Plaintiff does not allege he has any knowledge of any such agreement, nor that anyone has suggested such an agreement exists. And he does not allege he interacted with Musk at all.

### D.  Plaintiff's Complaint

The Complaint names as defendants (a) the City of New York; (b) the NYPD; (c) NYPD officers Ebrahim, Castro, Caruso, and Garcia (collectively, "Officer Defendants"); (d) X Corp.; (e) Musk; (f) Sharp; (g) John Does 1-4; and (h) Jane Doe. In the most conclusory fashion, the Complaint purports to name Musk in his individual capacity as the owner of X Corp., as "the

employer of John Doe 1, and as a contractee to NYPD." *Id.* ¶ 18.b. Plaintiff also alleges the
Officer Defendants and the Doe defendants, are "agents, servants, licensee, police officers,
officers and/or employees" of unspecified "Defendants"; and the Doe defendants are "officers,
representative, agents, servants, contractors, deputies, assignees of Defendants NYC, the NYPD
and/or Musk and X Corp[.]" *Id.* ¶¶ 20-21. Plaintiff, however, does not allege any facts
supporting his conclusory allegations of the existence of any of these purported relationships.

Plaintiff asserts four claims against all defendants "pursuant to 42 U.S.C. § 1983 for
violations of the First, Fourth, and Fourteenth Amendments." *Id.* ¶ 3. Plaintiff's claims are:

1. "Unlawful Detention"—based on John Doe 2 allegedly "restrict[ing] [Plaintiff's]
   movements . . . by confining [Plaintiff] . . . and holding him against his will" on
   November 1, 2022, as well as the Officer Defendants allegedly "forc[ing] Plaintiff to
   refrain from filing a police report" (*id.* ¶¶ 91-92);

2. "Excessive Use of Force"—based on "Defendants NYC and NYPD['s]" alleged
   "policies" resulting in his alleged "det[ention] and assault[]," and NYPD's "fail[ing]
   to give constitutionally adequate dispersal orders prior to unlawfully assaulting and
   detaining" Plaintiff (*id.* ¶¶ 99-102);

3. "Infringement of First Amendment Rights / First Amendment Retaliation"—based on
   the NYPD and Officer Defendants' purported conduct to prevent Plaintiff from
   engaging in "journalism concerning X Corp., . . . Sharp, Musk and other parties" (*id.*
   ¶ 106); and

4. "Violation of Due Process and Racial Discrimination"—based on the Doe
   defendants' alleged "disparate treatment of [Plaintiff] because of race, color and/or
   national origin" by "racially profil[ing] Plaintiff, calling him a racist and presuming
   he feared" them and by "physical assault[] with the intent to cause serious injury to
   [a] white male," as well as based on the Officer Defendants' alleged issuing a false
   summons against Plaintiff, preventing him from filing a report, and threatening to him
   "with involuntary incarceration in a medical hospital" (*id.* ¶¶ 112-119).

For relief, Plaintiff seeks compensatory and punitive damages. *Id.* ¶ 121.

      **E.**      **X Corp.'s Motion to Dismiss and This Court's Order to Show Cause**

On December 4, 2023, X Corp. moved to dismiss the Complaint for failure to state a claim (Dkt. 19; "Motion to Dismiss"). Plaintiff opposed the Motion to Dismiss (Dkt. 40) on January 8, 2024, to which X Corp. replied on January 29, 2024 (Dkt. 47).

On March 25, 2024, this Court issued an Order to Show Cause (Dkt. 84) because "it appear[ed] [to the Court] that the arguments made in [X Corp.'s Motion to Dismiss] would also govern any claims as to Musk" and "the complaint arguably fails to show that Musk was personally involved in or should be vicariously liable as to any alleged wrongful conduct." Dkt. 84 at 1. The Court ordered Plaintiff to show cause "why the claims as to Musk should not be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim." *Id.* The Court permitted X Corp. to file the instant response with its "views on this matter that may be helpful to the Court." *Id.*

## III.    <u>LEGAL STANDARD</u>

To avoid dismissal under Rule 12(b)(6), the plaintiff must plead factual allegations sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

This standard applies to pro se complaints, which, though broadly construed, must "be enough to raise a right to relief above the speculative level." *Brown v. Twitter, Automattic Inc.*, 19-CV-6328, 2021 WL 3887611, at *6 (S.D.N.Y. Aug. 31, 2021) (quoting *Twombly*, 550 U.S. at 555).

IV.   <u>**ARGUMENT**</u>

A.   **Plaintiff Fails to State a Plausible Section 1983 Claim Against Musk**

"To state a claim under § 1983, a plaintiff must allege [1] that defendants violated plaintiff's federal rights [2] while acting under color of state law." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014). Plaintiff's Response confirms that the Complaint fails to plausibly allege either of these elements for his claims against Musk, and thus should be dismissed.

### 1.   *Plaintiff Does Not Plausibly Allege Musk Violated His Federal Rights*

Plaintiff fails to plausibly allege Musk violated his federal rights for several independent reasons. *First*, Plaintiff does not plausibly allege there was any relationship between the Doe Defendants and Officer Defendants—*i.e.*, those who allegedly violated his rights—and Musk. In support of his allegations that some relationship existed between those defendants and Musk, Plaintiff alleges only: (i) Plaintiff partially overheard the Powlett Call about "two guys from Google"—not X Corp.—"that are going to be armed security"; (ii) the Powlett Call "caused [Plaintiff] to *believe*" NYPD officers "are in a regular practice of negotiating off duty or other unofficial private security work" that may involve "illegal concealed carry permits"—even though the Powlett Call did not discuss those topics; and (iii) Plaintiff's own belief about the purported "regular practice" "caused [Plaintiff] to *suspect* that some similar arrangement could have been made with Musk, X Corp[.], . . . John Doe 1 or *another third party*." Compl. 1 ¶¶ 76-77, 79 (emphasis added). From these allegations, Plaintiff concludes that "Defendants entered into an agreement . . . to provide various security services including illegally issued temporary concealed carry permits to support Musk's work . . . on October 31, 2022, and November 1, 2022." *Id.* ¶ 88.

Plaintiff's conclusory allegations against Musk are speculative and devoid of any factual basis. Instead, they are based solely on Plaintiff's mistaken *belief* in the existence of a purported arrangement that Plaintiff only "suspect[s] . . . could have been made." In fact, Plaintiff concedes

in his Response that he does not know that any such contract or arrangement exists. *See* Pl.'s Resp. at 6 ("Whether a clandestine agreement between NYPD, Musk, the Doe defendants, or X Corp existed or not is secondary at this stage of the case but could be learned in discovery."). Plaintiff's concession not only confirms that he fails to meet his pleading requirements, but also confirms he actually is engaged in "nothing more than a fishing expedition"; accordingly, his claims should be dismissed as a matter of law. *See Yamashita v. Scholastic, Inc.*, No. 16-CV-9201, 2017 WL 74738, at \*2 (S.D.N.Y. Jan. 5, 2017) (dismissing complaint that lacked factual allegations and was "nothing more than a fishing expedition"), *aff'd*, 936 F.3d 98 (2d. Cir. 2019).

*Second*, even had Plaintiff plausibly alleged any such a contract—and he does not— Plaintiff still would fail to plausibly allege Musk violated his federal rights because he does not plead facts sufficient to show that any of the Officer Defendants or Doe defendants acted on Musk's behalf. He does not allege the Officer Defendants acted on behalf of Musk, whether as employees, agents, or otherwise. As for the Doe defendants, the Complaint does not plausibly allege the existence of any employment relationship between Musk and them. Under New York law, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003). Plaintiff does not plausibly allege Musk had or exerted any degree of control over the Doe defendants sufficient to plausibly allege an employment relationship between them.[3]

Plaintiff also fails to plausibly allege the Doe defendants were Musk's agents. Under New York law, a principal is responsible for the acts of an agent only if the agent had actual or apparent authority to act on behalf of the principal. *Rice v. NAACP*, 103 A.D.2d 801, 802 (N.Y. App. Div. 1984). Plaintiff does not plausibly allege the Doe defendants had actual authority from

---

[3] The Complaint also fails to plausibly allege the Doe defendants are Musk's contractors; even if it did, Plaintiff's claim would fail because, except for a narrow exception not present here, principals cannot be held liable for the misconduct of their contractors. *Chainani v. Bd. of Educ. Of City of N.Y.*, 87 N.Y.2d 370, 380-81 (1995) ("Ordinarily, a principal is not liable for the acts of independent contractors . . . .").

Musk because "[t]he existence of actual authority depends upon the actual interaction between the putative principal and agent, *not on any perception a third party may have of the relationship*." *Hale v. Teledoc Health, Inc.*, No. 20-CV-5245, 2021 WL 1163925, at *3 (S.D.N.Y. Mar. 25, 2021) (cleaned up) (emphasis added). Plaintiff alleges no conduct between Musk, the putative principal, and the Doe defendants, the putative agents, and therefore does not plausibly allege the Doe defendants had actual authority to act on Musk's behalf.

Nor does Plaintiff plausibly allege apparent authority for the Doe defendants under New York law. Only "words or conduct of the *principal*, communicated to a third party," can "give rise to the appearance and belief that the agent possesses authority to act on behalf of the principal." *King v. Mitchell*, 31 A.D.3d 958, 959 (N.Y. App. Div. 2006) (cleaned up) (emphasis added); *see also M Entm't, Inc. v. Leydier*, 71 A.D.3d 517, 520 (N.Y. App. Div. 2010) ("[T]he words or conduct of a putative agent are insufficient to create apparent authority."). Plaintiff does not allege any words or conduct that *Musk* communicated to make it appear that the Doe defendants had authority to act on his behalf. The Complaint's many allegations of interactions between Plaintiff and the Doe defendants are "of no relevance" to whether the Doe defendants had apparent authority to act on Musk's behalf. *4C Foods Corp. v. Package Automation Co.*, No. 14-CV-2212, 2014 WL 6602535, at *6 (S.D.N.Y. Nov. 18, 2014). Accordingly, Plaintiff fails to plead facts sufficient to establish an agency relationship between Musk and the Doe defendants.

Finally, even had Plaintiff plausibly alleged the Officer Defendants or the Doe defendants were Musk's employees or agents—he does not—the Complaint does not plausibly allege that Musk, an individual, was personally involved in the defendants' alleged violation of Plaintiff's federal rights. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's *personal involvement* in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) (emphasis added) (affirming dismissal of Section 1983 claim because plaintiff failed to allege personal involvement of individual defendant); *see also Iqbal*, 556 U.S. at 663 ("[V]icarious liability is inapplicable to . . . § 1983 suits . . . ."). "[A] defendant may not be held

liable under Section 1983 solely because that defendant employs or supervises a person who violated the plaintiff's rights." *Iosilevich v. Walmart Inc.*, No. 22-CV-4757, 2024 WL 168283, at *7 (S.D.N.Y. Jan. 12, 2024) (dismissing Section 1983 claim against individual defendant). "Personal involvement" may be shown by allegations that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Grullon*, 720 F.3d at 139 (emphasis omitted). Plaintiff does not plausibly allege Musk interacted with Plaintiff, or any other conduct by Musk amounting to legally cognizable "personal involvement" in Plaintiff's quarrels with the Officer Defendants or the Doe defendants. *See id.*; *Lockett v. City of Middletown*, No. 19-CV-08255, 2021 WL 1092357, at *4 (S.D.N.Y. Mar. 22, 2021) (dismissing Section 1983 claim because "Plaintiff provided absolutely no facts upon which the Court could infer that [individual defendants] interacted with Plaintiff at all—let alone participated in any violation of any kind").[4] Thus, he fails to plausibly allege any personal involvement by Musk in the Officer Defendants' and Doe defendants' alleged violation of his federal rights.

In sum, the Complaint fails to plausibly allege Musk violated Plaintiff's federal rights, and therefore his Section 1983 claims should be dismissed.

---

[4] In Plaintiff's Response, he argues X Corp.—but not Musk—is vicariously liable for the Doe defendants' conduct. Pl.'s Resp. at 7. X Corp. declines to respond to these arguments here because Plaintiff's claim against X Corp. is outside the scope of the Order to Show Cause and because X Corp. addressed Plaintiff's contention that the Doe defendants are X Corp.'s agents or employees in X Corp.'s papers supporting its Motion to Dismiss (*see* Dkt. 19 at 9-10; Dkt. 47 at 2-5).

### 2. *Plaintiff Does Not Plausibly Allege Musk Acted Under Color of State Law*

Plaintiff also fails to plausibly allege the second element of a Section 1983 claim—that, when allegedly violating his rights, Musk was acting under color of state law. Courts apply three tests to determine whether a private party "acts under color of state law for purposes of § 1983": (1) the "compulsion test," (2) the "joint action" or "close nexus" test, and (3) the "public function test." *McGugan*, 752 F.3d at 229 (citing *Hogan v. A.O. Fox Mem'l Hosp.*, 346 Fed. App'x 627, 629 (2d Cir. 2009)). "The fundamental question under each test is whether the private [actor's] challenged actions are 'fairly attributable' to the state." *Id.*; *accord Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982). Thus, courts begin the fair attribution inquiry for the three tests by "identifying the specific conduct of which the plaintiff complains, rather than the general characteristics of the entity." *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264 (2d Cir. 2014) (internal quotation marks omitted); *accord Am. Mfrs. Mut. Ins. Co. v. Sullivan,* 526 U.S. 40, 51 (1999).

The Complaint does not allege facts that would plausibly meet the compulsion test, which is satisfied when the private party "acts pursuant to the 'coercive power' of the state or is 'controlled' by the state." *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)). "Put another way, the compulsion test is satisfied if a state exercises coercive power or provides such significant encouragement, either overt or covert, that the decision by the private actor must in law be deemed that of the State." *Lynch v. Southampton Animal Shelter Found. Inc.*, 971 F. Supp. 2d 340, 349 (E.D.N.Y. 2013) (cleaned up). "In this regard, courts look at whether the challenged activity was compelled or even influenced by state regulation." *Id.* (citing *Colabella v. Am. Inst. of Certified Pub. Accts.*, 2011 WL 4532132, at *11 (E.D.N.Y. Sept. 28, 2011)) (internal quotation marks omitted). The Complaint does not allege any facts suggesting Musk violated Plaintiff's rights "pursuant to the 'coercive power' of the state," that the state "provide[d] . . . significant encouragement" to him, either overt or covert, or that his alleged

actions were compelled or influenced by state regulation. *See Sybalski*, 546 F.3d at 257; *Lynch*, 971 F. Supp. 2d at 349.

The Complaint likewise fails to allege facts sufficient to satisfy the joint action or close nexus test. This test is satisfied when the private actor "is a willful participant in joint activity with the state," "the state provides significant encouragement" to the actor, or the actor's "functions are entwined with state policies." *Hollander v. Copacabana Nightclub*, 624 F.3d 30, 34 (2d Cir. 2010) (cleaned up). "A private actor can only be a willful participant in joint activity with the State or its agents if the two share some common goal to violate the plaintiff's rights." *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (internal quotation marks omitted). The Complaint does not plausibly allege that Musk and the state shared a common goal to violate Plaintiff's rights such that Musk can be deemed to have willfully participate in joint activity with the state. Nor does the Complaint allege facts that would plausibly show the state provided significant encouragement to Musk, or that his conduct was entwined with state policies.

The Complaint also fails to allege facts that would plausibly satisfy the public function test. "Under the public function test, state action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity." *Grogan*, 768 F.3d at 264-65 (cleaned up). "Accordingly, private actors must be delegated functions that were traditionally under the exclusive authority of the state for the public function test to be satisfied." *Sybalski*, 546 F.3d at 259. While Plaintiff "suspects" Musk contracted to *receive* security services *from* the NYPD, Plaintiff does not allege the reverse: that NYPD "contracted out" or otherwise delegated any function to Musk. Plaintiff therefore fails to allege facts that would plausibly meet this test.

Finally, even had Plaintiff plausibly alleged Musk and the NYPD entered a contract—and again, he has not— "[m]ere contracting . . . cannot support a claim of state action." *Davis v. City of New York*, 06-CV-3323, 2007 WL 2973695, at *2 (E.D.N.Y. Sept. 28, 2007) (citing *Brentwood Acad.*, 531 U.S. at 307-08); *see also Tasfay v. Ramos*, 20-CV-5472, 2022 WL 2338323, at *4-5 (S.D.N.Y. June 29, 2022) (none of the three tests were satisfied despite private

entity's "contracts with the City of New York" where complaint does not allege any governmental funding or that entity "in some way answers to the government"), *report & recomm. adopted*, 2022 WL 3225623 (S.D.N.Y. Aug. 10, 2022), *appeal dismissed*, 2023 WL 6379740 (2d Cir. July 6, 2023).

Plaintiff argues in his Response that "X Corp. collectively and each of its employees acted under color of law at the behest, and under the control, of the FBI" because: (1) James Baker, whom Plaintiff alleges was X Corp.'s deputy general counsel and a former FBI general counsel, "defied [Musk's] instructions and blocked information related to a New York Post story concerning a laptop attributed to Hunter Biden," which Plaintiff contends "expose[d] illegal activity implicating the FBI"; (2) "[i]t is not only plausible, but likely *to presume* that an individual *such as* Baker . . . would also take steps to prevent [Plaintiff] from revealing that FBI influence while it remained unknown"; and (3) X Corp. employees' testimony "in [C]ongress proved that [X Corp.] was paid and otherwise coerced and even compelled by the FBI to engage in activity that did not include investigations into specific criminal acts or suspicion of criminal acts." Pl.'s Resp. at 5-6, 8 (emphasis added).

This Court should disregard these new and irrelevant allegations, which Plaintiff did not plead in his Complaint. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) ("[A] party is not entitled to amend its complaint through statements made in motion papers."); *Gomez v. N.Y. City Dep't of Educ.*, 21-CV-1711, 2022 WL 4298728, at *3 (S.D.N.Y. Sept. 19, 2022) (disregarding new allegations raised by pro se plaintiff in her brief and dismissing complaint). In any case, these new allegations about the FBI do not plausibly allege as a matter of law that Musk acted "under color of state law," which "appl[ies] only to state actors, not federal officials." *Dotson v. Griesa*, 398 F.3d 156, 162 (2d Cir. 2005); *see also Cohen v. Capers*, No. 16-CV-6090, 2017 WL 2455132, at *4 (S.D.N.Y. June 6, 2017) (dismissing Section 1983 claim because "no action is alleged to have been committed under color of state law; the

defendants are all federal officials").[5] In any event, the FBI's alleged control over X Corp. is not the "specific conduct of which the [P]laintiff complains" for purposes of analyzing whether Musk acted under color of state law. *Grogan*, 768 F.3d at 264. Thus, Plaintiff fails to plausibly allege Musk acted under color of state law.

In sum, Plaintiff fails to plausibly allege Musk acted under color of state law for purposes of his Section 1983 claims, which should be dismissed.

## B.    This Court Should Not Grant Leave to Amend

"Although [Rule] 15(a) provides that the district court should freely grant leave to amend when justice so requires, it is proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile." *Hunt v. All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998). Leave to amend should be denied here. Plaintiff's only allegations against Musk are that he "suspects" Musk might have a contract with NYPD—allegations that, even taken as true, could not make Musk liable for Plaintiff's claims against the City, NYPD, Officer Defendants, and Doe defendants for the reasons set forth above. This Court should not allow Plaintiff to replead his futile claims against Musk. *See Sutton v. Stony Brook Univ.*, 18-CV-7434, 2021 WL 3667013, at *10 (E.D.N.Y. Aug. 18, 2021), *aff'd*, 2022 WL 4479509 (2d Cir. Sept. 27, 2022) (dismissing pro se plaintiff's "wholly speculative" Section 1983 claim with prejudice); *Brown v. Nassau Cnty. Police Dep't*, 14-CV-247, 2014 WL 1401510, at *6 (E.D.N.Y. Apr. 8, 2014) (denying leave to amend initial complaint to reassert Section 1983 claim against private party).

[The remainder of this page is intentionally left blank.]

---

[5] Plaintiff relies on an inapposite case, *Smith v. Allwright*, 321 U.S. 649 (1944), where the U.S. Supreme Court held the Democratic Party of Texas was a state actor subject to constitutional prohibitions against abridging the right to vote because the State of Texas's extensive control over the selection of party officers and primary elections. *Id.* at 661-65. Here, by contrast, Plaintiff does not plausibly allege any fact indicating state control over Musk's conduct.

## V.    <u>CONCLUSION</u>

For these reasons, Plaintiff fails to show cause why his claims against Musk should not be dismissed. This Court should dismiss the Complaint against Musk without leave to amend.

Respectfully submitted,

WILLENKEN LLP

By: */s/ Kenneth M. Trujillo-Jamison*
Kenneth M. Trujillo-Jamison
(admitted *pro hac vice*)
Peter Shimamoto
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Telephone: (213) 955-9240
Facsimile: (213) 955-9250
ktrujillo-jamison@willenken.com

*Attorneys for Defendant X Corp.*

Dated: April 22, 2024