UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

JASON GOODMAN,                                        :
                                                      :
                              Plaintiff,              :          REPORT & RECOMMENDATION
                                                      :          23 Civ. 9648 (JGLC) (GWG)
        -against-                                     :
                                                      :
THE CITY OF NEW YORK et al,                           :
                                                      :
                              Defendants.             :

-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

        Pro se plaintiff Jason Goodman brought this action against defendants the City of New

York; the New York City Police Department ("NYPD"); NYPD police officers George Ebrahim,

Chandler Castro, Jennifer Caruso and Kelvin Garcia (collectively, "City defendants"); X Corp.;

Elon Musk; Adam Sharp; and several unidentified defendants ("Doe defendants"). See

Complaint, filed Oct. 31, 2023 (Docket # 1) ("Compl."). Defendants X Corp.,[1] Sharp,[2] and the

City defendants[3] have separately moved to dismiss the complaint. In addition to the three

---

[1]  See Defendant X Corp.'s Notice of Motion to Dismiss, filed Dec. 4, 2023 (Docket # 18) ("X Corp. Mot."); Memorandum of Law in Support of Defendant X Corp.'s Motion to Dismiss, filed Dec. 4, 2023 (Docket # 19) ("X Corp. Mem."); Response in Opposition to Defendant X Corp's Motion to Dismiss, filed Jan. 8, 2024 (Docket # 40) ("Opp. to X Corp."); Defendant X Corp.'s Reply in Support of its Motion to Dismiss, filed Jan. 29, 2024 (Docket # 47) ("X Corp. Reply").

[2]  See Notice of Motion, filed Jan. 2, 2024 (Docket # 34) ("Sharp Mot."); Defendant Adam Sharp's Memorandum of Law in Support, filed Jan. 2, 2024 (Docket # 35) ("Sharp Mem."); Response in Opposition to Defendant Adam Sharp's Motion to Dismiss, filed Feb. 1, 2024 (Docket # 49) ("Opp. to Sharp"); Defendant Adam Sharp's Reply Memorandum of Law in Support, filed Feb. 15, 2024 (Docket # 52) ("Sharp Reply"); Defendant Adam Sharp's Notice of Supplemental Authority, filed Feb. 22, 2024 (Docket # 56) ("Supp. Authority").

[3]  See Notice of Motion, filed Mar. 26, 2024 (Docket # 85) ("City Mot."); Declaration of Mary Jane Anderson, filed Mar. 26, 2024 (Docket # 86) ("Anderson Decl."); Memorandum of Law in Support, filed Mar. 26, 2024 (Docket # 87) ("City Mem."); Response in Opposition to Motion to Dismiss, filed May 2, 2024 (Docket # 105) ("Opp. to City"); Reply Memorandum of

motions to dismiss, the Court ordered Goodman to show cause why the complaint should also not be dismissed as to defendant Musk,[4] see Order to Show Cause, filed Mar. 25, 2024 (Docket # 84), and the Doe defendants,[5] see Order to Show Cause, filed June 21, 2024 (Docket # 114). For the reasons that follow, the motions to dismiss should be granted and the case dismissed as to all defendants.

I. BACKGROUND

For purposes of deciding the instant motions, we assume the facts as alleged in the complaint to be true. In addition to the allegations in the complaint, the Court considers two additional sources of factual matter. First, we have considered additional factual allegations presented in Goodman's opposition papers. See, e.g., Portillo v. Webb, 2017 WL 4570374, at *1 (S.D.N.Y. Oct. 11, 2017) (considering factual allegations from pro se plaintiff's opposition submissions when deciding motion to dismiss) (collecting cases), adopted by 2018 WL 481889 (S.D.N.Y. Jan. 17, 2018). Second, we consider video footage taken by Goodman of the key events at issue. See Video, annexed as Ex. A to Anderson Decl. (Docket # 86) ("Video").[6] We

Law in Further Support, filed May 9, 2024 (Docket # 107) ("City Reply"); Letter, filed May 13, 2024 (Docket # 109) ("Pl. 5/13/24 Letter").

[4] See Response to Show Cause Order, filed Apr. 8, 2024 (Docket # 89) ("Pl. OSC Response"); Defendant X Corp.'s Response to Plaintiff's Response, filed Apr. 22, 2024 (Docket # 92) ("Def. OSC Response"); Reply to Defendants' Response, filed Apr. 30, 2024 (Docket # 101) ("Pl. OSC Reply").

[5] See Letter, filed July 4, 2024 (Docket # 118) ("Pl. Doe OSC Response"); Affidavit of Jason Goodman, filed July 16, 2024 (Docket # 120) ("Goodman Aff."); Letter, filed July 16, 2024 (Docket # 122).

[6] The video was supplied to the Court on a disk as it could not be filed on the ECF system. See Order, filed May 10, 2024 (Docket # 108); Memorandum Endorsement, filed May 15, 2024 (Docket # 110). The Court notes that Goodman also uploaded a video file documenting the events taking place on October 31, 2022, as permitted by the latter order. The Court has not found it necessary to cite to this video because the Court has accepted the complaint's recitation

consider the video because Goodman cites to the video in his complaint, see, e.g., Compl. ¶¶ 46, 49; provided a copy of the video to the City, see Opp. to City ¶ 2; and urges the Court in his opposition papers to view the video and use it to decide the motions to dismiss, see id. ¶ 9 ("[T]he Court should rely on the complete thirty-nine-minute video to understand that Goodman's actions were undertaken in the course of self-defense . . . ."). Courts frequently rely on video evidence in such circumstances when adjudicating a motion to dismiss. See Barkai v. Mendez, 629 F. Supp. 3d 166, 176-77 (S.D.N.Y. 2022) (collecting cases).

At the time of the incident that gave rise to the complaint, "X Corp." was called "Twitter." See Compl. ¶¶ 18(d), 23. Because the parties and the complaint use both names, this Report and Recommendation uses both names as well.

Goodman is a "documentarian, journalist and talk show host." Compl. ¶ 11. While Goodman provides background on previous reporting and interactions he has had with various defendants in this action, see, e.g., id. ¶¶ 27-28, the events giving rise to the instant action began on October 31, 2022, outside "X Corp's New York City headquarters," id. ¶ 31. Goodman had learned that defendant Musk, following his purchase of Twitter, Inc., "would fire most X Corp employees," and Goodman wanted "to do a livestream video broadcast" of any of the ensuing events. Id.

When he arrived at X Corp.'s office, Goodman observed a Tesla automobile "with New Jersey Dealership license plates," which he "found [ ] odd because he is aware that Tesla cars are not sold through traditional dealerships." Id. ¶ 32. He observed "a group of tall, burly individuals" standing around the car who "appear[ed] to be guarding" it. Id. ¶ 33. In another

---

of the events that took place on October 31, 2022, and those facts have no bearing on the outcome of the instant motions.

car, a black SUV, he saw another person "who also appeared to be security or law enforcement." Id. Goodman states that he "observed protrusions" on the backs of these individuals, which "caused him to believe they were carrying concealed firearms." Id. These facts suggested to him that "the individuals were specially licensed professional security or perhaps undercover law enforcement officers." Id. It also suggested to him that defendant Musk was "likely . . . inside Twitter NYC." Id. ¶ 34.

Shortly after Goodman arrived, a person referred to as "John Doe 3" shouted: "[t]hey got fired, it's over, go home!" and told Goodman that he had to leave. Id. ¶ 35. The two men argued and John Doe 3 "berate[d]" Goodman, stating that Goodman had to leave because "this is [John Doe 3's] plantation" and "Black Lives Matter . . . ." Id. While the men argued, three "other individuals situated outside Twitter NYC apparently waiting for Musk" — identified as John Doe 2, John Doe 4, and Jane Doe — "expressed their dissatisfaction with Goodman's presence and stated that they did not consent to being recorded and would call the police if Goodman did not leave." Id. The Doe defendants "called 911" and two NYPD officers arrived. Id. The officers interviewed Goodman and the Doe defendants and told Goodman that he "had acted lawfully and advised him to avoid further contact with the Doe individuals if he chose to continue recording video in public." Id. ¶ 36.

After the discussion with the police, Goodman approached the individuals surrounding the Telsa automobile and asked whether they would "convey some information to Mr. Musk." Id. ¶ 37. The information Goodman sought to provide was a report that he created related to cooperation between Twitter and the Federal Bureau of Investigation ("FBI"). See id. ¶¶ 27-28, 39. One of the individuals responded that he did not know who Goodman could contact about getting Musk the information. Id. ¶ 37. Goodman thanked him, continued recording for another

hour, and then went home.  Id.

The following day, November 1, 2022, Goodman learned from a news report that Musk had in fact been at the New York City X Corp. office and that Musk had publicly indicated he was again at the office.  Id. ¶ 38.  Believing he could "directly inform" Musk of the information contained in his report, Goodman travelled to the X Corp. office.  Id. ¶ 39.  Upon arriving, he noticed the same Telsa automobile and "approached one of the individuals guarding" it.  Id. Goodman asked the individual if he could relay a message to Musk and the individual said that he could not.  Id.  Goodman returned home, typed a "short letter," and returned to the X Corp. office.  Id.  When he returned, a different individual, John Doe 1, was guarding the Tesla automobile.  Id. ¶ 40.  John Doe 1 indicated he would not deliver the message to Musk, but "responded affirmatively" when Goodman suggested he was going to wait outside and hand the envelope to Musk himself.  Id.  Goodman began recording on his phone and shortly after, John Doe 2 approached John Doe 1, stating "y'all don't have to worry, we're gonna block all these cars for you."  Id. ¶ 42.  The seeming familiarity between John Doe 1 and John Doe 2 "cause[d] Goodman to believe" that one or both were "undercover law enforcement or part of a clandestine security team working for Musk, X Corp, Twitter NYC, NYPD, or all of those."  Id.

Several minutes later, John Doe 2, John Doe 3, and Jane Doe "surrounded" Goodman. Id. ¶ 43.  Goodman felt threatened, which was worsened when he saw John Doe 3 recording the interaction, leading him to believe that the three individuals were planning on recording a "gang beating to upload to the internet for fun."  Id.  Goodman alleges that this scenario created an "acute fear of imminent and potentially extreme bodily injury."  Id.  Jane Doe began "ruthlessly harassing" Goodman, using profanity and slurs.  Id. ¶ 44.  Goodman "attempt[ed] to ignore [Jane] Doe," id. ¶ 45, but she "repositioned herself blocking Goodman's camera view," id. ¶ 46.

Jane Doe then "thrust[] what appeared to be an NYPD badge directly at Goodman's camera, striking it," and exclaimed that's "a shield mutherf****r," as she thrust the object at Goodman's camera, striking it. Id. Goodman "demanded" to see the "shield" and asked if Jane Doe was an NYPD officer. Id. ¶ 48. John Doe 2 restrained Jane Doe who continued to make threats directed at Goodman, including challenging him to fight. Id. ¶¶ 48-50. Goodman also noticed she had a large number of baseballs in her sweatshirt pockets, which Goodman believes were intended to be used as weapons. Id. ¶ 52. At one point, Jane Doe "was holding a pen like a knife while wielding it like a stabbing weapon, thrusting it toward Goodman repeatedly." Id. ¶ 51. Because of the proximity of Jane Doe's pen to Goodman's face, Goodman became concerned that it was Jane Doe's "intention [ ] to stab him in the eye or neck or that any possible 'accident' could cause either." Id. ¶ 55. Goodman then "moved his hand quickly to block the pen and deflected it to the ground." Id. ¶ 56. During this altercation, John Doe 2 then "grab[bed] Goodman and beg[a]n shouting" "Yo bro, backup, backup, backup." Id. John Doe 2 "put his hand at the base of Goodman's neck pinning him against" a building. Id. John Doe 2 then "tightened his grip on Goodman's neck" while he was "immobilizing Goodman against the wall." Id.

John Doe 1 did not react to the "protracted argument unfolding in front" of him. Id. ¶ 49. Because of this, Goodman believed that John Doe 1 knew Jane Doe, and "knew she was not a threat to Musk." Id. ¶ 54. Goodman shouted at John Doe 1 to call the police for help. Id. ¶ 57. John Doe 1 "stood frozen and did not respond." Id.

While John Doe 2 was "restraining [ ] and gripping [Goodman's] throat," Goodman had "a moment of clarity," realizing that John Doe 2 was being "calculated" and that this behavior seemed "strange" for "a random street attack." Id. ¶ 59. John Doe 2's verbal "chanting," mainly telling Goodman to "back up," "reminded Goodman of police tactics." Id. ¶ 60. These factors

all suggested to Goodman that "John Doe 2 could be an undercover NYPD officer, an NYPD trainee, NYPD Auxiliary, a Special Patrolman . . ., or ha[d] at least had some police, or other security or self-defense training and was practiced and skilled in physically restraining people." Id. ¶ 61.  As all this was happening, another Doe defendant, John Doe 4, approached, which made Goodman fear he was at risk of "imminent bodily injury or possible death should the altercation continue to escalate."  Id. ¶ 62.  Goodman pushed John Doe 4, "which prompted John Doe 2 to release Goodman and caused the crowd to disperse."  Id. ¶ 63.

Goodman called the police.  Id. ¶ 64.  Goodman was "astonish[ed]" that none of the Doe defendants fled.  Id. ¶ 65.  He believes this suggests that they were "affiliated with [the] NYPD." Id.  "[S]even or more uniformed officers" arrived, including defendants Ebrahim, Caruso, and Castro.  Id. ¶ 66.  Goodman informed them of the assault that had taken place, but the officers did not examine his neck and Officer Castro "smiled, laughed, and openly mocked Goodman." Id.  Officer Caruso asked John Doe 1 if he had seen anything, and John Doe 1 said "no" before leaving.  Id.  "Despite the fact that the only witness to the event who was not one of the assailants claimed to witness nothing," Goodman was cited for disorderly conduct.  Id. ¶ 67.  The summons read, "[a]t TPO the undersigned is informed by someone known to the [department] that the defendant caused public alarm."  Id.  Goodman returned home and photographed "red finger marks on his neck in the location where John Doe 2 had grabbed" him.  Id. ¶ 69.

Several days later, on November 5, 2022, Goodman went to the 10th Precinct of the NYPD to file a report related to the incident outside the X Corp. office.  Id. ¶ 70.  Goodman saw Castro through the "open front door" and Castro indicated that he did not want to speak with Goodman.  Id. ¶ 71.  Goodman wished to continue recording his interactions with the police because he felt unsafe following his earlier interactions with the police.  Id.  Because "video

recording is not allowed inside the precinct," however, Goodman did not enter the 10th Precinct. Id.  Castro eventually came outside and said that Goodman did not need to file a report because no assault had occurred and because Goodman had been cited for disorderly conduct.  Id.  Goodman tried to show Castro the photographs of his neck, but Castro "refused to view" them. Id.  Another NYPD officer, Officer Garcia, came out and said that "no report [needed] to be filed."  Id. ¶ 72.  Goodman began "shout[ing]" that he would sue "every officer involved."  Id. ¶ 73.  Officer Garcia came back out and said that because of how Goodman was acting, they "called an ambulance for [him]."  Id.  Goodman viewed this as a "veiled threat" and an "abuse of power."  Id. ¶ 74.  Goodman then left.  Id.

The following day, Goodman encountered Lieutenant Ebrahim on duty near Central Park. Id. ¶ 75.  Lieutenant Ebrahim acknowledged the injury in the photographs and told Goodman that the police would "take a report" for him if he went to the 10th Precinct.  Id.

The next day, Goodman returned to the 10th Precinct.  Id. ¶ 76.  When he arrived, he spoke with Officer Powlett outside the precinct, who began recording the conversation between himself and Goodman on his body camera.  Id.  As they were talking, Powlett received a call — which Goodman alleges was "possibly" Community Affairs Officer Jarett Dilorenzo.  Id. Powlett spoke to the caller and made reference to "two gentlemen [ ] from Google" who would be "doing armed security" and were "armed."  Id.  Powlett indicated the caller would need to "link up with" the two men and said he would not "get into it too much" given he had his "camera on right now."  Id.  Goodman alleges that Powlett "conducted the conversation" in an "evasive way."  Id. ¶ 79.  Powlett then left to get Lieutenant Ebrahim, but returned and told Goodman that Lieutenant Ebrahim was not on duty.  Id. ¶ 76.  Powlett "attempted to coerce" Goodman to turn off his camera and come into the precinct to file a report.  Id.  Powlett then

"punched his own leg and slammed his foot on the sidewalk in a bizarre and inexplicable manner that made Goodman extremely uneasy," after which Goodman left.  Id.  Later, Goodman spoke with Detective Gene Ruda, inquiring into a possible procedure that allowed security guards to carry concealed weapons.  Id. ¶ 77.  Goodman was directed to the "legal records office" but has not received a response.  Id.

On January 24, 2023, NYPD Sergeant Robert O'Neill concluded an investigation into Goodman's complaints of assault.  Id. ¶ 78.  Goodman alleges that O'Neill took "an inordinately large amount of time to investigate the information and ultimately came to a conclusion that was not satisfactory to Goodman."  Id.  O'Neill did not provide the identity of Goodman's assailants.  Id.

## II.  LEGAL STANDARD

### A.  Motion to Dismiss

A party may move to dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) where the opposing party's pleading "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  While a court must accept as true all of the allegations contained in a complaint, that principle does not apply to legal conclusions.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citation, internal quotation marks, and brackets omitted).  In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678, and thus a court's first task is to disregard any conclusory statements in a complaint, id. at 679.

Next, a court must determine if a complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." Id. at 678 (citation and internal quotation marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("[A] complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion."). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "'show[n]' . . . 'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

B.  Pro Se Pleadings

In reviewing the complaint, we are mindful that "[a] document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations and internal quotation marks omitted); accord McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (a pro se party's pleadings should be construed liberally and interpreted "to raise the strongest arguments that they suggest") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). However, even pro se pleadings must contain factual allegations that "raise a right to relief above the speculative level." Dawkins v. Gonyea, 646 F. Supp. 2d 594, 603 (S.D.N.Y. 2009) (quoting Twombly, 550 U.S. at 555).

III.  DISCUSSION

        We begin by addressing the complaint's allegations against the private party defendants,

consisting of X Corp., Musk and Sharp, and then turn to the allegations against the City

defendants.  We conclude by addressing the claims against the Doe defendants.

        A.  Private Party Defendants

        X Corp., Musk and Sharp argue, inter alia, that the complaint must be dismissed because

none of the parties — two individuals and a private corporation — can be found to have "acted

under color of state law" for purposes of 42 U.S.C. § 1983.  See X Corp. Mem. at 10-13; Sharp

Mem. at 10-13; Def. OSC Response at 12-15.

        Goodman's central claim against the defendants arises under 42 U.S.C. § 1983 and

related statutes.  Compl. ¶¶ 1, 3.  "To state a claim under § 1983, a plaintiff [1] must allege the

violation of a right secured by the Constitution and laws of the United States, and [2] must show

that the alleged deprivation was committed by a person acting under color of state law."  West v.

Atkins, 487 U.S. 42, 48 (1988).  Neither Sharp, Musk nor X Corp. are alleged to be

governmental entities.  There are, however, other bases for finding private entities or individuals

have acted under color of state law:

> (1) [when] the entity acts pursuant to the coercive power of the state or is
> controlled by the state ("the compulsion test"); (2) when the state provides
> significant encouragement to the entity, the entity is a willful participant in joint
> activity with the state, or the entity's functions are entwined with state policies
> ("the joint action test" or "close nexus test"); or (3) when the entity has been
> delegated a public function by the state ("the public function test").

Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008) (internal

quotation marks, brackets, and punctuation omitted); accord Barrows v. Becerra, 24 F.4th 116,

135 (2d Cir. 2022); Fabrikant v. French, 691 F.3d 193, 207 (2d Cir. 2012).

Critically, the starting point for the analysis is to "identify[] the specific conduct of which the plaintiff complains, rather than the general characteristics of the entity." Grogan v. Blooming Grove Volunteer Ambulance Corps, 768 F.3d 259, 264 (2d Cir. 2014) (citation and internal quotation marks omitted). In other words, "[i]t is not enough . . . for a plaintiff to plead state involvement in 'some activity of the institution alleged to have inflicted injury upon a plaintiff'; rather, the plaintiff must allege that the state was involved 'with the activity that caused the injury' giving rise to the action." Sybalski, 546 F.3d at 257-58 (quoting Schlein v. Milford Hospital, Inc., 561 F.2d 427, 428 (2d Cir. 1977)) (emphasis in original).

We begin by discussing the allegations against X Corp. and then consider the allegations against Sharp and Musk.

     1.  X Corp.

While Goodman does not explicitly reference the specific test he seeks to hold the private party defendants liable under, it is plain that there are no allegations that remotely call to mind either the "compulsion test" or the "public function test." Rather, the complaint can only be read to assert that X Corp. and the other private party defendants engaged in "joint action" with a state actor — and, more specifically, that the state actor was "a willful participant in joint activity with the state." Sybalski, 546 F.3d at 257.

 "To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal" and that "the true state actor and the jointly acting private party . . . agree[d] to deprive the plaintiff of rights guaranteed by federal law." Bang v. Utopia Restaurant, 923 F. Supp. 46, 49 (S.D.N.Y. 1996); accord Wong v. Yoo, 649 F. Supp. 2d 34, 55-56 (E.D.N.Y. 2009). Because of the similarities of these requirements to the law of civil conspiracy, courts have commonly looked to the law of civil conspiracy to determine whether

the joint action allegations of a complaint are sufficient.  See, e.g., Catania v. United Fed'n of Tchrs., 2024 WL 495638, at *7 (S.D.N.Y. Feb. 8, 2024).  To show a civil conspiracy, "a plaintiff 'must provide some factual basis supporting a meeting of the minds, such as that defendants entered into an agreement, express or tacit, to achieve the unlawful end,' augmented by 'some details of time and place and the alleged effects of the conspiracy.'"  K.D. ex rel. Duncan v. White Plains Sch. Dist., 921 F. Supp. 2d 197, 208 (S.D.N.Y. 2013) (quoting Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)); accord Griffin v. Jacobi Med. Ctr., 2023 WL 6198801, at *7 (S.D.N.Y. Sept. 21, 2023).  "Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed."  Nealy v. Berger, 2009 WL 704804, at *5 (E.D.N.Y. Mar. 16, 2009) (collecting cases).

Here, Goodman appears to assert two possible "agreements" between X Corp. and a state actor.  The first is that X Corp. may have contracted with the NYPD, through the NYPD's "Paid Detail Unit," to receive security services from off-duty officers and to obtain permits for its security personnel to carry concealed firearms.  See Compl. ¶ 88 ("Evidence suggests Defendants entered into an agreement with one another to provide various security services including illegally issued temporary concealed carry permits to support Musk's work at Twitter NYC on October 31, 2022, and November 1, 2022."); see also Opp. to X Corp. ¶¶ 19-24 (discussing NYPD's "Paid Detail Unit").  The complaint is completely devoid of allegations showing that any such agreement actually existed, however.  The absence of any facts showing that the agreement existed dooms any argument that such an agreement satisfied the "joint action" test.  Moreover, the agreement as imagined by the complaint is not an agreement "to act in concert to inflict an unconstitutional injury," Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir.

1999), but rather represents some general agreement or cooperation between a private party defendant and a state actor. This too means the state action requirement has not been met.

Additionally, even if the Court were to accept the complaint's assertion that Goodman's assailants were X Corp. security personnel and that they were off-duty NYPD officers, the assertion would be insufficient to create state action because "[g]enerally, the acts of private security guards, hired by a company, do not constitute state action under § 1983." Masri v. Cruz, 2019 WL 2388222, at *3 (S.D.N.Y. June 6, 2019) (citation and quotation marks omitted) ("a peace officer employed by the Hospital as a security sergeant" did not act under color of state law for section 1983 purposes); see Brock v. City of New York, 2023 WL 3512973, at *5 (S.D.N.Y. May 18, 2023) ("[T]he existence of contracting arrangements between the . . . government[] and the defendants cannot be the basis [for] finding state action . . . ."), adopted by 2023 WL 5217933 (S.D.N.Y. Aug. 14, 2023).

The other "agreement" Goodman pleads is difficult to understand and certainly does not make X Corp. a state actor. In Goodman's telling, following Musk's purchase of Twitter, former executives, such as Sharp, sought to "hide evidence of wrongdoing." Compl. ¶ 29. Goodman asserts that Twitter's "former executives" would have been motivated to prevent Goodman from providing the evidence of wrongdoing, in the form of his report, to Musk. See id. Goodman concludes that the NYPD's assault on him was part of certain "coordinated tactics, intended to prevent Goodman from providing facts about the criminal past" of Twitter/X Corp. Id. For example, the complaint alleges that the Doe defendants became "interested in Goodman after he stated on air during the October 31, 2022 live broadcast that he would convey information to Musk that would reveal evidence of criminal acts taking place at the time in his newly acquired company." Id. ¶ 87. The complaint alleges that "some third party was communicating" with the

Doe defendants and "instructed them to specifically deter Goodman from [c]ommunicating with Musk." Id. ¶ 88.

These allegations fail because they amount to nothing but speculative and conclusory allegations of conspiracy lacking any factual basis. The same is true for Goodman's suggestion that former FBI General Counsel James Baker, Sharp, and "others in the FBI and X Corp" communicated with the third parties who then communicated with Goodman's assailants. See, e.g., Opp. to X Corp. ¶¶ 36-37; see also Compl. ¶ 30 ("Sharp has communicated with third parties, either directly or indirectly, who in turn communicated with individuals who were encouraged, coerced, employed or otherwise directed to engaged in a wide array of tactics including assault . . . ."). These allegations are also without specifics as to dates or the nature or means of the communications. Indeed, Goodman fails to allege exactly who these "third parties" are. The fact that Goodman alleges that people at the "FBI and X Corp" would be "motivated" and "ha[ve] the ability to communicate with the Doe defendants," id. ¶ 36, does nothing to render non-speculative the assertion that there was some agreement between X Corp. (or Sharp) and a state actor such as the NYPD, see Ciambriello v. County of Nassau, 292 F.3d 307, 324 (2d Cir. 2002) ("A merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a § 1983 claim against the private entity.") (citation omitted); see also Iqbal, 556 U.S. at 681 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").

Also failing to show any agreement or state action are the copious other conclusory and speculative allegations on this topic including, to provide but a sampling, allegations that (1) a nonparty may have been the individual responsible for conspiring with "Twitter, the FBI, and or NYPD to make false malicious claims" about Goodman, see Pl. OSC Response ¶ 17; (2) that

15

"Sharp and X Corp had a mutual interest in preventing Goodman from revealing alleged wrongdoing at X Corp related to illegal interactions with the FBI during and after the 2020 Presidential Election," Opp. to Sharp ¶ 42; (3) that "all X Corp employees acted under color of law because it has been testified to under oath in Congress that the FBI was providing regular directions, instructions, and even allegedly coercing X Corp during the time the events in question occurred," id. ¶ 43; (4) that "[t]he FBI had inappropriate clandestine influence or complete control over Twitter," Pl. OSC Response ¶ 22(a); and (5) that Goodman was compelled to leave the public sidewalk on November 1, 2022, because Twitter/X Corp. agents or employees "were acting under color of law carrying out orders from the FBI," Pl. OSC Response ¶ 3.

In sum, the complaint (combined with new allegations in Goodman's opposition filings) fails to show that X Corp. "jointly acted" with a state actor such that it acted under the color of state law. Accordingly, Goodman has failed to provide allegations that can form the basis for holding X Corp. liable under section 1983.

For what it is worth, even if we were to find that Goodman plausibly alleged a conspiracy between X Corp. and a state actor, Goodman fails to allege that X Corp. violated any of his federal rights. See X Corp. Mem. at 8-10. "Private employers are not liable under § 1983 for the constitutional torts of their employees . . . unless the plaintiff proves that 'action pursuant to official . . . policy of some nature caused a constitutional tort.'" Rojas v. Alexander's Dep't Store, Inc., 924 F.2d 406, 408 (2d Cir. 1990) (emphasis omitted) (quoting Monell v. Dep't of Social Serv. of the City of New York, 436 U.S. 658, 691 (1978)); accord Calderon v. St. Barnabas Hosp., 2022 WL 15523409, at *3 (S.D.N.Y. Oct. 24, 2022). Here, Goodman does not allege any "policy, custom, or practice of [X Corp.] caused a violation of [his] federal constitutional rights." Calderon, 2022 WL 15523409, at *3. Indeed, he alleges no policy at all.

16

Accordingly, the claims against X Corp. should be dismissed.

        2.  <u>Sharp</u>

Goodman's section 1983 claims against Sharp fare no better.  Goodman provides a substantial amount of information related to past dealings between himself and Sharp.  <u>See</u>, <u>e.g.</u>, Compl. ¶¶ 25-29; Opp. to Sharp ¶¶ 25-32.  However, Goodman makes clear that he is making claims only "about events that took place on November 1, 2022, outside X Corp's New York Headquarters and Sharp's alleged role in the assault on Goodman . . . ."  Opp. to Sharp ¶ 11; <u>see also</u> <u>id.</u> ¶ 19 ("[O]ld claims are not being litigated here.  This case pertains to new claims . . . .").  To this end, Goodman's sole allegation connecting Sharp to the alleged assault was that Sharp "communicated with third parties, either directly or indirectly, who in turn communicated with individuals who were encouraged, coerced, employed or otherwise directed to engage[] in a wide array of tactics."  Compl. ¶ 30; <u>see also</u> Opp. to Sharp ¶ 21 ("Goodman alleges former X Corp employees including [Sharp] conspired with the FBI and the NYPD.").  For the same reasons discussed above, such an allegation is conclusory and vague.  It therefore does nothing to show that Sharp engaged in joint action with a state actor.  It is conclusory in the sense that Goodman only alleges that Sharp "conspired with the FBI and NYPD," but fails to provide any factual information supporting this assertion.  Instead, Goodman provides biographical information on Sharp — including allegations related to Sharp's interactions with a former FBI general counsel and the fact he used to work at Twitter — and his belief that Sharp has some "motive" to obstruct him.  <u>See</u> Compl. ¶ 30 ("Because Sharp and others cannot refute Goodman's truthful claims, they rely on underhanded dirty tricks, schemes, and abusive, vexatious litigation tactics to thwart Goodman.").  But none of these allegations show "an agreement . . . between a state actor and a private [party] . . . to act in concert to inflict an unconstitutional injury."  <u>Pangburn</u>,

200 F.3d at 72.

Because Goodman has failed to provide factual allegations to create an inference that Sharp conspired with state actors to inflict an unconstitutional injury, the complaint does not show that Sharp acted under color of state law.  Accordingly, Goodman's section 1983 claims against Sharp should be dismissed.

### 3.  Musk

For similar reasons, Goodman's claims must be dismissed against Musk.  The complaint provides no non-conclusory allegations showing that Musk personally made any agreement with a state actor to violate Goodman's constitutional rights.  This failing by itself requires dismissal of Musk as a defendant.  See Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013) ("It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation.").

### 4.  Remaining Claims Against Private Defendants

Finally, in addition to referring to section 1983, the complaint makes reference to claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and 42 U.S.C. §§ 1981, 1981(a).  See Compl. ¶ 90.

Title VII allows an action to brought against an "employer."  42 U.S.C. § 2000e-2(a). But Goodman has failed to allege any facts in the complaint showing that he is or was an employee of X Corp., its predecessor Twitter, Inc., Elon Musk, or Adam Sharp.

To state a claim under § 1981, "a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities

18

enumerated in the statute." <u>Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.</u>, 7 F.3d 1085, 1087 (2d Cir. 1993). The activities enumerated in the statute include the right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981(a). "[A] plaintiff must . . . plead . . . that, but for race, [the plaintiff] would not have suffered the loss of a legally protected right." <u>Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media</u>, 589 U.S. 327, 341 (2020). The complaint is devoid of non-conclusory allegations that there was any discrimination on the basis of race by any defendant — let alone that it was the "but for" cause of any actions by a defendant. While section 1981 has been applied to instances of "racially-motivated, intentionally-infl[i]cted injury," <u>see</u> <u>Pierre v. J.C. Penney Co.</u>, 340 F. Supp. 2d 308, 312 (E.D.N.Y. 2004), Goodman does not provide any non-conclusory allegations showing that any of the private defendants inflicted any injury at all, let alone that they were motived by racial animus. Indeed, he alleges that they were motivated by a desire to prevent his reporting. <u>See</u>, <u>e.g.</u>, Compl. ¶ 106 ("Defendants engaged in these and other acts and omissions complained of herein in retaliation for Goodman's protected speech and/or conduct related to journalism concerning X Corp, Twitter NYC, Sharp, Musk and other parties.").[7]

*      *      *

---

[7] The complaint also refers to "sections 290-297" of the "New York State Human Rights Law" and "Constitution and the laws of the State of New York." Compl. ¶¶ 1, 22. Because the complaint does not identify which provisions are at issue, and because we discern in the allegations of the complaint no violation of any specific provision, we do not construe the complaint as stating a claim under any of these provisions.

In the same paragraphs, the complaint refers to violations of the "Administrative Code of the City of New York." Compl. ¶¶ 1, 22. The only alleged violation relates to "New York Administrative Code Title 14 § 107, Unlawful Use of Police Uniform or Emblem." Compl. ¶ 46. Because there is no claim that any named defendant violated this provision, it cannot form the basis of any relief.

Accordingly, Goodman's claims against X Corp., Musk and Sharp should be dismissed.

B.  City Defendants

Before addressing the allegations against the City defendants, we address the status of the Doe defendants in relation to the City Defendants.

We put to the side allegations suggesting the Doe defendants were private security for Musk or X Corp., see, e.g., Compl. ¶¶ 21, 116, because even if this were true, there would be no basis for section 1983 liability for the reasons just discussed.  At various points, the complaint suggests that the City must be liable for the conduct of the Doe defendants because the Doe defendants are "NYPD Officers, NYPD Auxiliaries, contractors, deputies, or assignees" of the City or NYPD.  See e.g., id. ¶¶ 16-17.  Goodman's opposition similarly contends that "the Doe defendants may have been employed by or operating under the instructions of NYPD . . . ."  Opp. to City ¶ 23.

The complaint and the factual allegations in Goodman's opposition papers, however, provide no non-speculative basis for concluding that the Doe defendants were NYPD employees/affiliates or acting under color of law in any other respect during their interactions with Goodman.  Notwithstanding the frequent allegations of such affiliation in the complaint, Goodman provides no non-conclusory bases for his contention that the Doe defendants acted under color of law.

The complaint alleges that Jane Doe "thrust[] what appeared to be an NYPD badge directly at Goodman's camera" while exclaiming that's "a shield."  Compl. ¶ 46.  But the mere fact that the badge "appeared to be" an NYPD badge is not enough to show Jane Doe was acting under color of law.  The allegation regarding the badge does nothing more than make Goodman's theory that Jane Doe was associated with the NYPD a "sheer possibility," which is

20

insufficient to survive a motion to dismiss.  See Iqbal, 556 U.S. at 678.[8]  In addition to the lack of identification of the badge, there is no allegation that Jane Doe effectuated an arrest or asserted any authority based on her role as a state actor.  Thus, this is not a situation where an off-duty officer "invokes the real or apparent power of the police department."  Pitchell v. Callan, 13 F.3d 545, 548 (2d Cir.1994) (citation omitted).  There was never an assertion by Jane Doe or any of the other individuals that they were officers or that they were invoking police powers, and there was never any action taken in furtherance of a police power.

The complaint also alleges that the summons Goodman received following the alleged assault stated that Officer Caruso was "informed by someone known to the dept. that the defendant caused public alarm."  Compl. ¶ 67.  As to this allegation, the fact that the basis for information underlying the summons came from "someone known" to the NYPD does not lead to the conclusion that the "someone" was an NYPD officer or employee.  The phrase is equally consistent with the informant being a civilian.  It would thus be pure speculation to conclude that it referred to an NYPD officer or employee.

Additionally, the allegation (made in plaintiff's opposition papers) that a member of the alleged security team, John Doe 1, "assisted NYPD in producing a facially defective summons by providing false testimony," Opp. to X Corp. ¶ 28, also does not show state action by a Doe defendant inasmuch as a private actor's "provision of background information to a police officer" leading to an arrest "does not by itself make [the private actor] a joint participant in state action under Section 1983," Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268, 272 (2d Cir. 1999); accord Schvimmer v. Randall, 2022 WL 4586086, at *21 (E.D.N.Y. Sept. 29,

---

[8]  The notion that Jane Doe was an NYPD officer is further undercut by the allegation that she (along with others) "called 911" without apparently using any official mode of communication when she first encountered Goodman.  Compl. ¶ 35.

2022) (vague allegations that defendants "met and reached an agreement" to "provide false and misleading testimony" did "not even begin to plausibly allege an agreement to act in concert to inflict an unconstitutional injury"), aff'd, 2023 WL 7986444 (2d Cir. Nov. 17, 2023); see also Benavidez v. Gunnell, 722 F.2d 615, 618 (10th Cir. 1983) ("The mere furnishing of information to police officers does not constitute joint action under color of state law which renders a private citizen liable under §[] 1983 . . . .").

Goodman also failed to show NYPD involvement through his allegations that: (1) John Doe 2's "chants of 'back up, back up, back up'" and other actions by the Doe defendants made Goodman believe that they had police training and thus could be undercover officers, Compl. ¶¶ 60-61, (2) Goodman believed certain individuals carried concealed firearms, id. ¶ 33, and (3) none of the Doe defendants "made any effort to flee the scene" after Goodman called the police, id. ¶ 65. It is pure speculation to conclude from these allegations that the Doe defendants were "NYPD Officers, . . . NYPD Auxiliaries, contractors, deputies, or assignees," as Goodman alleges. Id. ¶ 16; accord id. ¶ 61.

In sum, Goodman's allegations do not show that the Doe defendants were state actors through any connection with the City or the NYPD. Therefore, none of the City defendants can be liable for any of the Doe defendants' conduct.

With this in mind, we turn to the allegations in the complaint insofar as they describe conduct of the named defendants that are alleged to be City actors: that is, the City of New York, the NYPD, and police officers Ebrahim, Castro, Caruso, and Garcia.

### 1. Unlawful Detention

Goodman asserts a claim of "unlawful detention," see Compl. ¶¶ 89-97, which arises under the Fourth Amendment, see Manuel v. City of Joliet, Ill., 580 U.S. 357, 369 (2017). We

analyze this as a claim for "false arrest" because "false arrest is simply an unlawful detention or confinement brought about by means of an arrest rather than in some other way and is in all other respects synonymous with false imprisonment." Singleton v. N.Y.C. Police Dep't, 2021 WL 665032, at *5 n.6 (S.D.N.Y. Feb. 17, 2021) (citation and internal quotation marks omitted).

"A false arrest claim under Section 1983, premised on an individual's right under the Fourth Amendment to be free from unreasonable seizures, 'is substantially the same as a claim for false arrest under New York law.'" Nardoni v. City of New York, 331 F. Supp. 3d 116, 122 (S.D.N.Y. 2018) (quoting Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012)). Thus, to state a claim for false arrest, a plaintiff must show: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Willey v. Kirkpatrick, 801 F.3d 51, 70-71 (2d Cir. 2015) (quoting Broughton v. State of New York, 37 N.Y.2d 451, 456 (N.Y. 1975)).

While the complaint makes generic allegations of unlawful detention against "defendants," see Compl. ¶¶ 91-92, 94, the only specific allegation is the claim that John Doe 2 made an "illegal seizure" of Goodman by holding him against his will, Compl. ¶ 93; accord Opp. to City ¶ 22 (identifying the basis for his unlawful detention claim as the incident when John Doe 2 "forcefully grabbed Goodman by the neck and pressed him against 241 West 17th street shouting 'back up, back up' . . . ."). For the reasons already explained, none of the City defendants can be held responsible for the actions of John Doe 2.

Goodman also alleges at several points that "defendants" unlawfully confined him. See, e.g., Compl. ¶¶ 92, 94-97, 113. But such allegations cannot satisfy Goodman's obligations under Fed. R. Civ. P. 8 because the allegations "lump[] all the defendants together and fail[] to

distinguish their conduct[,] . . . [thereby] fail[ing] to give adequate notice to the defendants as to what they did wrong." Appalachian Enters., Inc. v. ePayment Sols., Ltd., 2004 WL 2813121, at *7 (S.D.N.Y. Dec. 8, 2004) (citation and quotation marks omitted); see Abadi v. NYU Langone Health Sys., 2023 WL 8461654, at *4 (S.D.N.Y. Dec. 7, 2023) (a court must "ignore the paragraphs [in the complaint] that make allegations against all or some defendants in an undifferentiated manner as a group"). In any case, we discern no allegations that any City defendant (as opposed to a Doe defendant) unlawfully confined him.

Accordingly, because the only specific allegations of unlawful detention relate to the conduct of John Doe 2, Goodman has failed to state a claim against any of the City defendants for unlawful detention.

### 2. Excessive Force

"The elements of an excessive force claim under 42 U.S.C. § 1983 mirror those of a civil battery or assault claim with the added requirement that the underlying tort be committed under the color of state law." Sierra v. City of New York, 2024 WL 947530, at *2 (S.D.N.Y. Mar. 5, 2024). Under New York law, "[o]ne commits a civil battery when (1) there was bodily contact between the plaintiff and the defendant, (2) the contact was offensive, and (3) the defendant intended to make the contact without the plaintiff's consent." Rothman v. City of New York, 2019 WL 3571051, at *16 (S.D.N.Y. Aug. 5, 2019).

The portion of the complaint that asserts "Excessive Use of Force," Compl. ¶¶ 98-102, refers to "Defendants" who "assault[ed]" Goodman. Id. ¶¶ 99-100. These allegations are insufficient to put any one defendant on notice of a claim of excessive force. Goodman's complaint and opposition papers assert that John Doe 2 used "force[]" when he "grabbed Goodman by the neck," Opp. to City ¶ 22, and that Jane Doe committed an assault when she

thrust her badge at Goodman, Compl. ¶¶ 46-47; Opp. to City ¶ 35. As already explained, the City defendants are not responsible for the conduct of any of the Doe defendants.

Accordingly, Goodman has failed to state a claim against any of the City defendants for the use of excessive force.

       3.  <u>First Amendment Retaliation</u>

To state a First Amendment retaliation claim, a private citizen must allege that: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right." <u>Curley v. Village of Suffern</u>, 268 F.3d 65, 73 (2d Cir. 2001); <u>accord</u> <u>Searle v. Red Creek Cent. Sch. Dist.</u>, 2023 WL 3398137, at *2 (2d Cir. May 12, 2023) (summary order).

Here, the precise nature of Goodman's claim is unclear. He lists a number of actions by the "defendants" that form the basis of the retaliation in the complaint, <u>see</u> Compl. ¶ 105, but the only one that involves the City defendants appears to be the issuance of the summons, <u>see</u> <u>id.</u> ¶¶ 67, 105. Goodman asserts that the summons was issued "in retaliation for Goodman's protected speech and/or conduct related to journalism concerning X Corp, Twitter NYC, Sharp, Musk and other parties." <u>Id.</u> ¶ 106.

       a.  <u>Motivation/Causation</u>

The City argues that there are no allegations that the City attempted to retaliate against Goodman's speech, <u>see</u> City Mem. at 12, and that "just because Plaintiff was arrested [sic] for disorderly conduct does not mean he was being retaliated against for exercising his first amendment rights," <u>id.</u> This argument addresses the causation element of a First Amendment retaliation claim. With respect to the causation element, a plaintiff must show that the conduct

that is protected by the First Amendment was the "but-for" cause of the defendant's action, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." See Nieves v. Bartlett, 587 U.S. 391, 399 (2019).

Goodman has no direct response to the City's argument on causation. A review of the complaint and the video supplied by Goodman is devoid of any indication that the summons was issued because of Goodman's "journalism concerning X Corp, Twitter NYC, Sharp, Musk and other parties," Compl. ¶ 106, as opposed to the officers' determination (even if incorrect, as Goodman alleges) that Goodman had engaged in disorderly conduct.

As one case notes, "mere sequence alone does not plausibly establish causation, even at the motion-to-dismiss stage and even for a plaintiff proceeding pro se." Edwards v. Penix, 388 F. Supp. 3d 135, 144 (N.D.N.Y. 2019). Instead,

> a retaliation plaintiff is obligated to allege at least some fact or facts to circumstantially establish, at the very least, a tenuous causal relationship between the two events. See, e.g., Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983) ("[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone."); Richard v. Leclaire, 2017 WL 4349381, at *5 (N.D.N.Y. Sept. 29, 2017) (Sannes, J.) ("In order to establish a causal connection at the pleadings stage, the allegations much be sufficient to support the inference that the speech played a substantial part in the adverse action."). Accordingly, plaintiff's First Amendment claim(s) will be dismissed.

Id.; accord Washington v. County of Rockland, 373 F.3d 310, 321 (2d Cir. 2004) ("[P]laintiffs must aver some tangible proof demonstrating that their protected speech animated [the adverse action]. They may not rely on conclusory assertions of retaliatory motive.") (citations and quotation marks omitted). Here, there is no allegation or reasonable inference that the officers had any prior knowledge of Goodman's "journalism concerning X Corp, Twitter NYC, Sharp, Musk and other parties," id. ¶ 106, when they arrived at the scene, and it would thus be purely

speculative to conclude that the disorderly conduct citation was issued to retaliate against Goodman for those activities.

To the extent the complaint means to allege that the protected activity was his filming on the street on the very date the summons was issued, again, it would be purely speculative to assume that Goodman was issued the summons because of the filming as opposed to the officers' judgment about whether Goodman had had a fight with Jane Doe.  See Medina v. Skowron, 806 F. Supp. 2d 647, 651 (W.D.N.Y. 2011) (observing that courts should not "indulge in specious, 'post hoc, ergo propter hoc' reasoning, i.e., to permit an inference that simply because the defendants' action followed the plaintiff's protected activity, that the former must have been motivated by the latter"); accord Zielinski v. Annucci, 547 F. Supp. 3d 227, 234-35 (N.D.N.Y. 2021).

b.  Existence of Probable Cause

The First Amendment retaliation claim fails for an independent reason.  Even if we assume that causation has been shown, Officer Caruso had probable cause to cite Goodman for disorderly conduct, which negates any claim of First Amendment retaliation.  See Fabrikant v. French, 691 F.3d 193, 215 (2d Cir. 2012) ("The existence of probable cause will defeat . . . . a First Amendment claim that is premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive."); accord Espinoza v. City of New York, 2012 WL 4761565, at *5 (S.D.N.Y. Aug. 3, 2012) (dismissing plaintiff's claim for First Amendment retaliation because police had probable cause to ticket plaintiff); Chepilko v. Henry, 2024 WL 1203795, at *11 (S.D.N.Y. Mar. 21, 2024) ("Because . . . the Court finds that Lt. Henry had probable (or arguable probable) cause to issue a criminal summons to Plaintiff, Plaintiff cannot establish a First Amendment retaliation claim based on the issuance of the summons.").

27

"In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). "Probable cause 'is not a high bar,'" D.C. v. Wesby, 583 U.S. 48, 57 (2018) (quoting Kaley v. United States, 571 U.S. 338 (2014)), and "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity," id. (quoting Illinois v. Gates, 462 U.S. 213, 243-44 & n.13 (1983)); accord Al-Anesi v. City of New York, 2022 WL 1948879, at *5 (S.D.N.Y. June 6, 2022).

As the Second Circuit has held:

> To determine the existence of probable cause, a court considers the totality of the circumstances, based on a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest. The court considers <u>those facts available to the officer at the time of the arrest and immediately before it</u>. The significance of each of these factors may be enhanced or diminished by surrounding circumstances.

Guan v. City of New York, 37 F.4th 797, 804 (2d Cir. 2022) (citations and quotation marks omitted) (emphasis added). Importantly, "[w]here there is probable cause to arrest a plaintiff or issue a summons, the Court need not make an inquiry into the defendants' motives for doing so." Norton v. Town of Islip, 97 F. Supp. 3d 241, 257 (E.D.N.Y. 2015).

Following the alleged assault, Goodman was issued a summons for disorderly conduct under New York Penal Law § 240.20(7). See Complaint/Information, annexed as Ex. F to Compl. (Docket # 1). Section 240.20(7) provides that "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: . . . He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose." While it is not clear that Goodman's conduct fits within this

subsection of § 240.20, "[t]he existence of probable cause to arrest — <u>even for a crime other than the one identified by the arresting officer</u> — will defeat a claim of false arrest under the Fourth Amendment."  <u>Figueroa v. Mazza</u>, 825 F.3d 89, 99 (2d Cir. 2016) (emphasis added).  In other words, "it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest."  <u>Jaegly v. Couch</u>, 439 F.3d 149, 154 (2d Cir. 2006).

 Another subsection of section 240.20 applies when an individual "engages in . . . violent, tumultuous or threatening behavior."  New York Penal Law § 240.20(1).  Generally, under New York law, "a person may be guilty of disorderly conduct only when the situation extends beyond the exchange between the individual disputants to a point where it becomes a potential or immediate public problem."  <u>People v. Weaver</u>, 16 N.Y.3d 123, 128 (N.Y. 2011) (citation and internal quotation marks omitted); <u>accord</u> <u>Burden v. Inc. Vill. of Port Jefferson</u>, 664 F. Supp. 3d 276, 283 (E.D.N.Y. 2023).  "In assessing whether an act carries public ramifications, relevant factors to consider are the time and place of the episode under scrutiny; the nature and character of the conduct; the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances."  <u>Weaver</u>, 16 N.Y.3d at 128.

The complaint in combination with the video supplied by Goodman shows that Officer Caruso had probable cause to issue a summons to Goodman for disorderly conduct in light of his physical interaction with Jane Doe, which at a minimum constituted "tumultuous or threatening behavior" under New York Penal Law § 240.20(1).  As to the "time and place of the episode under scrutiny," the complaint alleges that the events occurred on a public sidewalk in Manhattan by X Corp.'s office at 249 W. 17th Street, New York, NY.  <u>See</u> Compl. ¶¶ 31, 39-40.

We turn next to the video itself to determine whether there is any argument that the officers lacked probable cause to issue the summons.  The video bears on the determination of whether the officers had probable cause to issue the summons because Goodman apparently showed the portion of the video documenting the altercation to Lieutenant Ebrahim at the time the police arrived on the scene.  See Video at 16:50-16:55; Video at 17:03-17:07; Video at 23:38-23:41; Video at 28:24-28:30.

The video was taken by Goodman as he stands on the sidewalk on November 1, 2022.  At one point, the video shows two individuals, Jane Doe and John Doe 2, walk past Goodman's camera and stand somewhere behind the camera's range but apparently close to Goodman.  Video at 2:05-2:17. Goodman requests that Jane Doe and John Doe 2 stand further away from him because he felt intimidated and then states "You're a fucking cunt lady" — apparently addressing Jane Doe.  Video at 2:25-2:40.  Jane Doe replies, inaudibly, and Goodman states "Why don't you get the fuck away from me you fat little midget bitch."  Video at 2:45-2:48. Goodman and Jane Doe continue to argue with one another, both cursing, until Jane Doe appears on camera and thrusts an object at Goodman, stating "that's a shield motherfucker."  Video at 2:50-3:35.  Goodman demands to see the "badge," but Jane Doe refuses.  Video at 3:35-3:38. Jane Doe is restrained by John Doe 2, who tells Goodman to relax, while Goodman swears at him and tells him to pull Jane Doe away.  Video at 3:40-4:05.  Over the course of the next several minutes, Goodman and Jane Doe continue to argue with loud voices and insult one another.  Video at 4:05-8:30.  Throughout this period, other pedestrians can be seen walking by.

Included among the statements made in this portion of the video are Goodman saying to Jane Doe, "Bitch, I was standing here minding my own business and you came over and agitated."  Video at 9:20-9:27.  After Jane Doe responds "shut the fuck up," Godman retorts

"You shut the fuck up you fat cunt.  Get lost."  Video at 9:31.  The conversation between Jane

Doe and Goodman proceeds as follows:

> Jane Doe: Your mother, your mother.  You're very disrespectful to women.
>
> Goodman: No.  I'm disrespectful to fat idiots who come over and start bothering me, I'm extremely polite to women.  You're not a woman . . .
>
> Jane Doe: [begins repeating "Your mother" while Goodman continues]
>
> Goodman: . . . You're a fat, disgusting piece of shit who's advancing on me.  Who's threatening me.
>
> Jane Doe: You got to back up them fucking words.
>
> Goodman: What the hell are you talking about stupid idiot?
>
> Jane Doe: You're talkin' because another person would have broke your fucking mouth already.
>
> Goodman: Do it, do it!  Come at me you fat little cunt!
>
> Jane Doe: You're looking for somebody to put their hand on you cuz you're not man enough to do it.

Video at 9:30-10:00.

Near the end of this exchange, the video shows Jane Doe facing Goodman and

gesticulating forcefully with a pen in front of her.  Video at 9:48-10:00.  The complaint describes

Jane Doe as "holding [the] pen like a knife while wielding it like a stabbing weapon, thrusting it

toward Goodman repeatedly."  Compl. ¶ 51.  The video does not depict any kind of violent (as

opposed to emphatic) motion with the pen, but at one point the camera turns away from Jane Doe

and Goodman says "get that fucking pen out of my face."  Video at 10:02-10:04.  The camera

jolts and Goodman's hand can be seen briefly coming from off camera in a swinging motion in

the vicinity of Jane Doe.  Id.  The complaint alleges that "Goodman moved his hand quickly to

block the pen and deflected it to the ground."  Compl. ¶ 56.

At that point, John Doe 2 puts the bag he is carrying on the ground and approaches Goodman. Video at 10:04-10:06. Goodman says, "you just fucking touched me" and yells at John Doe 2 to not touch him and covers the camera with his hand. Video at 10:07. John Doe 2 can be heard saying "back up, back up, back up." Video at 10:07-10:15. Goodman again yells at John Doe 2 to get his hands off of him. Video at 10:10-10:15. Goodman yells that someone should call the cops. Video at 10:18-10:20.

There appears to be a break in the video at this point. The complaint alleges that John Doe 2 put his hand on Goodman's neck and pushed him against a building and that John Doe 2 "tightened his grip on Goodman's neck repeating, 'back up, back up,' while immobilizing Goodman against the wall." Compl. ¶ 56. John Doe 2 continued to restrain Goodman by his neck until he released Goodman. Id. ¶ 63. Goodman called 9-1-1 and once the call ended, Goodman resumed recording the video. Id. ¶ 64. As a result of John Doe 2's actions, Goodman had red marks on his neck. Id. ¶ 69.

The video resumes at a point where Jane Doe and John Doe 2 are standing approximately 10 to 15 feet away from Goodman in front of the camera. Video at 10:22. Goodman states, referring to Jane Doe's pen, "You were poking it in my face and I pulled it out of your hand in self-defense. Just shut up and tell it to the police you dumb bitch." Video at 10:30-10:35.

The next few minutes of the video are not accompanied by audio. Text appearing on the video indicates that Goodman was speaking with 9-1-1 dispatch. See Video at 10:40-12:19. The police arrive and an officer asks Goodman to calm down and explain what had happened. Video at 12:29-14:13. At one point, Goodman loudly accuses an individual at the scene of having participated in the assault and having "lied to law enforcement," whereupon the officer requests that Goodman continue with his story. Video at 14:16-14:25. Regarding the incident with the

pen, he tells an officer during this discussion that after Jane Doe stuck the pen "in [his] face, dangerously close to poking [him] in the eye," he "simply grabbed the pen out of her hand and threw the pen down," adding that he "did not attack" or "grab" Jane Doe.  Video at 13:26-13:42. Eventually, Lieutenant Ebrahim approaches, introduces himself, and asks that Goodman explain what had happened.  Video at 14:35.  Goodman states that he has a video of the events and Lieutenant Ebrahim requests to see it.  Video at 16:50-16:58.  The video appears to cut again to a later time period.  During this time, there was apparently a conversation where the officers determined that Goodman had hit Jane Doe as reflected in statements made by Goodman.  See Video at 17:03-17:07 ("This is not how this works.  You guys look at evidence and you determine that I hit someone.  Where did you see that?").  Over the next few minutes, Goodman speaks with an officer who on numerous occasions requests that he be less argumentative and answer her questions.  Video at 17:20-21:11.  After speaking with Goodman, the officers speak among themselves.  Video at 21:12-21:26.  The officer who had just interviewed Goodman briefly goes to speak with Jane Doe and John Doe 2.  Video at 21:30-21:39.  At 22:30, Lieutenant Ebrahim approaches Goodman and explains that there had obviously been a fight and that he would be issuing summonses to both participants because he was not sure who was at fault.  Video at 22:29-22:45.  Goodman protests that he had been strangled (apparently referring to the actions of John Doe 2 after the interaction with Jane Doe) and Lieutenant Ebrahim states that he had not seen that on the video.  Video at 22:47-22:52.  Lieutenant Ebrahim then indicates that his investigation, which included looking at the video (to which he makes reference, see, e.g., Video at 22:48-22:51, 23:39-23:42) led him to conclude that Goodman had slapped Jane Doe and John Doe 2 had pushed Goodman.  Video at 23:32-23:45.  Lieutenant Ebrahim makes several other references to the video over the course of his conversation with Goodman.  See

Video at 24:49-24:52, 28:24-28-30 ("In your <u>own</u> video I saw it").  Over the next ten minutes,

Goodman curses and insults Lieutenant Ebrahim and also attempts to engage him in a discussion

about what had occurred.  <u>See</u> Video at 24:00-34:00.  The officers eventually hand Goodman the

summons and leave.  Video at 34:30.

The issue before the Court is not whether there is a basis on which the officers could have

acted reasonably by declining to issue Goodman a summons.  Rather, the issue is whether the

facts presented to the officers allowed them to come to the conclusion that Goodman had

engaged in disorderly conduct.  Here, the video shows Goodman move his arm forcefully

towards Jane Doe and the complaint concedes that Goodman "deflected" the pen "to the

ground."  Compl. ¶ 56.  Also, the video shows Goodman admitting that he "pulled [the pen] out

of" Jane Doe's hand, even if he claimed it was in self-defense.  <u>See</u> Video at 10:30, 16:17.  In

light of these circumstances, the officers had probable cause to believe that Goodman had at a

minimum engaged in disorderly conduct because it was not clear to those officers that Jane Doe

had in fact wielded the pen in a manner that required "deflect[ion]."  Goodman's main argument

against a finding of probable cause is that his movement towards Jane Doe must be taken in

context and that the video shows he was acting in self-defense.  <u>See</u> Opp. to City ¶ 9 ("[T]he

Court should rely on the complete thirty-nine-minute video to understand that Goodman's

actions were undertaken in the course of self-defense, prior to and during an assault involving

four assailants, not two as falsely asserted in the motion to dismiss."); <u>id.</u> ¶ 25 ("Goodman acted

in self-defense and did not intend to annoy or cause inconvenience.  He engaged in the verbal

altercation only after he was surrounded, provoked, and intimidated by the Doe defendants as

proven in the video defendants attempt to recast in a false light to impugn Goodman's

character.").  But, as Lieutenant Ebrahim stated at the time, the video is inconclusive not only

about who started the fight but also about what was happening at the moment Goodman moved

his hand towards Jane Doe.  In light of this ambiguity in the video, along with Goodman's heated

statements repeatedly telling Jane Doe that she should "try" to fight him, see, e.g., Video at 4:26-

4:29 (responding "Come and do it, you fat little bitch" after Jane Doe said "I will fuck him up");

Video at 5:36-5:38 (responding "So do it, all talk" after Jane Doe said "No, I'm gonna fuck him

up"); Video at 9:55-9:58 ("Do it, do it!  Come at me you fat little cunt!"), a reasonable officer

having viewed the video could certainly conclude that Goodman's contact with Jane Doe

represented unnecessarily "violent, tumultuous or threatening behavior," New York Penal Law §

240.20(1).

    We accept as true Goodman's allegation that Jane Doe was in fact waving a pen

dangerously close to Goodman's eye.  See Compl. ¶ 55.  However, this is not depicted clearly in

the video that was presented to the officers and what matters is not what actually occurred but

what information was available to the officers at the time.  Certainly, Goodman may not be

guilty of disorderly conduct, but the Court finds that given the evidence presented to the officers,

a reasonable officer could make a finding of probable cause to issue Goodman a summons for

disorderly conduct.

    The fact that Jane Doe and John Doe 2 may have engaged in disorderly conduct or even

criminal conduct themselves does not alter this conclusion.  Case law recognizes that "whether

the officers had probable cause to arrest the other participants has no bearing on whether the

officers had probable cause to arrest [the plaintiff]."  Hernandez v. City of New York, 2022 WL

316938, at *7 (S.D.N.Y. Feb. 2, 2022); see Daniels v. City of New York, 2003 WL 22510379, at

*3 (S.D.N.Y. Nov. 5, 2003)  ("To the extent that the officers encountered two people who each

appeared credible and who each claimed to be the victim of assault by the other, the police had probable cause to arrest either [party] or both.").

Goodman claims in his opposition that Lieutenant Ebrahim "failed to review the evidence and was unable to make a determination about what had actually transpired." Opp. to City ¶ 26. But there is no non-conclusory explanation of what Lieutenant Ebrahim did or omitted doing that constituted a "fail[ure] to review evidence." In fact, the allegations and the video provided by Goodman himself make clear that Lieutenant Ebrahim looked at the video and talked to Goodman at length to learn his version of what happened. It does not matter that Lieutenant Ebrahim said he did not "know who's at fault" or "who started it." Video at 22:30-22:40. Officers are not required "to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest." Jocks v. Tavernier, 316 F.3d 128, 135-36 (2d Cir. 2003). "Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury. Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." Krause v. Bennett, 887 F.2d 362, 372 (2d Cir. 1989). It also is not significant that Goodman protested his innocence at the time given that "an officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause." Panetta v. Crowley, 460 F.3d 388, 395-96 (2d Cir. 2006).

*       *       *

Accordingly, Goodman's First Amendment retaliation claim should be dismissed for two independent reasons: (1) because the complaint fails to show that the summons was issued because of any First Amendment protected activity and (2) because, even if the plaintiff had

shown an improper motivation, the officers had probable cause to issue a summons to Goodman.[9]

        4.  <u>Due Process and Racial Discrimination</u>

Goodman also makes a claim for "violations of Due Process and Racial Discrimination." <u>See</u> Compl. ¶¶ 111-120. Any non-conclusory allegations regarding racial discrimination relate exclusively to statements made by the Doe defendants. <u>See</u> Compl. ¶¶ 112, 116. As already discussed, the complaint provides no basis for holding the City defendants liable for any actions of the Doe defendants. As to claims that the City defendants acted out of improper racial motivations, <u>id.</u> ¶¶ 113-14, there are no non-conclusory allegations supporting such claims.

As for the due process claim, it is unclear what claim is being made. In his opposition to the City's motion to dismiss, Goodman asserts three grounds for his due process claim: "the initial refusal to arrest Goodman's assailants, the issuance of a summons without reviewing evidence and . . . defendants Castro and Garcia threatening Goodman with arrest rather than taking a police report." Opp. to City ¶ 30. As to this latter claim, Goodman alleges that several days after the assault, he went to the 10th Precinct where he attempted to file a police report about the incident. Compl. ¶¶ 70-71. Officer Castro initially refused to speak to Goodman, who was standing outside the precinct, and then ultimately "refused Goodman's request to amend the

---

       [9] Goodman suggests that the NYPD's failure to give him an opportunity to file a police report related to the assault represented a separate First Amendment violation. <u>See</u> Opp. to City ¶ 32. We construe this argument as a claim that he was denied access to the courts in violation of the First Amendment. <u>See</u> <u>Brown v. Volpe</u>, 2017 WL 985895, at *4 (S.D.N.Y. Mar. 13, 2017) (construing similar allegations that plaintiff was denied the opportunity to file a police report as a First Amendment "access to the courts" claim). Such a claim fails, however, because Goodman has "no protected legal interest in [the Doe defendants'] criminal prosecution." <u>Id.</u>; <u>see</u> <u>Linda R.S. v. Richard D.</u>, 410 U.S. 614, 619 (1973) ("[I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.").

report" related to the incident.  Id. ¶ 71.  Goodman, "realizing Castro would not relent," then "raised his voice to shout past Castro, through the doorway in an attempt to draw the attention of another officer visible inside the precinct."  Id.  Officer Garcia approached the doorway and indicated that "there [was] no report to be filed."  Id. ¶ 72.  Goodman began "shout[ing]" that he "demand[ed] to file a report" and that he would "sue every officer involved."  Id. ¶ 73. This prompted Officer Garcia to "remerge [sic] from the Precinct and warn Goodman" that they had called an ambulance and that it was going to take him to the hospital.  Id.  "Goodman immediately perceived this as a threat of involuntary incarceration" and was thus compelled to leave.  Id. ¶ 74.

A plaintiff can prevail on a due process claim on either procedural or substantive due process grounds.  To state a procedural due process claim under the Fourteenth Amendment, a plaintiff must plausibly allege "(1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process."  Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted).  Here, plaintiff identifies no liberty interest that he was deprived of, and certainly does not explain how any deprivation was the result of insufficient state process.

To state a claim for violations of substantive due process, a plaintiff must allege "(1) a valid property interest or fundamental right; and (2) that the defendant infringed on that right by conduct that shocks the conscience or suggests a gross abuse of governmental authority."  Dukes v. New York City Employees' Ret. Sys., 361 F. Supp. 3d 358, 375 (S.D.N.Y. 2019) (citation and quotation marks omitted); accord 20 Dogwood LLC v. Vill. of Roslyn Harbor, 2024 WL 1597642, at *1 (2d Cir. Apr. 12, 2024) (summary order) ("To survive a motion to dismiss, a plaintiff must allege governmental conduct that is so egregious, so outrageous, that it may fairly

be said to shock the contemporary conscience.") (citation and internal quotation marks omitted). "Substantive due process is an outer limit on the legitimacy of governmental action. It does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action. Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999).

At most, Goodman's complaint alleges actions that were arbitrary or capricious, not anything that "shocks the conscience" or constitutes a "gross" abuse of governmental authority. Thus, Goodman's due process and racial discrimination claims fail and should be dismissed.[10]

     5.   Municipal and NYPD Liability

Finally, as to the City of New York specifically, because Goodman has not sufficiently alleged "an underlying constitutional violation or any policy, practice, or custom of the City" that caused such a violation, his claims against the City for municipal liability under Monell v. Dep't of Social Serv. of the City of New York, 436 U.S. 658, 691 (1978), should be dismissed.

---

[10]  While Goodman explicitly lists four causes of action in his complaint consisting of federal constitutional and statutory claims, see Compl. ¶¶ 89-120, the complaint also provides a long list of various non-statutory and non-Constitutional causes of action. See Compl. ¶ 1. Because these claims are not linked to specific allegations, and because their bases are not raised in Goodman's opposition papers, we do not find that the complaint states any such claims. Thus, we do not address them further.

That being said, because "malicious prosecution," see Opp. to City ¶ 38; Compl. ¶ 105, has an analogue in the section 1983 context, we note that any such claim would fail both because "a warrantless summons, demanding only a court appearance, cannot provide the basis for a malicious prosecution claim, under either § 1983 or state law," Brown v. City of New York, 2016 WL 7410661, at *2 (E.D.N.Y. Dec. 22, 2016) (citation and quotation marks omitted), and separately because probable cause bars an action for malicious prosecution except in circumstances not alleged here, see Nieves v. Bartlett, 587 U. S. 391, 400-402, 405-406 (2019).

Komatsu v. City of New York, 2024 WL 1639281, at *13 (S.D.N.Y. Apr. 15, 2024),

reconsideration denied, 2024 WL 1905786 (S.D.N.Y. Apr. 30, 2024).

Any claims against the NYPD must be dismissed because, as an agency of the City of

New York, the NYPD is not an entity that can be sued.  See N.Y. City Charter ch. 17, § 396

("[A]ll actions and proceedings for the recovery of penalties for the violation of any law shall be

brought in the name of the city of New York and not in that of any agency, except where

otherwise provided by law."); Jenkins v. City of New York, 478 F.3d 76, 93 n.19 (2d Cir. 2007)

(noting that the NYPD is a non-suable entity).

    C.  Doe Defendants

The only remaining defendants in this case are the Doe defendants, who have neither

been named nor served.  The complaint, however, cannot proceed against these defendants with

respect to any federal claims because the complaint fails to show that they acted under color of

law for purposes of 42 U.S.C. § 1983 or any related statutes for the reasons already stated.  See

section III.B.

Goodman's response to the Court's Order to Show Cause as to why the Doe defendants

should not be dismissed provides little by way of factual matter.  Instead, Goodman provides

nothing but hypotheticals, conjecture and conclusory statements.  As just a few examples,

Goodman alleges that (1)"[i]f the Does acted under [former FBI General Counsel James] Baker's

orders, they also acted under color of law for the FBI," Pl. Doe OSC Response at 2; (2) "[e]ven if

the Court disagrees that the Doe defendants acted under color of law, they were at least acting on

behalf of X Corp security or the NYPD," id.; and (3) "[m]y assertion that the Does acted under

color of law stems from the theory that any X Corp employee acting on instructions from Baker

was in fact acting on behalf of the FBI" in light of Baker's past employment with the FBI and the

40

fact that the FBI and NYPD participate in a Joint Terrorism Task Force, Goodman Aff. ¶¶ 19, 20.  Allegations of this sort fail to show that there is any relationship between the Doe defendants and any person acting under color of law, including the named defendants.[11]  Instead, they represent conjectural allegations of conspiracy.  Accordingly, Goodman fails to state any federal claims against the Doe defendants.

It is not clear whether there are any state law claims being pled against the Doe defendants, though Goodman seeks to amend his complaint to add claims of "assault and menacing."  See Pl. Doe OSC Response at 3; Goodman Aff. ¶ 31.  Any such state law claims should not affect the dismissal of this case, however, because in light of the dismissal of the federal claims, the Court should decline to exercise supplemental jurisdiction over any state law claims.  See 28 U.S.C. § 1367(c)(3).

Accordingly, the case should not proceed in this Court against the Doe defendants.[12]

D.  Sharp's Request for a Filing Injunction

In connection with his motion to dismiss, Sharp requests that Goodman "be barred from filing any additional documents involving Sharp in this District, and from filing any federal district court action . . . against Sharp without leave of court."  Sharp Mem. at 13.  But the Court need not decide this issue because, after Sharp made his request here, a filing injunction was issued in another case.  See Goodman v. Bouzy, 2024 WL 706973, at *2 (S.D.N.Y. Feb. 21,

---

[11]  Goodman alleges in his response to the OSC that the video evidence from October 31, 2022, shows the Doe defendants "communicating freely with employees of Musk and X Corp within and just outside their offices and on the street nearby."  See Goodman Aff. ¶ 22.  As already discussed above, see section III.A, even if there is a connection between X Corp., Musk and Goodman's assailants, such connection is insufficient to establish liability under section 1983.

[12]  Goodman requests that the Court compel the "NYPD or X Corp" to provide the names of the Doe defendants.  See Pl. Doe OSC Response at 3.  Given that Goodman's complaint should be dismissed in its entirety, there is no basis for issuing such an order.

2024); Supp. Authority at 2.  Accordingly, Sharp's request is moot inasmuch as the relief he

seeks has already been granted.

    E.  <u>Motion to Amend</u>

    Goodman states in several filings, without elaboration, that he seeks leave to amend his

complaint.  <u>See</u> Opp. to Sharp ¶¶ 39, 48; Pl. OSC Reply ¶ 18; Pl. Doe OSC Response at 3.

Plaintiff provides no indication of how he would amend the complaint in order to state a claim

against any named defendant.  Thus, leave to amend must be denied for this reason alone.  <u>See</u>

<u>TechnoMarine SA v. Giftports, Inc.</u>, 758 F.3d 493, 505 (2d Cir. 2014) ("A plaintiff need not be

given leave to amend if it fails to specify [ ] to the district court . . . how amendment would cure

the pleading deficiencies in its complaint"); <u>Gregory v. ProNAi Therapeutics Inc.</u>, 757 F. App'x

35, 39 (2d Cir. 2018) (affirming denial of leave to amend where "plaintiffs sought leave to

amend in a footnote at the end of their opposition to defendants' motion to dismiss" and

"included no proposed amendments"); <u>Crianza v. Holbrook Plastic Pipe Supply, Inc. et al.</u>, 2024

WL 216696, at *5 (E.D.N.Y. Jan. 19, 2024) ("The fact that Plaintiff's opposition brief provides

no explanation about how she intends to amend her Complaint is sufficient reason by itself to

deny leave to amend."); <u>Jahad v. Holder</u>, 2023 WL 8355919, at *10 (S.D.N.Y. Dec. 1, 2023)

("[L]eave to amend is properly denied where," as here, "all indications are that the <u>pro se</u>

plaintiff will be unable to state a valid claim.").

    In addition, the Court has considered the copious additional factual material provided in

Goodman's opposition papers.  None of this material cures the deficiencies in the original

complaint.  As was stated in a similar context by another court in denying leave to amend,

> [B]ecause I have considered the allegations raised for the first time in
> the Opposition as if they were included in the [operative complaint], Plaintiff has
> effectively been given another opportunity to amend.  <u>See</u> <u>McKeever v. Singas,</u>
> No. 17-cv-4996, 2022 WL 5430426, at *2, *15 (E.D.N.Y. June 16, 2022)

(considering allegations raised for the first time in pro se plaintiff's opposition in deciding a motion to dismiss and denying plaintiff leave to file a third amended complaint), <u>report and recommendation adopted as modified</u>, 2022 WL 4095558 (E.D.N.Y. Sept. 7, 2022).

<u>Bledsoe v. New York City Transit Auth.</u>, 2024 WL 989845, at *8 (E.D.N.Y. Mar. 7, 2024);

<u>accord</u> <u>Schuh v. Druckman & Sinel, L.L.P.</u>, 2008 WL 542504, at *12 (S.D.N.Y. Feb. 29, 2008)

(denying leave to replead where plaintiffs' inability to cure the defects in the complaint was

"made plain from the voluminous facts submitted by plaintiffs themselves").  Thus, dismissal

should be granted without leave to amend.

<u>Conclusion</u>

For the foregoing reasons, the motions of X Corp., Sharp, and the City defendants

(Docket ## 18, 34, 85) should be granted.  Additionally, Goodman's claims against defendant

Musk should be dismissed <u>sua</u> <u>sponte</u> for failure to state a claim.  All these claims should be

dismissed with prejudice.

Finally, any federal claims against the Doe defendants should be dismissed.  The district

court should decline to exercise jurisdiction over any purported state law claims against the Doe

defendants pursuant to 28 U.S.C. § 1367(c)(3).  As our recommendation disposes of the claims

against all defendants, a final judgment of dismissal should be entered.

**<u>PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION</u>**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of

this Report and Recommendation to file any objections.  <u>See also</u> Fed. R. Civ. P. 6(a), (b), (d).  A

party may respond to any objections within 14 days after being served.  Any objections and

responses shall be filed with the Clerk of the Court.  Any request for an extension of time to file

objections or responses must be directed to Judge Clarke.  If a party fails to file timely

objections, that party will not be permitted to raise any objections to this Report and

Recommendation on appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP

v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir.

2010).

Dated: July 25, 2024
        New York, New York



                                        _____
                                        GABRIEL W. GORENSTEIN
                                        United States Magistrate Judge