IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
                JASON GOODMAN,

                          Plaintiff,
-against-

THE CITY OF NEW YORK and NEW YORK CITY
POLICE DEPARTMENT, NEW YORK CITY POLICE
DEPARTMENT LIEUTENANT GEORGE EBRAHIM,
NEW YORK CITY POLICE DEPARTMENT OFFICER
CHANDLER CASTRO, NEW YORK CITY POLICE
DEPARTMENT OFFICER JENNIFER CARUSO, NEW
YORK CITY POLICE DEPARTMENT OFFICER
KELVIN GARCIA, JOHN DOE 1, JOHN DOE 2, JOHN
DOE 3, JOHN DOE 4, JANE DOE, ELON MUSK, X
CORP, ADAM SHARP.
                         Defendants.
-----------------------------------------------------------------------X

23-cv-09648-JGLC-GWG

**MOTION FOR RECONSIDERATION AND RELIEF FROM JUDGMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 59(e) AND 60(b)**

        I.      Introduction

        Unprecedented events occurred within days of the dismissal of this action which shed new light on facts and details that this dispute is fundamentally about. After attempting to report a crime unrelated to this case at the NYPD 14th Precinct on September 5, 2024, Plaintiff was assaulted again and then placed in danger of imminent bodily harm or death by officers who engaged in deliberate and malicious deception. Later that same day, it was announced that New York City Mayor Eric Adams and NYPD Commissioner Edward Caban, had both come under Federal Investigation which culminated in the historic indictment of the now disgraced Mayor. Newly appointed NYPD Commissioner Thomas Donlon also became a target of the investigation on or around September 20. Former FDNY Bureau of Fire Prevention officials have been indicted in a bribery scandal and accusations of cash "shake downs" were linked to so-called private security firms operated by former commissioner Caban's twin brother. These schemes substantially match plaintiff's allegations against NYPD defendants, Elon Musk and X Corp. To

wit, Mayor Adams is now represented by Mr. Musk's personal attorney and widely recognized close advisor Alex Spiro of Quinn Emanuel, LLP. At the outset of this instant action, Spiro was contacted by Plaintiff and is fully aware of the allegations. The close nexus of these individuals and events can no longer be ignored. The judgment dismissing this case must be overturned.

Because of these unprecedented events, and for the additional reasons stated below, plaintiff Goodman, proceeding pro se, respectfully submits this Motion for Reconsideration and Relief from Judgment pursuant to FRCP Rules 59(e) and 60(b). Plaintiff further requests that the Court reconsider its Order dated August 29, 2024, adopting the Report and Recommendation and dismissing Plaintiff's claims against Defendants. Plaintiff submits that the Court's decision contains clear errors of fact and law, misinterprets Plaintiff's claims, and fails to consider key evidence, including newly discovered facts revealing a bias aimed at protecting allegedly corrupt government actors and their financial schemes while simultaneously suppressing Plaintiff's first amendment right to redress grievances with the government.

## II. Legal Standard

1. Under Rule 59(e), the court may reconsider a judgment to correct clear errors of law or fact, newly discovered evidence, or to prevent manifest injustice. Additionally, Rule 60(b) provides relief from judgment for reasons including newly discovered evidence, fraud, misrepresentation, misconduct by the opposing party, or any other reason justifying relief.

## III. Grounds for Reconsideration and Relief from Judgment

### A. Misunderstanding of First Amendment Claims

2. The Court's ruling reveals a fundamental misunderstanding of Plaintiff's First Amendment claims, particularly concerning NYPD Officer Chandler Castro's refusal to take Plaintiff's report in November 2022. In the initial complaint, Plaintiff did not allege that Officer

Castro was retaliating against Goodman for his journalistic activities as incorrectly interpreted by the Court.  Officer Castro's actions amounted to a First Amendment violation because he refused to take Plaintiff's report, thus denying Plaintiff the right to redress grievances against the NYPD pertaining to their own egregious misconduct on November 1, 2022.

3. On September 5, 2024, Plaintiff attempted to file a new police report concerning matters completely unrelated to this case.  After discovering suspicious U.S. military personnel occupying a private hotel, Goodman learned that a nonprofit organization, the Neighborhood Association of Inter-Cultural Affairs, had received over $79,000,000 from the city to coordinate migrant services and in doing so was utilizing military personnel at the hotel.  Upon further researching this nonprofit organization Goodman learned its chief operating officer Richard Izquierdo Arroyo had been convicted of embezzling over $100,000 from a nonprofit that had employed him previously.  **(EXHIBIT A)**

4. Public IRS 990 filings indicate Arroyo is paid over $650,000 annually, which is suspicious in and of itself and an alarmingly high salary for any individual to be paid by any non-profit for any position at all.  When viewed in light of revelations in the Eric Adams indictment, a clearer picture begins to come into view. **(EXHIBIT B)**

5. On September 26, 2024, in a public press conference, U.S. Attorney for the Southern District of New York Damien Williams described the charges against Mayor Adams.  Among them was a "straw donor" scheme whereby unnamed Adams backers steered large sums of money to his mayoral campaign to maximize public dollars the campaign would receive.

6. While Goodman has no direct evidence that Arroyo was one of these alleged straw donors described in the indictment, in a good faith effort to report a suspected crime Goodman personally entered the 14th precinct and attempted to explain the details to an officer.

7. Upon hearing mention of the Wolcott hotel, the location of the suspected crimes, and in what can only be described as a troubling pattern and practice if not direct retaliation for past disputes including this case, NYPD officer Justin Mclaurin assaulted and physically ejected Goodman from the precinct without due cause and, again violating Goodman's first amendment rights, failed to take a report. Under fear of imminent bodily harm, Goodman left the 14th precinct and telephoned the detective bureau and spoke with an individual identifying himself as detective Johnson. Johnson agreed to meet at 4 West 31st Street the following day at 10:30 am.

8. Upon arrival at the agreed upon location, Goodman observed three individuals who matched public descriptions of Tren de Aragua gang members, handling a very small infant. These individuals appeared to be attempting to hand off the infant to another person driving a vehicle with no valid New York license plate and only a suspicious, paper, temporary Florida tag.

9. When Detective Johnson failed to arrive as scheduled, Goodman phoned the 14th precinct again and was informed there was no Detective Johnson employed there. In response to his request that another detective be sent right away, Goodman was mocked by the officer who made childlike police siren sounds with his mouth prior to hanging up the phone.

10. This pattern and practice of intimidation and abuse of Goodman's right matches the treatment Goodman encountered when he attempted to supplement a police report at the 10th precinct with Officer Castro after the November 1, 2022 assault outside X Corp headquarters.

11. The Court incorrectly assumed that Plaintiff believed Officer Castro's refusal was related to Plaintiff's journalism. This error not only misrepresents Plaintiff's claims but also demonstrates a failure to properly engage with the facts as presented. The violation at issue was the NYPD's obstruction of Plaintiff's right to file a police report, not retaliation for journalism. This obstruction has now become a pattern and practice regarding Goodman's interactions with

NYPD. The Court's inability or refusal to grasp this distinction either demonstrates a serious error in judgment or a deliberate effort to ignore the core facts of the case, either of which disqualifies the Court from providing fair judgment.

**B.    Government's Fear of Plaintiff's Journalism**

12.    Ironically, the Court's misinterpretation of Plaintiff's First Amendment claim against Officer Castro causes Goodman to posit that the government, including the City of New York under Mayor Eric Adams, the NYPD and this Court itself, may in fact fear Plaintiff's journalism. While Plaintiff initially did not allege that Officer Castro's actions were retaliatory, the recent actions of the 14th precinct demonstrate that there is a pattern and practice by the City of New York, the NYPD and this Court to suppress Plaintiff's journalistic activities, violate his rights and abuse the law to benefit the corrupt schemes now revealed in federal indictments that go right to the top of city government and top NYPD executives.

13.    The court can no longer ignore this new evidence and must reverse its misguided decisions and reinstate this case at once including reassignment to an impartial Judge who did not play a role in New York State government during the evolution of these scandalous occurrences. A trial by jury overseen by an impartial judge, that is someone other than judge Clarke, is the only path to justice in this matter.

**C. X Corp, Elon Musk's Bodyguard, and the Removal of Evidence**

14.    The Court's dismissal of Plaintiff's claims ignored critical facts surrounding X Corp and the actions of Elon Musk's personal bodyguard, who lied to the police and removed a Tesla vehicle containing video evidence relevant to Plaintiff's case. This removal constitutes obstruction of justice and spoliation of evidence and played a significant role in undermining Plaintiff's ability to obtain crucial information for the case. The Court's failure to address these

issues or consider how the destruction of evidence impacted Plaintiff's claims leaves a significant gap in the analysis and is another reason the dismissal must be reversed.

### D.  Doe Defendants and the Court's Failure to Compel Disclosure

15.    The identities of the Doe Defendants remain concealed, despite clear evidence that the NYPD, X Corp, Elon Musk, and John Doe 1 know or have access to information about their identities. Video evidence already submitted shows that John Doe 1 conversed with other Doe defendants, indicating that these individuals are familiar with one another and their roles.

16.    It is imperative that the Court compel the NYPD, X Corp, Elon Musk, and John Doe 1 to disclose what they know about these individuals. The ongoing concealment of the Doe defendants' identities not only obstructs justice but also makes all involved parties, including this Court, complicit in the assault against Plaintiff.  This deliberate obfuscation of facts must be addressed to ensure a full and fair adjudication of Plaintiff's claims.

### E.  Adam Sharp, Twitter, and FBI Collaboration

17.    The Court overlooked the involvement of Adam Sharp, former Twitter executive, and the broader influence of Twitter, X Corp, and the FBI in suppressing Plaintiff's journalistic activities related to the now widely acknowledged interference with the 2020 presidential election. The joint action between private actors and government entities to censor and retaliate against journalists raises serious First Amendment concerns that the Court should have thoroughly examined.  Failure to do so further mandates reversal of the wrongful dismissal.

18.    Adam Sharp's close ties to the dissemination of information during the 2020 election, along with the involvement of the FBI and former Twitter counsel James Baker, show a coordinated effort to suppress Plaintiff's reporting and chill his First Amendment rights. The

Court's failure to address these important facts is a clear oversight and demonstrates a lack of consideration for the broader implications of Plaintiff's claims.

### F. James Baker and Government Interference

19. Plaintiff's case involved substantial evidence suggesting that James Baker and other government actors were directly involved in censorship efforts on platforms like Twitter, which disproportionately affected Plaintiff's journalism. The Court's dismissal without considering these critical connections demonstrates a failure to acknowledge the role that government interference played in these claims, especially in the context of the 2020 election.

### G. David Sweigert's Lawfare Tactics

20. Malicious non-party David Sweigert's role in filing numerous lawsuits against Plaintiff and his open efforts to manipulate legal processes including this instant action, with the stated goal to suppress Plaintiff's work is a prime example of lawfare tactics designed to harass, intimidate, and overwhelm. Sweigert's coordination with other defendants to achieve these aims further highlights the retaliatory nature of the actions against Plaintiff.  The Court's decision to take no action upon notification that Sweigert had sent a letter to counsel for New York City describing Goodman as a **"FUCKING JEW"** is truly disgusting, reprehensible and inexcusable. This one action alone so fundamentally calls Judge Clarke's judgment in this matter into question she must now voluntarily recuse herself lest the stench of bigotry, racism and vile Jewish hatred taint any further decisions in this matter.  The judge's reprehensible act also ignored the broader context of Sweigert's repeated and abusive litigation tactics.  This represents a significant failure in understanding the cumulative impact of these efforts on Plaintiff's ability to operate as a journalist and earn a living, two critical things Sweigert endeavors to obstruct.

### H. Judicial Notice of Recent Revelations Regarding Social Media Platforms and Government Collaboration

21. Since the filing of this case, there have been significant revelations that further substantiate Plaintiff's claims that social media platforms, including Twitter (now X Corp), cooperated with the U.S. government in ways that suppressed free speech and journalistic activities. The Court should take judicial notice of these facts, as they directly support Plaintiff's First Amendment claims and allegations of government interference.

### I. Mark Zuckerberg's Letter to House Judiciary Chairman Jim Jordan

22. Mark Zuckerberg, CEO of Meta (formerly Facebook), recently admitted in a letter to House Judiciary Chairman Jim Jordan that Facebook cooperated with the U.S. government in ways that improperly influenced content moderation and public discourse. This admission directly aligns with Plaintiff's claims that social media platforms, including Twitter, acted in concert with the government to suppress information, particularly during the 2020 election.

23. This revelation is critical to Plaintiff's case, as it confirms the joint action between government entities and private platforms like X Corp (formerly Twitter), demonstrating a clear pattern of First Amendment violations through the suppression of dissenting voices, including Plaintiff's journalism.

### J. Jim Baker and Former Twitter Employees' Congressional Testimony

24. Former Twitter counsel Jim Baker and other Twitter employees have also testified before Congress, confirming that Twitter cooperated with U.S. government agencies, including the FBI, in moderating and suppressing content. These testimonies provide further support for Plaintiff's claims of censorship and retaliation.

25. The Court's failure to take judicial notice of these facts reinforces the need for reconsideration of the judgment and acknowledgment of the collusion between government entities and private companies in suppressing Plaintiff's First Amendment rights.

**K. Court's Denial of Reality and Failure to Acknowledge Government-Corporate Collaboration**

26. Plaintiff believes that the Court, in its decision to dismiss this case, has chosen to stipulate its own version of reality, ignoring the mounting evidence that government-corporate collaboration has been used to suppress journalism and dissent and improperly impact the outcome of free and fair elections. This represents a fundamental and existential threat to our Constitutional Republic. These recent revelations from Zuckerberg, Baker, and others, as well as the ongoing congressional investigations, demonstrate the pervasive and unconstitutional nature of these actions.

27. By failing to take judicial notice of these developments, the Court risks perpetuating a false narrative that government interference with social media platforms did not occur, when it is now a matter of public record. The Court's refusal to acknowledge these facts is yet another reason to reconsider the judgment and allow Plaintiff's claims to proceed.

### IV. Voluntary Recusal or Motion to Disqualify

28. Given the clear bias demonstrated by the presiding judge in this case, including mischaracterizations of Plaintiff's claims, a failure to address key evidence, a grotesque, undeniable demonstration of bigotry tending toward religious persecution, and in the interest of judicial efficacy, Plaintiff respectfully suggests that the judge consider voluntary recusal. If the judge refuses to voluntarily recuse, Plaintiff reserves the right to file a motion to disqualify based on clear bias and the judge's failure to fairly adjudicate this matter.

29. It is important to note that Judge Clarke was previously employed by New York State Attorney General Letitia James as recently as 2023. As the rampant criminality of New York City government continues to be exposed by U.S. Attorneys and other federal investigators it cannot be denied that AG James failure to identify, investigate, or prosecute any of the vast corruption in New York City government represents a fundamental lack of competence if not direct involvement. AG James has been widely criticized by legal pundits on both sides of the political aisle for what many believe is unfair prosecution of former U.S. President and political adversary Donald Trump.

30. The evolving scandal continues to expand at the time of this filing. It remains an open question as to whether AG James or even Judge Clarke herself could be implicated. In an August 15, 2024 New York Daily News article citing a filing in Bronx Civil Court, AG James was named as a frequent patron of a restaurant owned by disgraced NYPD commissioner Caban's brother, Richard Caban, Con Sofrito. The apparent conflict of interest here is so alarming, Judge Clarke must voluntarily recuse herself or else provoke an immediate motion pursuant to 28 U.S. Code § 455.

### V.  Right to Amend the Complaint to Include Additional Defendants

31. In light of the unprecedented and stunning new evidence arising from the events of September 2024, Plaintiff requests leave to amend the complaint to add additional defendants, including every detective from the 14th precinct involved in the deceptive and dangerous actions against Plaintiff, as well as Officer Justin McLaurin, who physically assaulted Plaintiff in the lobby of the precinct. Additional relevant defendants will include Mayor Eric Adams himself due to the large amount of evidence that he presided over a fundamentally corrupt City

MOTION FOR RECONSIDERATION AND RELIEF FROM JUDGMENT PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 59(e) AND 60(b)   – 10

government and engaged in the precise financial schemes Goodman has accused defendant Musk and X Corp of entering into with the NYPD.

### VI. Conclusion

32. For the foregoing reasons, Plaintiff respectfully requests that the Court grant this Motion for Reconsideration and Relief from Judgment, vacate the judgment dismissing Plaintiff's claims, allow Plaintiff's case to proceed on the merits, and grant leave to amend the complaint to include additional defendants and new claims. Plaintiff further requests that the judge immediately and voluntary recuse herself to ensure a fair and impartial adjudication. Plaintiff also reserves the right to file a formal motion for recusal and a Notice of Appeal should the Court deny this motion.

Dated: September 27, 2024

Respectfully submitted,

Jason Goodman
Pro Se Plaintiff
truth@crowdsourcethetruth.org
252 7th Avenue Apt 6s
New York, NY 10001
347-380-6998

**(EXHIBIT A)**



**United States Attorney**
**Southern District of New York**

| | |
|---|---|
| **FOR IMMEDIATE RELEASE**<br>**MARCH 12, 2010** | **CONTACT:**   **U.S. ATTORNEY'S OFFICE**<br>YUSILL SCRIBNER,<br>REBEKAH CARMICHAEL,<br>JANICE OH<br>PUBLIC INFORMATION OFFICE<br>(212) 637-2600<br><br>**DOI**<br>DIANE STRUZZI<br>PUBLIC INFORMATION OFFICE<br>(212)825-5931 |

## PRESIDENT OF BRONX NOT-FOR-PROFIT ORGANIZATION PLEADS GUILTY IN MANHATTAN FEDERAL COURT TO EMBEZZLEMENT

PREET BHARARA, United States Attorney for the Southern District of New York, and ROSE GILL HEARN, the Commissioner of the New York City Department of Investigation, announced today that RICHARD IZQUIERDO ARROYO pleaded guilty to embezzling $115,000 from SBCC Management Corp., a not-for-profit organization that provides management services to residential buildings for low-income tenants.  IZQUIERDO ARROYO served as president of SBCC Management Corp. and also was chief of staff to a New York State Assemblywoman.

According to the Indictment to which IZQUIERDO ARROYO pleaded guilty, other documents filed in this case, and statements made during IZQUIERDO ARROYO's guilty plea proceeding before United States District Judge ALVIN K. HELLERSTEIN:

IZQUIERDO ARROYO admitted to embezzling $115,000 in SBCC Management Corp. money between May 2005 and February 2009.  He stole this money by using an SBCC Management Corp. corporate credit card to charge approximately $95,000 in unauthorized expenses, including personal expenses for clothes, shoes, airfare, hotels, restaurants, and flowers.  He also signed or caused to be signed checks that diverted approximately $20,000 from SBCC Management Corp. for the benefit of elected officials with whom he had relationships, including for campaign contributions made to the New York State Assemblywoman for whom he worked, payments for new flooring in the Assemblywoman's office, and payments to summer interns working in the Assemblywoman's office and in the office of a New York City Councilmember.

U.S. Attorney BHARARA stated: "It is often said that the buck stops with the president of an organization; Izquierdo Arroyo chose to make a quick buck instead, by using his clout to commit a crime.  Izquierdo Arroyo betrayed those he was meant to serve by stealing more than $100,000 meant for needy tenants to boost his own income and fill the coffers of his favored politicians.  Today's plea is another success in our ongoing effort with New York City's Department of Investigation to bring those who would criminally abuse their power to justice."

DOI Commissioner GILL HEARN said, "This nonprofit executive is guilty of a shameful abuse of a program for the poor.  In his hands, the taxpayers' money that should have benefitted vulnerable, elderly tenants was instead squandered on shoes, airfare, hotel stays, and restaurant tabs.  DOI and the U.S. Attorney's Office for the Southern District of New York will continue to be dedicated partners in the effort to root out fraud from publicly-funded non profits."

IZQUIERDO ARROYO, 33, faces a statutory maximum of 10 years in prison on the count of embezzling federal funds to which he pleaded, Count Two of the Indictment.  He has also agreed to pay restitution in the amount of $115,000.  Sentencing is scheduled for June 25, 2010 at 11:00 a.m. before Judge HELLERSTEIN.

Mr. BHARARA praised the investigative work of the New York City Department of Investigation.

This prosecution is being handled by the Office's Public Corruption Unit.  Assistant United States Attorneys RUA M. KELLY and MICHAEL S. BOSWORTH are in charge of the prosecution.

10-078                                              ###

**(EXHIBIT B)**

| | | | |
|---|---|---|---|
| **16a** Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . . . . . . . . . . . . . | | **16a** | No |
| **b** If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . . . | | **16b** | |

### Section C. Disclosure

**17** List the states with which a copy of this Form 990 is required to be filed ▶ NY

**18** Section 6104 requires an organization to make its Form 1023 (1024 or 1024-A, if applicable), 990, and 990-T (section 501(c)(3)s only) available for public inspection. Indicate how you made these available. Check all that apply.
☑ Own website    ☐ Another's website    ☑ Upon request    ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20** State the name, address, and telephone number of the person who possesses the organization's books and records:
▶SHAMEEKA GONZALEZ  15 EAST CLARKE PLACE    BRONX, NY 10452  (347) 291-8120

Form **990** (2022)

---

Page 7

Form 990 (2022)                                                                                                 Page **7**

Part VII    **Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors**
Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . . . . ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.
• List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.
• List all of the organization's **current** key employees, if any. See the instructions for definition of "key employee."
• List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (box 5 of Form W-2, box 6 of Form 1099-MISC, and/or box 1 of Form 1099-NEC) of more than $100,000 from the organization and any related organizations.
• List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.
• List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.
See the instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC/1099-NEC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC/1099-NEC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) SHAMEEKA GONZALEZ<br>CFO | 40.00 | | | X | | | | 662,097 | 0 | 0 |
| (2) RICHARD IZQUIERDO-ARROYO<br>COO | 40.00 | | | X | | | | 656,027 | 0 | 0 |
| (3) ELVIRA BARONE<br>CEO | 40.00 | | | X | | | | 209,622 | 0 | 0 |
| (4) MARLEN VALAREZO<br>ED OF LEGAL | 40.00 | | | | | X | | 189,635 | 0 | 0 |
| (5) GARY LEE<br>ED OF INFORM | 40.00 | | | | | X | | 162,349 | 0 | 0 |
| (6) ELVIS TORRES<br>ED OF HOUSIN | 40.00 | | | | | X | | 162,219 | 0 | 0 |
| (7) ANA MALDONADO<br>ED OF FACILI | 40.00 | | | | | X | | 135,076 | 0 | 0 |