**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JASON GOODMAN, | No. 1:23-cv-09648-JGLC |
| Plaintiff, | ORAL ARGUMENT REQUESTED |
| v. | |
| THE CITY OF NEW YORK and NEW YORK CITY POLICE DEPARTMENT, NEW YORK CITY POLICE DEPARTMENT LIEUTENANT GEORGE EBRAHIM, NEW YORK CITY POLICE DEPARTMENT OFFICER CHANDLER CASTRO, NEW YORK CITY POLICE DEPARTMENT OFFICER JENNIFER CARUSO, NEW YORK CITY POLICE DEPARTMENT OFFICER KELVIN GARCIA, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JANE DOE, (fictitious names intended to be officers, representatives, agents, servants of the New York City Police Department, individually and in their official capacities, ELON MUSK, X CORP, ADAM SHARP, | |
| Defendants. | |

**DEFENDANT X CORP.'S OPPOSITION TO PLAINTIFF'S MOTION FOR**
**RECONSIDERATION AND RELIEF FROM JUDGMENT**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................................1

II.   BACKGROUND .........................................................................................................2

    A.    Plaintiff's Complaint .........................................................................................2

        1.    Plaintiff's Alleged Altercations with Doe Defendants and NYPD
             Officers Outside X Corp.'s Office ........................................................2

        2.    Plaintiff's Alleged Subsequent Interactions With NYPD ........................5

        3.    Plaintiff's Suspicions Regarding X Corp. ..............................................6

    B.    Plaintiff's Arguments and Allegations Raised in His Briefing on X Corp.'s
        Motion to Dismiss .............................................................................................7

        1.    Plaintiff's Arguments and New Allegations in His Opposition to
             MTD .....................................................................................................7

        2.    Plaintiff's Arguments and New Allegations in his Response to the
             Court's Show Cause Order Regarding His Claims as to Elon Musk ..........8

    C.    Magistrate Judge Gorenstein Recommends Dismissal of Plaintiff's
        Complaint ........................................................................................................10

    D.    Plaintiff's Arguments and A New Allegation Raised in His Objection to
        Magistrate Gorenstein's R&R ........................................................................11

    E.    The Court Adopts Magistrate Judge Gorenstein's Report and
        Recommendation and Dismisses Plaintiff's Complaint....................................11

    F.    Plaintiff's Motion for Reconsideration ..........................................................12

III.  LEGAL STANDARD .................................................................................................15

IV.   ARGUMENT ..............................................................................................................16

    A.    Plaintiff's Motion for Reconsideration Should Be Denied ..............................16

        1.    Plaintiff Fails to Show a Need to Correct a Clear Error or Prevent
             Manifest Injustice with Respect to the Dismissal Order .........................16

        2.    Plaintiff's New Allegations Do Not Merit Reconsideration....................20

V.    CONCLUSION ...........................................................................................................24

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Associated Press v. U.S. Dep't of Def.*,
  395 F. Supp. 2d 17 (S.D.N.Y. 2005)...............................................................16, 20

*Bang v. Utopia Restaurant*,
  923 F. Supp. 46 (S.D.N.Y. 1996) .................................................................................22

Boule v. Hutton,
  328 F.3d 84 (2d Cir.2003) ...............................................................................16, 21

*Calderon v. St. Barnabas Hosp.*,
  2022 WL 15523409 (S.D.N.Y. Oct. 24, 2022).........................................................23

*Fogel v. Chestnutt*,
  668 F.2d 100 (2d Cir. 1981) .......................................................................................16

Gaston v. Coughlin,
  102 F.Supp.2d 81 (N.D.N.Y. 2000).........................................................................15

*In re C-TC 9th Ave. P'ship*,
  182 B.R. 1 (N.D.N.Y. 1995)........................................................... 1, 15, 16, 20, 23

*Jacob v. Duane Reade, Inc.*,
  293 F.R.D. 578 (S.D.N.Y. 2013) ..........................................1, 15, 16, 17, 18, 19, 20

*Kennedy v. Biden*,
  No. 3:23-CV-00381 (W.D. La.)...................................................................................8

*Kubicek v. Westchester Cnty.*,
  No. 08 Civ. 372 (ER), 2014 WL 4898479 (S.D.N.Y. Sept. 30, 2014) ....................15

*Lee v. Cully*,
  No. 09-CV-6502 VEB, 2011 WL 5040693 (W.D.N.Y. Oct. 24, 2011) ...................21

*Mikhaylova v. Bloomingdale's Inc.*,
  No. 19CIV8927GBDSLC, 2022 WL 17986122 (S.D.N.Y. Dec. 29, 2022)................ 1, 15, 23

*Missouri v. Biden*,
  No. 3:22-CV-01213 (W.D. La.)...................................................................................8

*Monell v. Dep't of Social Serv. of the City of New York*,
  436 U.S. 658 (1978)...................................................................................................23

*Montanile v. Nat'l Broad. Co.*,
  216 F. Supp. 2d 341 (S.D.N.Y. 2002).......................................................................21

*Polsby v. St. Martin's Press. Inc.*,
  No. 97 Civ. 960 (MBM), 2000 WL 98057 (S.D.N.Y. Jan. 18, 2000) ...............17, 20

*Rojas v. Alexander's Dep't Store, Inc.*,
  924 F.2d 406 (2d Cir. 1990) ...................................................................................23

*Shrader v. CSX Transp., Inc.*,
  70 F.3d 255 (2d Cir. 1995) ....................................................................................15

*Sigmon v. Goldman Sachs Mortg. Co.*,
  229 F. Supp. 3d 254 (S.D.N.Y. 2017) ...................................................................15

*Simpson v. City of New York*,
  No. 12 CIV. 6577 KBF, 2014 WL 595759 (S.D.N.Y. Feb. 10, 2014) ...................21

*Sybalski v. Indep. Grp. Home Living Program, Inc.*,
  546 F.3d 255 (2d Cir. 2008) ..................................................................................22

*Wong v. Yoo*,
  649 F. Supp. 2d 34 (E.D.N.Y. 2009) .....................................................................22

*Yin v. Alvarado*,
  No. 1:11-CV-00780 EAW, 2017 WL 4417714 (W.D.N.Y. Oct. 4, 2017) .............21

*Zdanok v. Glidden Co.*,
  327 F.2d 944 (2d Cir. 1964) ..................................................................................16

**Statutes**

42 U.S.C. § 1981 .........................................................................................................10

42 U.S.C. § 1981(a) .....................................................................................................10

42 U.S.C. § 1983 ...............................................................................................10, 21, 23

42 U.S.C. § 2000e *et seq*. ...........................................................................................10

42 U.S.C. § 2000e-2(a) ................................................................................................10

**Rules**

Federal Rule of Civil Procedure 12(b)(6) .....................................................................8

Federal Rule of Civil Procedure 59(e) ...........................................................................1

Federal Rule of Civil Procedure 60(b) ......................................................................1, 15

## I.    <u>INTRODUCTION</u>

Plaintiff's Motion for Reconsideration and Relief from Judgment Pursuant to Federal Rules of Civil Procedure 59(e) and 60(b) (Dkt. 136; "Motion for Reconsideration") should be denied, because Plaintiff comes nowhere close to "satisfy[ing]" the "stringent requirements" to merit the "extraordinary judicial relief" Plaintiff seeks. *In re C-TC 9th Ave. P'ship*, 182 B.R. 1, 2 (N.D.N.Y. 1995); *Mikhaylova v. Bloomingdale's Inc.*, No. 19CIV8927GBDSLC, 2022 WL 17986122, at *1 (S.D.N.Y. Dec. 29, 2022) (internal citations and quotation marks omitted).

Plaintiff "submits that the Court's decision [*i.e.*, its Order Adopting Report and Recommendation (Dkt. 134; "Dismissal Order")] contains clear errors of fact and law, misinterprets Plaintiff's claims, and fails to consider key evidence . . . ." Dkt. 136 at 2. In support of that assertion, Plaintiff rehashes old arguments he already made in his Response in Opposition to Defendant X Corp.'s Motion to Dismiss (Dkt. 40; "Opposition to MTD"); his Response to Show Cause Order (Dkt. 89; "Response to OSC"); and his Objection to Report and Recommendation (Dkt. 125; "Objection to the R&R"). In so doing, Plaintiff fails to demonstrate "an intervening change in controlling law" or a "need to correct a clear error or prevent manifest injustice." *Jacob v. Duane Reade, Inc.*, 293 F.R.D. 578, 580–81 (S.D.N.Y. 2013), *aff'd*, 602 F. App'x 3 (2d Cir. 2015) (internal citation omitted). And it confirms that Plaintiff's Motion for Reconsideration is an improper attempt to try to get "two bites at the apple," which is not a valid basis for reconsideration or relief from judgment. *See In re C-TC 9th Ave. P'ship*, 182 B.R. at 3.

Plaintiff's new allegations state that he was allegedly assaulted on September 5, 2024 by officers of the New York Police Department; that New York City Mayor Eric Adams and other New York City officials are the subject of criminal investigation; and that Alex Spiro, an attorney who he alleges has also represented Elon Musk, is representing Mayor Adams with respect to his recent criminal indictment. These allegations do not satisfy the "stringent

requirements" that would merit the relief Plaintiff seeks. Additionally, Plaintiff proffers no evidence to support these allegations. Even if he did, they would not disturb the Court's holdings that Plaintiff "fails to show that X Corp. 'jointly acted' with a state actor such that it acted under the color of state law" required to "hold[] X Corp. liable under section 1983," and "fails to allege that X Corp. violated any of his federal rights"—the basis on which the Court dismissed his claims against X Corp. (Dkt. No. 123 at 16, 18.)

Accordingly, Plaintiff's Motion for Reconsideration should be denied.

## II.    BACKGROUND

### A.    Plaintiff's Complaint

#### 1.    *Plaintiff's Alleged Altercations with Doe Defendants and NYPD Officers Outside X Corp.'s Office*

Plaintiff alleges that, on October 31, 2022, he read that Elon Musk wanted to fire most of X Corp.'s employees, so Plaintiff "decided to do a livestream video broadcast standing outside" the building where X Corp.'s New York City office was located. Dkt. No. 1 ¶¶ 24, 31-32. Plaintiff "speculate[d]" that Musk "likely . . . was inside" the building, because Plaintiff allegedly saw a Tesla car "with New Jersey Dealership license plates" parked outside and "a group of tall, burly individuals" who "appeared" to Plaintiff "to be security or law enforcement" "standing around the car," while "additional individuals" were in a "black SUV parked directly behind the Tesla." *Id.* ¶¶ 32-34. Plaintiff alleges he saw "protrusions at the small of the back" of some of the individuals, which "caused him to believe they were carrying concealed firearms," though he does not allege seeing any firearms. *Id.* ¶ 33. Plaintiff alleges he had a "verbal altercation" with John Does 2-4 and Jane Doe, who were among the individuals allegedly present there, during which John Doe 3 allegedly told Plaintiff to leave and stated "this is my plantation" and "Black Lives Matter." *Id.* ¶ 35. Plaintiff alleges the argument ended when the police arrived.

2

*Id.* ¶¶ 35-36.

Plaintiff further alleges that the next day he returned to outside the X Corp. New York City office building, after purportedly seeing a post on Twitter[1] that Musk was there, and because Plaintiff wanted to inform Musk about Plaintiff's report "The Twitter Coup." *Id.* ¶¶ 38-39. The report, which Plaintiff apparently did not publish until December 2022, accuses Adam Sharp, allegedly an X Corp. employee from 2010 to 2016, and District Judge Valerie Caproni, when she was the FBI's general counsel, of working "to violate the Fourth Amendment and multiple other state and federal laws, by granting the FBI and U.S. Government virtually unfettered, clandestine access to Twitter." *Id.* ¶ 28 & Ex. E. The report names Sharp, Judge Caproni, and President Obama as "the three most important conspirators" of "one of the most sinister and sophisticated crimes in our nation's history," which purportedly occurred during the Obama presidency and before Judge Caproni left the FBI in 2011. *Id.* Ex. E. Plaintiff alleges he "first became aware of" Sharp in 2020, and Plaintiff began the "investigation" for his report after he and Sharp became "involved in prior legal action." *Id.* ¶¶ 25, 27, 86. Judge Caproni allegedly presided over two of the lawsuits between Plaintiff and Sharp. *Id.* Ex. E.

Plaintiff alleges he went home to write a letter and, later that evening, returned outside the office building. *Id.* ¶ 39. Plaintiff allegedly asked John Doe 1, who was standing near the Tesla, whether Plaintiff may "wait here outside this building and when Mr. Musk comes out . . . ask [Musk] if [Plaintiff] can hand him" an envelope which allegedly contained the letter. *Id.* ¶ 40. John Doe 1 allegedly "responded affirmatively" and "did not deny that Musk was expected to exit the building." *Id.* Plaintiff believed John Doe 1 had a "concealed firearm," though he does

---

[1] Twitter, the online social media platform, has been re-branded as "X." This brief continues to refer to the platform as "Twitter" throughout for ease of understanding.

not allege seeing any indication of such a firearm. *Id.*

Plaintiff alleges that while he was waiting, John Doe 2 approached John Doe 1 and said, "'y'all don't have to worry, we're gonna block all these cars for you.'" *Id.* ¶ 42. "The interaction causes [Plaintiff] to believe John Doe 1 and Joe Doe 2 know each other and that either one or both of them are undercover law enforcement or part of a clandestine security team working for Musk, X Corp[.], . . . NYPD, or all of those." *Id.*

Plaintiff alleges that soon thereafter he was approached by, and had another argument with, John Does 2-3 and Jane Doe. *Id.* ¶¶ 43-45. Jane Doe allegedly "thrust what appeared to be an NYPD badge" in front of Plaintiff's camera but did not identify herself as "NYPD." *Id.* ¶¶ 46, 48. She also allegedly "wield[ed] a pen like a stabbing weapon" and carried in her pockets "a large number of baseballs," which Plaintiff believes were "street fighting tools." *Id.* ¶¶ 52, 54. Plaintiff alleges that when he deflected the pen, John Doe 2 "grab[bed]" Plaintiff and shouted, "Yo bro, backup, backup, backup." *Id.* ¶ 56. John Doe 2 then "put his hand at the base of [Plaintiff's] neck[,] pinning [Plaintiff] against the façade" of a building in a "careful, calculated way." *Id.* ¶¶ 56, 59. John Doe 2's actions allegedly caused Plaintiff "to believe that John Doe 2 could be an undercover NYPD officer" or other person with "some police, or other security or self-defense training." *Id.* ¶ 61.

John Doe 1 was allegedly nearby but did not intervene, despite Plaintiff's request to call the police. *Id.* ¶¶ 49, 53-54, 57-58. Plaintiff alleges he caused John Doe 2 to release him, after which Plaintiff called 911. *Id.* ¶¶ 63-64. Plaintiff also alleges that John Does 2-4 and Jane Doe did not "flee the scene," causing Plaintiff to further suspect "they are affiliated with NYPD." *Id.* ¶ 65.

Plaintiff alleges several NYPD officers arrived, including George Ebrahim, Chandler

Castro, and Jennifer Caruso, but none of them "examined [his] neck," and Castro "openly

mocked" Plaintiff. *Id.* ¶ 66. John Doe 1 allegedly told the officers that he did not witness

anything. *Id.* Plaintiff was cited "with a disorderly conduct summons." *Id.* ¶ 67.

Plaintiff alleges that "some third party" instructed the Doe defendants to "deter [Plaintiff]

from [c]ommunicating with Musk." *Id.* ¶ 88. Plaintiff also alleges "Sharp would be highly

motivated to prevent Musk from learning the allegations contained in [Plaintiff's] report"

because "Musk could take action that would certainly lead to civil if not criminal prosecution"

against Sharp. *Id.* ¶ 86.

### 2.    *Plaintiff's Alleged Subsequent Interactions With NYPD*

On November 5, 2022, Plaintiff allegedly went to the 10th Precinct NYPD station "with

the intention of amending the official report of the November 1 incident." *Id.* ¶ 70. Plaintiff

further alleges he had an argument with police officers, including Castro and Kelvin Garcia, who

prevented Plaintiff from amending the report or filing his own report. *See id.* ¶¶ 71-73. Plaintiff

alleges he left the station because Garcia threatened to "call[] an ambulance . . . to take [Plaintiff]

to the hospital." *Id.* ¶ 73.

On November 7, 2022, Plaintiff allegedly returned to the 10th Precinct station, where

police officer Matthew Powlett answered a phone call in front of Plaintiff ("Powlett Call"). *Id.*

¶ 76. Plaintiff alleges he overheard Powlett's side of the conversation, during which Powlett

discussed "two guys from Google that are going to be armed security" who "need to touch base"

with the caller "to show . . . what identifiers they have," but Powlett did not want to "get into it

too much" because he was in the presence of "someone who's like an assault victim," *i.e.*,

Plaintiff. *Id.* ("Identifiers" is an "unclear term" to Plaintiff. *Id.* ¶ 82.) Plaintiff alleges "Powlett

was aware [Plaintiff] had been recording the entire conversation." *Id.* ¶ 76. Plaintiff does not

allege Powlett mentioned X Corp. at all or police officers' providing security services or

concealed carry permits.

Nonetheless, Plaintiff alleges the Powlett Call "caused [him] to believe" NYPD officers "are in a regular practice of negotiating off duty or other unofficial private security work." *Id.* ¶ 77. "To learn more," Plaintiff alleges he contacted a detective to ask whether "[t]here's a legal process . . . with the NYPD" for a "professional bodyguard" to "legally concealed carry a gun in New York City" for "an event that included a celebrity guest speaker." *Id.* The detective allegedly responded that he believed "the law is very gray" and that he did not "want to give [Plaintiff] any wrong information." *Id.* Plaintiff alleges the detective gave him the "phone number for the legal records office," which Plaintiff called but got "no response." *Id.*

On January 24, 2023, Plaintiff was allegedly contacted by a police officer who had investigated Plaintiff's complaint. *Id.* ¶ 78. Plaintiff states that the officer's conclusion "was not satisfactory" to Plaintiff, which "was the final motivation toward bringing this instant action." *Id.*

### 3.    *Plaintiff's Suspicions Regarding X Corp.*

Plaintiff alleges the Powlett Call "caused him to believe" NYPD officers "might be engaging in the trade of temporary, illicit, or otherwise illegal concealed carry permits, waivers or some other 'identifiers.'" *Id.* ¶ 79. This belief, in turn, "caused [Plaintiff] to suspect that some similar arrangement *could* have been made with Musk, X Corp[.], . . . John Doe 1 or another third party which allowed Musk's private security to carry concealed firearms within New York City." *Id.* (emphasis added). From this suspicion, Plaintiff contends that "Defendants entered into an agreement with one another to provide various security services including illegally issued temporary concealed carry permits to support Musk's work at [X Corp.'s New York office] on October 31, 2022, and November 1, 2022." *Id.* ¶ 88. Plaintiff also contends "[i]n order to protect the alleged illegal gun licensing operation, it was necessary for NYPD officers to prevent [Plaintiff] from exposing any illicit relationship between [his] attackers, NYPD, Musk, [and] X

Corp." *Id.*

Plaintiff does not allege he saw an agreement between X Corp. and NYPD or that anyone has suggested such an agreement exists. Plaintiff also does not allege X Corp.'s entering such an agreement or any policy of X Corp. caused him any harm. In fact, Plaintiff does not allege that he interacted with X Corp. at all.

**B.    Plaintiff's Arguments and Allegations Raised in His Briefing on X Corp.'s Motion to Dismiss**

**1.    *Plaintiff's Arguments and New Allegations in His Opposition to MTD***

On December 4, 2023, X Corp. moved to dismiss Plaintiff's Complaint. Plaintiff filed his Opposition to MTD on January 8, 2024. There, Plaintiff argued video recordings allegedly taken by a Tesla parked in front of X Corp. on the date of the altercation would support his claims. *See* Dkt. No. 40 ¶ 27.

Plaintiff also included new allegations that were not in his Complaint. For example, according to Plaintiff, "[u]pon further review of the evidence while writing this response, it is now clear these individuals . . . were either full-time or temporary X Corp security and each were acting in a security guard capacity for, and at the instructions of X Corp at the time of the assault." Dkt. No. 40 ¶ 7. He claims it was his "initial interaction with these X Corp and Musk employed security personnel, not the NYPD, that gave rise to this complaint." *Id*. ¶ 6.

Regarding Plaintiff's allegation that the individuals involved in the altercation with Plaintiff appeared to be carrying concealed weapons, Plaintiff added an allegation that he "has had NRA certified handgun training and precision rifle training and is able to recognize and identify a concealed firearm by sight." *Id*. ¶ 14. Plaintiff also alleged for the first time to have "discussed the firearms with some of these individuals on the scene" and "confirmed they work for Musk." *Id*. ¶¶ 16-17.

Plaintiff also alleged X Corp. became "complicit after the fact" in the alleged November 1 assault because a non-party "who identified himself only as an X Corp[.] security employee" declined to provide Plaintiff access to the footage from the "surveillance camera outside the front door" of the X Corp. office. *Id.* ¶¶ 31-32.

Plaintiff also added allegations that James Baker, the "former FBI General Counsel" and X Corp.'s "Deputy General Counsel at the time," was fired by X Corp. "only weeks after this incident precisely because of concerns that the FBI was exerting undue and even possibly illegal control over X Corp." *Id.* ¶ 39. Plaintiff argued that because Baker had been the FBI's former general counsel and had been fired by Musk, and because Congress was looking into his and the FBI's involvement in X Corp., his claim that X Corp. had an agreement with the NYPD is logically proven. *See id.* ¶¶ 41-42. Plaintiff also contended that "Congress has formed a Weaponization of Government committee" that "has examined allegations similar to [Plaintiff's] regarding FBI involvement at X Corp.," and *Missouri v. Biden*, No. 3:22-CV-01213 (W.D. La.), and *Kennedy v. Biden*, No. 3:23-CV-00381 (W.D. La.), "are presently contemplating these same questions." *Id.* ¶¶ 41-42.

### 2. *Plaintiff's Arguments and New Allegations in his Response to the Court's Show Cause Order Regarding His Claims as to Elon Musk*

On March 25, 2024, the Court issued an Order to Show Cause directing Plaintiff to explain "why the claims as to [Elon] Musk should not be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim." Dkt. 84 at 1. Plaintiff filed his Response to Show Cause Order on April 8, 2024. Dkt. 89. There, Plaintiff argued that evidence existed showing that Twitter, X Corp., and the FBI conspired to suppress his journalistic activities related to the interference with the 2020 presidential election, and that this alleged interference in 2020 proved there was an agreement between X Corp., the FBI, and the NYPD to support his claims against

Elon Musk. Dkt. 89 ¶¶ 4-6, 30, 40-47. He further argued, again, that former Twitter counsel Jim

Baker's previous involvement with the FBI, and Congress's investigation into Baker's and the

FBI's involvement in X Corp., proves the existence of the agreement between X Corp., the FBI,

and the NYPD. *Id.* ¶¶ 4-6, 41, 46-47.

Plaintiff also added even more new allegations not contained in his Complaint or his

Opposition to the MTD. Plaintiff alleged that "according to information published by the FBI, in

1980," an unknown FBI special agent and an unknown NYPD executive created the Joint

Terrorism Task Force, ("JTTF") ostensibly to fight terrorism (Dkt. 89 ¶ 4), and as a result

"NYPD is so closely linked with the FBI through the JTTF," that the "then FBI director James

Comey described the New York JTTF as the 'granddaddy of them all'" (*Id.* ¶ 5). But Plaintiff

does not allege that X Corp. has any connection to the JTTF. Plaintiff also alleged that "[w]hat

began as a small, highly specialized investigative unit of less than two dozen total members has

now spread like an unchecked, rapidly metastasizing cancer, to nearly every local law

enforcement agency in the nation, blurring the lines of states' rights and infringing on citizens

individual freedoms." *Id.* ¶ 6.

Plaintiff further alleged that "[s]ubsequent to November 1, 2022 . . . Musk learned of the

FBI infiltration from company records," that he "made the first post announcing the revelation

on Twitter itself," and that "[s]hortly thereafter multiple committees in Congress opened

investigations into the claims." *Id.* ¶¶ 10-12. Plaintiff also added more detailed allegations about

Baker, including that "Baker was notably removed from the FBI after becoming embroiled in a

matter concerning the criminal prosecution of Hillary Clinton campaign attorney Michael

Sussman" (*Id.* ¶ 28), that Musk fired Baker "[a]fter learning Baker defied his instructions and

blocked information related to a New York Post story concerning a laptop attributed to Hunter

Biden" (*Id.* ¶ 30), and that "[o]n February 8, 2023, former Twitter employees including Baker,

gave sworn testimony to The House Judiciary Select Subcommittee on the Weaponization of the

Federal Government proving the FBI had pervasive clandestine influence over Twitter and had

paid the company millions" (*Id.* ¶ 31).

### C.    Magistrate Judge Gorenstein Recommends Dismissal of Plaintiff's Complaint

In his Report & Recommendation, Magistrate Judge Gorenstein recommended that the

case should be "dismissed as to all defendants." Dkt. 123 ("R&R") at 2. Magistrate Judge

Gorenstein determined that Plaintiff failed to plausibly allege either element of his claim for

violation of 42 U.S.C. § 1983 X Corp. because:

> the complaint (combined with new allegations in Goodman's opposition filings)
> fails to show that X Corp. "jointly acted" with a state actor such that it acted under
> the color of state law. Accordingly, Goodman has failed to provide allegations that
> can form the basis for holding X Corp. liable under section 1983. For what it is
> worth, even if we were to find that Goodman plausibly alleged a conspiracy
> between X Corp. and a state actor, Goodman fails to allege that X Corp. violated
> any of his federal rights.

Dkt. 123 at 16. Magistrate Judge Gorenstein also determined that "[Plaintiff's] allegations fail

because they amount to nothing but speculative and conclusory allegations of conspiracy lacking

any factual basis." *Id.* at 15.

As to his claims for violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e *et seq.* ("Title VII"), Magistrate Judge Gorenstein held that although "Title VII allows

an action to brought against an 'employer,'" "Goodman has failed to allege any facts in the

complaint showing that he is or was an employee of X Corp., its predecessor Twitter, Inc., Elon

Musk, or Adam Sharp." Dkt. 123 at 18 (quoting 42 U.S.C. § 2000e-2(a).) As for his claims for

violations of 42 U.S.C. §§ 1981 and 1981(a), Magistrate Judge Gorenstein found that "[t]he

complaint is devoid of non-conclusory allegations that there was any discrimination on the basis

10

of race by any defendant—let alone that it was the 'but for' cause of any actions by a defendant." *Id.* at 19.

In dismissing Plaintiff's claims, Magistrate Judge Gorenstein "considered the copious additional factual material provided in Goodman's opposition papers. None of this material cures the deficiencies in the original complaint." Dkt. No. 123 at 42.

### D.    Plaintiff's Arguments and A New Allegation Raised in His Objection to Magistrate Gorenstein's R&R

On August 9, 2024, Plaintiff filed his Objection to the R&R. There, he again argued that: (1) there was alleged video footage taken by the Tesla parked in front of X Corp. on the date of the altercation that would support his claims, and therefore the footage should be turned over (Dkt. No. 125 at 7, ¶ 33); (2) because former Twitter counsel Jim Baker had been the FBI's former general counsel, he had been fired by Musk, and Congress was looking into his and the FBI's involvement in X Corp., his claim that X Corp. had an agreement with the NYPD is logically proven (*id.* at 2-3, ¶¶ 27-29); (3) Twitter, X Corp. and the FBI conspired to suppress his journalistic activities related to the interference with the 2020 presidential election, and that proved there was an agreement between X Corp., the FBI, and the NYPD (*id.* ¶¶ 27-29); and (4) at the "very least defendants [X] Corp. and Elon Musk should be compelled to reveal the identity of [the Doe Defendants]" and Plaintiff should be granted leave to amend to add that information. *Id.* at 7 ¶ 32, 9 ¶ 39. Plaintiff also alleged for the first time that "Defendant X Corp., Twitter, at the time, was performing a public function by managing information dissemination that affected the public's perception of the 2020 presidential election in a technologically unprecedented way." Dkt. No. 125 at 2, ¶ 27.

### E.    The Court Adopts Magistrate Judge Gorenstein's Report and Recommendation and Dismisses Plaintiff's Complaint

In the Dismissal Order, the Court adopted Magistrate Judge's Report and

Recommendation in its entirety and dismissed Plaintiff's Complaint. Dkt. 134 at 4. The Court noted it had "reviewed the motions, the Report and Recommendation, Plaintiff's objections, and Defendants' responses, and finds the Report and Recommendation to be well-reasoned and grounded in fact and law" and that "none of Plaintiff's objections have merit." Dkt. No. 134 at 2. The Court also considered Plaintiff's allegation from his Objection to the R&R that X Corp. was "performing a public function by managing information dissemination that affected the public's perception of the 2020 presidential election in a technologically unprecedented way," and found it "does nothing to refute the R&R's conclusion that these Defendants did not engage in 'joint action' with a state actor or that there were no facts alleging an agreement 'to act in concert to inflict an unconstitutional injury.'" *Id.* at 2-3. The Court entered judgment on August 30, 2024. Dkt. No. 135.

### F.    Plaintiff's Motion for Reconsideration

In his Motion for Reconsideration, Plaintiff rehashes old arguments he made previously in his briefing on X Corp.'s Motion to Dismiss, his Response to the OSC, or his Objections to the R&R. Plaintiff argues, for example, that "[t]he identities of the Doe Defendants remain concealed," and "[i]t is imperative that the Court compel the NYPD, X Corp[.], Elon Musk, and John Doe 1 to disclose what they know about these individuals" (Dkt. No. 136, ¶¶ 15-16)— which he previously asserted in his Objection to R&R (Dkt. No. 125 at 7 ¶ 32, 9 ¶ 39). Plaintiff also argues the Court "ignored critical facts surrounding X Corp. and the actions of Elon Musk's personal bodyguard, who lied to the police and removed a Tesla vehicle containing video evidence relevant to Plaintiff's case," and that the "Court's failure to address these issues or consider how the destruction of evidence impacted Plaintiff's claims leaves a significant gap in the analysis and is another reason the dismissal must be reversed." Dkt. No. 136 ¶ 14. But Plaintiff already alleged the existence of this Tesla video footage in the Complaint and his

Opposition to MTD (Dkt. No. 1 ¶¶ 49, 66; Dkt. No. 40 ¶ 27), which he previously argued provided grounds for why he should be granted leave to amend (Dkt. No. 125 at 7, ¶ 33).

Plaintiff also rehashes his arguments about the 2020 presidential election. He argues the Court failed to consider the influence of "Twitter, X Corp[.], and the FBI in suppressing Plaintiff's journalistic activities related to the now widely acknowledged interference with the 2020 presidential election." Dkt. No. 136 ¶ 17. Plaintiff also argues that "Adam Sharp's close ties to the dissemination of information during the 2020 election, along with the involvement of the FBI and former Twitter counsel James Baker, show a coordinated effort to suppress Plaintiff's reporting and chill his First Amendment rights," and "[t]he Court's dismissal without considering these critical connections demonstrates a failure to acknowledge the role that government interference played in these claims, especially in the context of the 2020 election." *Id.* ¶¶ 18-19. He further argues "there have been significant revelations that further substantiate Plaintiff's claims that social media platforms, including Twitter (now X Corp[.]), cooperated with the U.S. government in ways that suppressed free speech and journalistic activities." (*id*. ¶¶ 21-23). Plaintiff raised these arguments about the 2020 election twice before. Dkt. No. 89 ¶¶ 30, 44-47; Dkt. No. 125 at 2-3, ¶¶ 27-29.

Finally, Plaintiff argues "[f]ormer Twitter counsel Jim Baker and other Twitter employees have also testified before Congress, confirming that Twitter cooperated with U.S. government agencies, including the FBI, in moderating and suppressing content," and this evidence was not considered by the Court. Dkt. No. 136 ¶¶ 24-25. Plaintiff has made this argument three times before. Dkt. No. 40 ¶¶ 41-42; Dkt. No. 89 ¶¶ 41, 46-47; Dkt. No. 125 at 2-3, ¶¶ 27-29.

Plaintiff also argues purportedly new evidence of "unprecedented events" proves "the

close nexus of these [defendants] and events" and, as such, "[t]he judgment dismissing this case

must be overturned." Dkt. No. 136 at 2. With respect to his claims against X Corp., Plaintiff

offers the following "newly discovered evidence":[2]

- "After attempting to report a crime unrelated to this case at the NYPD 14th Precinct on September 5, 2024, Plaintiff was assaulted again and then placed in danger of imminent bodily harm or death by officers who engaged in deliberate and malicious deception." *Id*. at 1.

- "Later that same day, it was announced that New York City Mayor Eric Adams and NYPD Commissioner Edward Caban, had both come under Federal Investigation which culminated in the historic indictment of the now disgraced Mayor." *Id*.

- "Newly appointed NYPD Commissioner Thomas Donlon also became a target of the investigation on or around September 20. *Id*.

- Former FDNY Bureau of Fire Prevention officials have been indicted in a bribery scandal and accusations of cash 'shake downs' were linked to so-called private security firms operated by former commissioner Caban's twin brother. *Id*.

- Regarding his criminal indictment, Mayor Adams is being represented by Alex Spiro, whom Plaintiff alleges is "Mr. Musk's personal attorney and widely recognized close advisor." *Id*. at 2.

Plaintiff did not proffer any evidentiary support for these allegations and did not raise a

connection to his claims against X Corp.

---

[2] Plaintiff presents additional "newly discovered evidence," including: (1) events surrounding Plaintiff's attempt to file a new police report on September 5, 2024 "concerning matters completely unrelated to this case," involving suspicious U.S. military personnel occupying a private hotel which Plaintiff connected to the Neighborhood Association of Inter-Cultural Affairs and its chief operating officer, Richard Izquierdo Arroyo, who Plaintiff found had a history of embezzlement and therefore, he connected Arroyo to Mayor Adams' indictment (Dkt. 136 ¶¶ 3-7); (2) Goodman's observation of "three individuals who matched public descriptions of Tren de Aragua gang members, handling a very small infant" and attempting to "hand off the infant to another person driving a vehicle with no valid New York license plate and only a suspicious, paper, temporary Florida tag (*id*. ¶ 8);" and (3) alleged mocking by an officer in the 14th Precinct during a phone call with Plaintiff (*id*. ¶ 9). This "new evidence" was not raised in connection to Plaintiff's claims against X Corp. or Mr. Musk.

### III. <u>LEGAL STANDARD</u>

"In order to prevail on a motion for reconsideration, the movant must satisfy stringent requirements." *In re C-TC 9th Ave. P'ship*, 182 B.R. at 2. "Rule 60(b) affords 'extraordinary judicial relief' that 'can be granted only upon a showing of exceptional circumstances.'" *Mikhaylova v. Bloomingdale's Inc.*, No. 19CIV8927GBDSLC, 2022 WL 17986122, at *1 (S.D.N.Y. Dec. 29, 2022) (quoting *Kubicek v. Westchester Cnty.*, No. 08 Civ. 372 (ER), 2014 WL 4898479, at *1 (S.D.N.Y. Sept. 30, 2014)). "The reconsideration standard 'is strict,' and reconsideration is generally only granted upon a showing of 'controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" *Mikhaylova*, 2022 WL 17986122 at *1, quoting *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir. 1995). "Motions for reconsideration are not vehicles in which a party may get two bites at the apple, and any litigant considering bringing a motion for reconsideration must evaluate whether what may seem to be a clear error of law is in fact simply a point of disagreement between the Court and the litigant." *In re C-TC 9th Ave. P'ship*, 182 B.R. at 3 (internal citation omitted); *see also Gaston v. Coughlin,* 102 F.Supp.2d 81, 83 (N.D.N.Y. 2000) (citation omitted). "A narrow application of the rule not only helps to ensure the finality of decisions but also prevents the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *Sigmon v. Goldman Sachs Mortg. Co.,* 229 F. Supp. 3d 254, 257 (S.D.N.Y. 2017) (internal quotations omitted).

Motions for reconsideration "are properly granted only if there is a showing of: (1) an intervening change in controlling law; (2) the availability of new evidence or (3) a need to correct a clear error or prevent manifest injustice." *Jacob*, 293 F.R.D. at 580–81.With respect to the second ground, "[i]t is settled law in this District that a motion for reconsideration is neither

an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced." *Associated Press v. U.S. Dep't of Def.*, 395 F. Supp. 2d 17, 19 (S.D.N.Y. 2005). Furthermore, any newly discovered evidence must be "relevant to the merits of the litigation." *Boule v. Hutton,* 328 F.3d 84, 95 (2d Cir.2003).

As for the third ground, "[i]t is not enough . . . that the [moving party] now make a more persuasive argument . . . The law of the case will be disregarded only when the court has 'a clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir. 1981) (citing *Zdanok v. Glidden Co.,* 327 F.2d 944, 953 (2d Cir. 1964)).

## IV.  ARGUMENT

### A.  Plaintiff's Motion for Reconsideration Should Be Denied[3]

#### 1.  *Plaintiff Fails to Show a Need to Correct a Clear Error or Prevent Manifest Injustice with Respect to the Dismissal Order*

As explained in detail below, Plaintiff's Motion for Reconsideration rehashes old arguments he raised in his previous filings—which were considered and rejected by this Court. As such, he fails to demonstrate a "need to correct a clear error or prevent manifest injustice." *See Jacob*, 293 F.R.D. at 580–81. Rather, the Motion for Reconsideration is an improper attempt to get "two bites at the apple," and should be denied. *In re C-TC 9th Ave. P'ship*, 182 B.R. at 3; *see Associated Press*, 395 F. Supp. 2d at 19 (S.D.N.Y. 2005) (denying a motion for reconsideration that "simply rehashes three arguments previously rejected and adds a fourth, new argument that, having not been previously advanced, has now been waived" because "[i]t is settled law in this District that a motion for reconsideration is neither an occasion for repeating

---

[3] Plaintiff does not argue "an intervening change in controlling law" has occurred, and therefore the Dismissal Order should not be reconsidered on that basis. *See Jacob*, 293 F.R.D. at 580–81.

old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced."); *see also Polsby v. St. Martin's Press, Inc.*, No. 97 Civ. 960 (MBM), 2000 WL 98057, at *1 (S.D.N.Y. Jan. 18, 2000) (a motion for reconsideration is not a way to "advance new facts, issues or arguments not previously presented to the Court.") (internal quotation marks and citation omitted).

 *The Identities of the Doe Defendants*. Plaintiff contends "[t]he identities of the Doe Defendants remain concealed" and "[i]t is imperative that the Court compel the NYPD, X Corp[.], Elon Musk, and John Doe 1 to disclose what they know about these individuals." Dkt. No. 136, ¶¶ 15-16. Plaintiff asserted this same argument in his Objection to R&R (Dkt. No. 125 at 7 ¶ 32, 9 ¶ 39), which the Court rejected (Dkt. No. 123 at 41 n.12 ("Goodman requests that the Court compel the 'NYPD or X Corp[.]' to provide the names of the Doe defendants. Given that Goodman's complaint should be dismissed in its entirety, there is no basis for issuing such an order." (internal citation omitted)). By simply rehashing his old arguments, Plaintiff fails to show the "need to correct a clear error or prevent manifest injustice" with respect to this ruling. *See Jacob*, 293 F.R.D. at 580–81.

 *The Alleged Video Evidence from a Tesla Vehicle*. Plaintiff also argues the Court "ignored critical facts surrounding X Corp. and the actions of Elon Musk's personal bodyguard, who lied to the police and removed a Tesla vehicle containing video evidence relevant to Plaintiff's case," and that the "Court's failure to address these issues or consider how the destruction of evidence impacted Plaintiff's claims leaves a significant gap in the analysis and is another reason the dismissal must be reversed." Dkt. No. 136 ¶ 14. Plaintiff previously alleged the existence of this Tesla video footage in the Complaint and his Opposition to MTD (Dkt. No. 1 ¶¶ 49, 66; Dkt. No. 40 ¶ 27), which he has argued provided grounds for why he should be

granted leave to amend (Dkt. No. 125 ¶ 33). And, the Court reviewed in detail the 39-minute video Plaintiff took at the time of the November 1, 2023 altercation, which allegedly "reveal[ed] the Tesla record[ing] the altercation with its Sentry Mode feature." Dkt. No. 123 at 2-3 ("[w]e consider video footage taken by Goodman of the key events at issue."); Dkt. No. 40 ¶ 27. After reviewing the video footage, the Court found the evidence *supported* Defendants' arguments— not those of the Plaintiff. Dkt. No. 123 at 30-36; *see also* Dkt. No. 134 at 3. Plaintiff is incorrect that the Court "ignored" the potential relevance of the video evidence from the Tesla vehicle, and fails to show any error, much less clear error, in this ruling, or any manifest injustice that needs to be prevented. *See Jacob*, 293 F.R.D. at 580–81.

 *The Purported Suppression of Plaintiff's Journalistic Activities Surrounding the 2020 Presidential Election*. Plaintiff argues the Court failed to consider the influence of "Twitter, X Corp[.], and the FBI in suppressing Plaintiff's journalistic activities related to the now widely acknowledged interference with the 2020 presidential election." Dkt. No. 136 ¶ 17. Plaintiff goes on to allege that "Adam Sharp's close ties to the dissemination of information during the 2020 election, along with the involvement of the FBI and former Twitter counsel James Baker, show a coordinated effort to suppress Plaintiff's reporting and chill his First Amendment rights," and "[t]he Court's dismissal without considering these critical connections demonstrates a failure to acknowledge the role that government interference played in these claims, especially in the context of the 2020 election." *Id.* ¶¶ 18-19. He further argues "there have been significant revelations that further substantiate Plaintiff's claims that social media platforms, including Twitter (now X Corp[.]), cooperated with the U.S. government in ways that suppressed free speech and journalistic activities." *Id.* ¶¶ 21-23.

18

Plaintiff has raised these arguments about the 2020 election twice before (Dkt. No. 89 ¶¶ 30, 44, 47; Dkt. No. 125 at 2-3, ¶¶ 27-29), which the Court addressed and rejected. (Dkt. No. 123 at 16 ("[T]he complaint (combined with new allegations in Goodman's opposition filings) fails to show that X Corp. 'jointly acted' with a state actor such that it acted under the color of state law. Accordingly, Goodman has failed to provide allegations that can form the basis for holding X Corp. liable under section 1983."); Dkt. No. 134 at 2-3 ("Plaintiff objects to Judge Gorenstein's recommendation that claims against X Corp. be dismissed, contending that X. Corp. was 'performing a public function by managing information dissemination that affected the public's perception of the 2020 presidential election in a technologically unprecedented way. . . .' This does nothing to refute the R&R's conclusion that these Defendants did not engage in 'joint action' with a state actor or that there were no facts alleging an agreement 'to act in concert to inflict an unconstitutional injury.'" (internal citations omitted)). By merely rehashing them again, Plaintiff fails to show he merits reconsideration of the Court's rulings. *See Jacob*, 293 F.R.D. at 580–81.

*Jim Baker's Testimony Before Congress.* Finally, Plaintiff argues "[f]ormer Twitter counsel Jim Baker and other Twitter employees have also testified before Congress, confirming that Twitter cooperated with U.S. government agencies, including the FBI, in moderating and suppressing content," and this evidence was not considered by the Court. Dkt. No. 136 ¶¶ 24-25. Plaintiff has made this argument *three* times before. Dkt. No. 40 ¶¶ 41-42; Dkt. No. 89 ¶¶ 41, 46-47; Dkt. No. 125 at 2-3, ¶¶ 27-29. Like all of Plaintiff's other rehashed old arguments, the Court has already addressed and rejected this argument. Dkt. No. 123 at 40-41 (holding "allegations of this sort fail to show that there is any relationship between the Doe defendants and any person acting under color of law, including the named defendants. Instead, they represent conjectural

allegations of conspiracy. Accordingly, Goodman fails to state any federal claims against the Doe defendants."); Dkt. No. 134 at 2-4 (finding Magistrate Judge Gorenstein's "Report and Recommendation to be well-reasoned and grounded in fact and law" and adopting the R&R "in its entirety").

In sum, Plaintiff's rehashed arguments fail to demonstrate a "need to correct a clear error or prevent manifest injustice" to merit reconsideration of the Court's dismissal of his Complaint. *See Jacob*, 293 F.R.D. at 580–81. His improper attempt to get "two bites at the apple"—or, for some of his arguments, a *third* or even a *fourth* bite—should be rejected, and the Motion for Reconsideration should be denied. *See In re C-TC 9th Ave. P'ship*, 182 B.R. at 3; *Associated Press*, 395 F. Supp. 2d at 19; *Polsby*, 2000 WL 98057, at *1.

### 2. Plaintiff's New Allegations Do Not Merit Reconsideration

In his Motion for Reconsideration, Plaintiff newly alleges (1) he was "assaulted again" "by officers" at the NYPD 14th Precinct on September 5, 2024; (2) New York City Mayor Eric Adams and NYPD Commissioner Edward Caban both came under federal investigation resulting in an indictment of Mayor Adams; (3) newly appointed NYPD Commissioner Thomas Donlon became a target of the investigation; (4) former FDNY Bureau of Fire Prevention officials have been indicted in a bribery scandal linked to so-called private security firms; and (5) Mayor Adams is represented in his criminal indictment by Alex Spiro, who Plaintiff alleges is "Mr. Musk's personal attorney and widely recognized close advisor." Dkt. No. 136, at 1-2. Plaintiff contends "the close nexus of these individuals and events can no longer be ignored" and "[t]he judgment dismissing this case must be overturned." *Id.* at 2.

These allegations fail to meet the "stringent requirements" to merit reconsideration, for at least two reasons. *In re C-TC 9th Ave. P'ship*, 182 B.R. at 2.

*First*, Plaintiff's speculative allegations have no evidentiary basis, and as such do not

qualify as "newly discovered evidence" sufficient to merit reconsideration of the Dismissal

Order. *See, e.g.*, *Lee v. Cully*, No. 09-CV-6502 VEB, 2011 WL 5040693, at *3 (W.D.N.Y. Oct.

24, 2011) (denying motion for reconsideration based on plaintiff's allegations he had newly

discovered evidence that trial counsel conducted a deficient investigation but failed to attached

any evidence support that conclusory statement); *Yin v. Alvarado*, No. 1:11-CV-00780 EAW,

2017 WL 4417714, at *2 (W.D.N.Y. Oct. 4, 2017) (Plaintiff's "new" conclusory assertions that

the jury improperly considered her "delay" in bringing this action do not amount to "new

evidence."); *see also Simpson v. City of New York,* No. 12 CIV. 6577 KBF, 2014 WL 595759, at

*2 (S.D.N.Y. Feb. 10, 2014) (rejecting the plaintiff's "narrative" as "speculative" and denying

the motion for reconsideration); *Montanile v. Nat'l Broad. Co.,* 216 F. Supp. 2d 341, 344

(S.D.N.Y. 2002) (denying motion for reconsideration where "in her [prior] opposition papers and

in her motion for reconsideration, [the movant] merely rested on her inferential leaps and

speculative assertions").

    *Second*, even if Plaintiff had evidence to prove those allegations, they would not disturb

either of the Court's holdings in dismissing his claims against X Corp.—that Plaintiff (1) "fails

to show that X Corp. 'jointly acted' with a state actor such that it acted under the color of state

law" required to "hold[] X Corp. liable under section 1983," and (2) "fails to allege that X Corp.

violated any of his federal rights." (Dkt. No. 123 at 16, 18). *See Boule*, 328 F.3d at 95 (to merit

reconsideration, newly discovered evidence must be "relevant to the merits of the litigation").

    Regarding the "joint actor" requirement, the Court previously found that "the complaint

can only be read to assert that X Corp. and the other private party defendants engaged in 'joint

action' with a state actor — and, more specifically, that the state actor was 'a willful participant

in joint activity with the state.'" Dkt. No. 123 at 12 (citing *Sybalski v. Indep. Grp. Home Living*

*Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)).  "To establish joint action, a plaintiff must show that the private citizen and the state official shared a common unlawful goal" and that "the true state actor and the jointly acting private party . . . agree[d] to deprive the plaintiff of rights guaranteed by federal law." *Bang v. Utopia Restaurant*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996); accord *Wong v. Yoo*, 649 F. Supp. 2d 34, 55-56 (E.D.N.Y. 2009).

As recounted by the Court in the R&R, Plaintiff speculates that (1) "X Corp. *may* have contracted with the NYPD, through the NYPD's 'Paid Detail Unit,' to receive security services from off-duty officers and to obtain permits for its security personnel to carry concealed firearms;" and (2) the "NYPD's assault on him was part of certain 'coordinated tactics, intended to prevent Goodman from providing facts about the criminal past' of Twitter/X Corp." Dkt. No. 123 at 13-14 (emphasis added).

Plaintiff's new, speculative allegations about his alleged September 5, 2024 assault at the hands of purported NYPD officers, New York City Mayor Eric Adams and other New York City officials being the subject of criminal investigation, and Alex Spiro's representation of Mayor Adams with respect to his recent criminal indictment, would not plausibly establish either of those purported agreements existed. Indeed, the Court's reasoning in the R&R still applies to these new allegations:

> [As for the first alleged agreement,] [t]he absence of any facts showing that the agreement existed dooms any argument that such an agreement satisfied the 'joint action' test. Moreover, the agreement as imagined by the complaint is not an agreement 'to act in concert to inflict an unconstitutional injury,' but rather represents some general agreement or cooperation between a private party defendant and a state actor. This too means the state action requirement has not been met. Additionally, even if the Court were to accept the complaint's assertion that Goodman's assailants were X Corp. security personnel and that they were off-duty NYPD officers, the assertion would be insufficient to create state action because '[g]enerally, the acts of private security guards, hired by a company, do not constitute state action under § 1983.'

> …[As for the second alleged agreement,] [t]hese allegations fail because they amount to nothing but speculative and conclusory allegations of conspiracy lacking any factual basis.

Dkt. No. 123 at 13-16 (internal citations omitted).

Plaintiff's new allegations also would not establish X Corp. violated his federal rights. As the Court reasoned:

> [E]ven if we were to find that Goodman plausibly alleged a conspiracy between X Corp. and a state actor, Goodman fails to allege that X Corp. violated any of his federal rights. 'Private employers are not liable under § 1983 for the constitutional torts of their employees . . . unless the plaintiff proves that 'action pursuant to official . . . policy of some nature caused a constitutional tort.'' *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990) (emphasis omitted) (quoting *Monell v. Dep't of Social Serv. of the City of New York*, 436 U.S. 658, 691 (1978)); accord *Calderon v. St. Barnabas Hosp.*, 2022 WL 15523409, at *3 (S.D.N.Y. Oct. 24, 2022). Here, Goodman does not allege any 'policy, custom, or practice of [X Corp.] caused a violation of [his] federal constitutional rights.' *Calderon*, 2022 WL 15523409, at *3. Indeed, he alleges no policy at all.

Dkt. No. 123 at 16 (internal citation omitted). Plaintiff's new allegations do not address, much less demonstrate, that X Corp. had any "policy, custom, or practice" that caused any violation of his federal rights. *See id.*

In sum, Plaintiff's new allegations, which lack any evidentiary support, come nowhere close to "satisfy[ing]" the "stringent requirements" to merit the "extraordinary judicial relief" Plaintiff seeks. *In re C-TC 9th Ave. P'ship*, 182 B.R. at 2 (N.D.N.Y. 1995); *Mikhaylova*, 2022 WL 17986122, at *1.


[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**V.**    **CONCLUSION**

For these reasons, the Court should deny Plaintiff's Motion for Reconsideration.


Respectfully submitted,

WILLENKEN LLP

_/s/ Kenneth M. Trujillo-Jamison_
Kenneth M. Trujillo-Jamison
(admitted _pro hac vice_)
Peter Shimamoto
707 Wilshire Blvd., Suite 3850
Los Angeles, CA 90017
Telephone: (213) 955-9240
Facsimile: (213) 955-9250
ktrujillo-jamison@willenken.com

_Attorneys for Defendant X Corp._

Dated: October 11, 2024